# EXHIBIT 1

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

INTERNATIONAL ARBITRAL TRIBUNAL

Case No. 50 168 T 00322 06

April 28, 2009

In the Matter of the Arbitration between:

Cardell Financial Corp. (Claimant)
vs.
Suchodolski Associates, Inc. and Consultora Worldstar, S.A. (Respondents)

---

Suchodolski Associates, Inc. and Consultora Worldstar, S.A. (Third Party Claimants)
vs
Deltec Holdings, Inc. (Third-Party Respondent)

---

## FINAL AWARD

   We, undersigned Arbitrators, having been designated in accordance with the arbitration agreement incorporated into Section 19 of the Stock Pledge Agreement dated November 30, 2001, entered into by and among Cardell Financial Corp. ("Cardell" or "Claimant"), Suchodolski Associates, Inc. ("SAI"), Consultora Worldstar, S.A. ("Worldstar" or "WS") (collectively "SAI/WS", "Respondents", or "Third-Party Claimants"), Metropolis Shipping and Business, Inc. ("Metropolis"), and Deltec Holdings, Inc., ("Deltec" or "Third-Party Respondent", then known as "Brastar Corporation"), and having been duly sworn as Arbitrators and duly heard the proofs and allegations of the Parties pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("AAA Rules" or "Rules") , do hereby, AWARD as follows:

### I. THE PARTIES

1.  Cardell is a corporation organized under the laws of the Republic of Panama, with its registered place of business at calle Aquilino de la Guardia No. 8, IGRA Building, Panama City;  SAI is a corporation also organized under the laws of Panama, with its principal place of business at Arias, Fabrega & Fabrega, Plaza Banco Mer, Calle 50, Panama City; WS is a corporation organized under the laws of Uruguay, with its principal place of business at Plaza Independencia No. 811, Montevideo, Uruguay; and Deltec is organized under the laws of the Republic of Panama and operates as a holding company for four subsidiaries whose principal assets are certain real estate properties in Sao Paulo, Brazil.[1]

---

[1]   Deltec's assets are held primarily by two subsidiary corporations: Anastácio Emprendimientos Imobilarios e Participaçoes ("Anastácio"), the principal holder of Deltec's real estate, and Companhia City de

Claimant and Third-Party Respondent are represented by John H. Doyle III, now at the law firm of Reed Smith, LLP,  Michael J. Lane, Helen J. Williamson, and Greg Hansen of the law firm of Anderson Kill & Olick, P.C. Respondents and Third-Party Claimants are represented by Michael Evan Jaffe, now at the law firm Pillsbury, Winthrop, Shaw, Pittman LLP, and David L. Kelleher, now at Jackson & Campbell P.C.

## II. PROCEDURAL HISTORY AND SUMMARY DISPOSITION

2.  Claimant's Demand for Arbitration was filed on July 26, 2006 ("Demand for Arbitration"), followed by Respondents' "Answering Statement and Third-Party Demand for Arbiration" ("Answering Statement," filed on August 16, 2006) and Claimant's "Response to Answering Statement and Third-Party Demand for Arbitration With Counterclaims" ("Counterclaims", filed on August 31, 2006).

3.  Cllaimant nominated Sheldon H. Elsen Esq., as an arbitrator and Respondents nominated Platt W. Davis III, Esq. Pursuant to Section 19 of the SPA, the third arbitrator was appointed by the AAA pursuant to the AAA Rules. Thus, on September 14, 2007,  Professor Alejandro M. Garro was invited to preside over the tribunal by the International Centre for Dispute Resolution. The Tribunal was constituted on that day, upon Professor Garro's acceptance of his appointment.

4.  Pursuant to the Commercial Arbitration Rules of the American Arbitration Association  (hereinafter the "AAA Commercial Arbitration Rules" or simply "the Rules"), including its "Procedures for Large, Complex Commercial Disputes" (hereinafter "Procedure for Complex Disputes") the first step taken by the Tribunal was to schedule a preliminary hearing (R-20 of the Rules and L-3 of the Procedure for Complex Disputes). Accordingly, a preliminary hearing by telephone conference was held on October 30, 2007. In that preliminary hearing, the members of the Tribunal sought to obtain additional information from the parties, inquired as to the extent to which they intended to seek discovery, and invited the parties to agree on the procedural steps to be taken during the course of the proceedings. Claimant requested an opportunity to submit a request for summary disposition of the issues, which the Tribunal answered by stating that such request would be entertained at a later point in time.

5.  On November 5, 2007, the parties submitted a draft "Stipulation and Scheduling Order," which the Tribunal adopted in substance in Procedural Order No. 1, dated November 12, 2007 ("PO No. 1"). According to the calendar adopted in this procedural order, the parties were scheduled to engage in an exchange of briefs, with which they complied pursuant to the following sequence: Claimant and Third-Party Respondent's  Motion for Summary Judgment and Statement of Uncontested Facts ("*Cardell and Deltec's Motion for Dispositive Relief*"), attaching the declarations of Erick S. Akhund ("*Akhund Decl.*"),  John Y. Freeman ("*Freeman Decl.*"), and Helen J. Willamson ("*Williamson Decl.*"); Respondents' and Third-Party Claimants'

---

Desenvolvimento ("Cia City"), a provider of land development services (Williamson Decl. Ex. 13). Respondents allege that Deltec's real estate holdings in Brazil are of significant value, far exceeding the outstanding balance of the loan owed by Deltec to Respondents. Cardell does not deny these allegations but consistently maintains its irrelevancy for the purpose of deciding this dispute. See Cardell and Deltect Responses to Respondents' Statement of Material Facts As to Which There is No Genuine Issue to Be Tried ("Cardell and Deltec Responses") at 10-13.

Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried, Responsive Statement of Material Facts As To Which There Is No Genuine Issue, Statement of Legal Issues That Can Be Heard and Decided Without Discovery, Statement Outlining Proposed Discovery and Request For Hearing ("*SAI/Worldstar's Statements*") and Memorandum in Opposition to the Motion by Cardell Financial Corp. and Deltec Holdings, Inc. for Summary Judgment Dismissing the Third Party Demand ("*SAI/Worldstar's Memorandum in Opposition*"); Claimant and Third-Party Respondent's Reply Memorandum of Law in Further Support of the Motions for Summary Judgment ("*Cardell and Deltec's Reply Memorandum*"), Response to Respondents' Statement Outlining Proposed Discovery (*Cardell and Deltec's Response to Discovery Request*"),   Response to Respondents' Statement of Material Facts as to Which There is No Genuine Issue to be Tried ("*Cardell and Deltec's Response to Statement of Material Facts*"), attaching the Supplemental Declaration of Erik S. Akhund ("*Akhund Supp. Decl.")* and the Supplemental Declaration of Helen J. Willamson ("*Williamson Supp. Decl.*").

6.  Following this exchange of briefs, on February 6, 2008 the Tribunal issued Procedural Order No. 2 ("PO No. 2"), affirming its jurisdiction to decide the claims and counterclaims submitted by the parties (PO No. 2, Para. 6), providing for limited discovery in favor of SAI/WS (PO No. 2, Pars. 8-10). After the parties had filed voluminous papers on the claimant's motion for summary disposition, the Tribunal decided to schedule a hearing so that Claimants would produce its key witness on the auction, Mr. John Freeman, and Respondents could avail themselves of the opportunity to cross-examine him in order to develop issues of material fact on the "commercial reasonableness" of the public auction.

7.  Thus, the Tribunal issued Procedural Order No. 3, February 25, 2008 ("PO No. 3"), scheduling an in-person hearing for March 19 or March 21, 2008, for the cross and redirect examination of Mr. John Freeman (PO No. 2, Pars. 10-11; PO No. 3, Pars. 3-4). After the hearing was held, the Tribunal affirmed its authority to focus on the issues relevant to the case and to summarily dispose of those issues for which no material facts were in dispute (AAA Rule 30(c) and PO No. 3, Par. 5.

8.  Respondents were also permitted to file evidence and they filed an affidavit by Andres G. Otero, who disagreed with some of Mr. Freeman's decisions. As noted further below in this award, Mr. Otero's suggestions as to how Claimants should have conducted the public hearing ignores Cardell's rights under the Stock Pledge Agreement, such as Cardell's rights to set the method, manner, place and terms of the auction. The dissenting opinion's contention about a fair price, reflecting the arguments raised by Respondents, is rejected by the majority opinion. Indeed, as stated above, the majority holds that none of the points raised by Respondents are relevant and material to the issue of commercial reasonableness of the public sale under New York law.

9.  The dissenting opinion suggests that nothing would be lost by setting the matter down for trial. In the view of the majority, however, this suggestion ignores the history of the case, set forth further below, which includes four years of litigation, hearings for injunctions, judicial proceedings in New York and Brazil, and a prior arbitration, in none of which Respondents have prevailed. There must come a time when there is an end to litigation. In the view of the majority, no issues of material fact were left after

3

the hearing and summary disposition was the appropriate course of action to follow.[2]
Also in Procedural Order No. 2, the Tribunal decided that the arbitration hearings
"shall not be closed until the Tribunal expressly decides that the record is complete,
declaring the hearings formally closed" (PO No. 2, Par. 14).

10. On March 19, 2008, SAI/WS alleged that Cardell and Deltec had failed to comply
with the Tribunal's directive to produce documents that are relevant and material to
the question whether the auction had been conducted in a commercially reasonable
manner (PO No. 2, Par. 8). Cardell and Deltec replied the next day that, having
complied with the Tribunal's order to produce, they had no other documents in their
possession or control that were relevant to the question whether the auction had been
conducted in a commercially reasonable manner.

11. Having held an evidentiary hearing to examine Mr. Freeman, and after hearing legal
arguments on the parties' positions regarding the "commercial reasonableness" of the
sale and SAI/WS's third party-claim against Deltec for reimbursement, the Tribunal
issued Procedural Order No. 4 ("PO No. 4") on April 5, 2008, directing the parties to
file post-hearing briefs by April 28, 2008, with reply briefs due on May 12, 2008.
While the parties were free to address in their post-hearing briefs the issues they deem
most relevant to this arbitration, the Tribunal directed the parties' attention to some
issues listed by the Tribunal in Paragraph 3 of Procedural Order No. 4. The parties
filed their post-hearing submissions pursuant to those terms.

12. After a period of robust and extended deliberation on the claims and counterclaims
before the Tribunal, only two of its members were able to reach a consensus on its
outcome and supporting rationale. Having reached a majority decision in favor of
granting Claimant's and Third-Party Respondent's demands, dismissing those
submitted by Respondents, the Tribunal was set to proceed, pursuant to Section 19 of
the SPA, with the allocation of reasonable costs and attorneys' fees incurred in the
First Arbitration (an issue also falling under the scope of the arbitration agreement)
and in this arbitration.[3]

13. Thus, on December 26, 2008, the Tribunal issued Procedural Order No. 5, requesting
Claimants to submit by January 19, 2009, an account of the attorneys' fees and
disbursements spent in connection with the First Arbitration and with this arbitration,

---

[2] Replicating standards applicable to motions for summary judgment in court proceedings, the dissent takes
issue with the view of the majority of the arbitrators to proceed with a decision on the merits after
scheduling a hearing. It is worth at this point to quote Rule 30 (b) & 31 (b): *"The arbitrator, exercising his
or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and
may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on
issues the decision of which could dispose of all or part of the case."* *"The arbitrator shall determine the
admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the
arbitrator to be cumulative or irrelevant."*

[3] Respondents submitted to this Tribunal that the Demand for Arbitration did not seek recovery of any fees or
costs incurred in connection with the First Award (Letter of David L. Kelleher on Respondents' behalf, dated
January 16, 2009). Claimants deny this allegation, referring to Paragraph 26 of their Demand for Arbitration
("...Accordingly, Cardell as the prevailing party was entitled to an award of attorneys fees") and to page 7 of its
Response to the Answer and Third-Party Demand (Letter of Michael J. Lane dated January 20, 2009). This
issue is now moot in light of the intervening decisions referred to below, resulting in Claimants' decision to
confine its petition to attorneys' fees and costs incurred exclusively in this arbitration proceedings.

providing Respondents the opportunity to comment within ten days. At the request of the parties, the Tribunal extended those periods, respectively, to January 20 and February 12, 2009. However, in light of intervening decisions of the District Court and the Second Circuit, Counsel for the Claimants represented to this Tribunal that they are not seeking an award on attorneys' fees and costs in connection with the First Award (Letter of Michael J. Lane dated January 20, 2009).[4]

14. After reviewing the parties' submissions and extensive exchanges between the members of the Tribunal, being satisfied that the record is complete, the closure of the hearing was formally declared (AAA Rules, R-35) (Letter of the Tribunal of April 10, 2009), thus proceeding with the rendering of the final award. On April 13, 2009, Respondents filed an objection, requesting the reopening of the proceedings in order to obtain discovery from Claimants and the opportunity to present what Respondents regard as evidence pertinent and material to this arbitration. Respondents' objection was rejected and, referring to Articles 31, 35, and 41 of the AAA Rules, the Tribunal proceeded with the making of the award.

### III.     SUBJECT MATTER OF THIS ARBITRATION

15. Claimant relies on an arbitration clause embodied in a "Stock Pledge Agreement" ("SPA") dated November 30, 2001, seeking an award declaring that the public auction conducted on January 27, 2005 (the "Public Auction") and other actions taken by Claimant were conducted in a commercially reasonable manner, plus an award for the reasonable costs and attorneys' fees incurred by Claimant in connection with this and with a previous arbitral proceeding, as well as any other relief the Tribunal deems just.[5]

16. Respondents dispute the commercial reasonableness of the Public Auction, claiming the existence of material facts on which they seek to submit evidence, calling for discovery from Cardell and Deltec on the selection and sale of the collateral and on the value of their shares in Deltec at the time they lost those shares.[6] Respondents also

---

[4]  The First Award stated that "*Cardell shall not receive any award or attorneys' fees and costs unless Claimants [SAI/WS]...initiate any challenge to this arbitration award in a Brazilian or Panamanian court.*" First Award, at 11-12.  Judge Pauley's Order of January 3, 2006, however, did not set any amount, apparently interpreting that holding of the First Award to entitle Cardell to an award of attorneys' fees and costs incurred in the prosecution of the motion for the antisuit injunction, rather than in connection with the prosecution of the First Arbitration. Cardell thereafter filed an application for $286,855 of attorneys' fees, but the U.S. District Court had not yet ruled on that application when the Demand was filed on July 25, 2006. In August, 2006, SAI/WS filed an appeal of Judge Pauley's Order of January 3, 2006, Cardell filing a cross-appeal solely on the attorneys' fee decision. In January, 2008, the Second Circuit affirmed Judge Pauley's Order of January 3, 2006, but it ruled that it lacked jurisdiction on the award of attorneys' fees and costs, since the District Court had not set any amount of fees in that order (Letter of Michael J. Lane, dated January 20, 2009). On December 18, 2008, Judge Pauley rejected as unreasonable 88% of Claimants' fees and 100% of Claimants' costs. Judge Pauley's Memorandum & Order of December 18, 2008, annexed to Respondents' Suchodolski Associates, Inc., And Consultora Worldstar, S.A.'s Response in Opposition to Claimants' Fee Application" ("Respondents' Opposition").
[5]  Demand for Arbitration, dated July 25, 2006 ("Demand for Arbitration") at 25-26.
[6]  Suchodolski Associates Inc. and Consultora Worldstar, Inc's Post-Hearing Memorandum Submitted Pursuant to Procedural Order No. 4 ("Respondents PH Brief") at 32.

requested an in-person hearing on matters raised by the filings of the parties in regard to the issue of commercial reasonableness.[7]

17.  Respondents also brought a Third-Party Demand for Arbitration Against Deltec, asking for an award of $2.5Million or such greater amount as their shares in Deltec that were foreclosed upon by Cardell are worth, plus a declaratory award that the Tribunal's award in this arbitration does not limit or in any way restrict Respondents' rights to assert claims against "any party or non-party to the proceeding that may be barred by the January 3, 2006, injunction of the U.S. District Court that is on appeal to the U.S. Court of Appeals."[8]

18.  What follows is a summary of the facts providing a contextual framework to the dispute, followed by a description of the arbitration clause supporting the jurisdiction of the Tribunal to settle this dispute, a summary of the procedural history leading to this final award, an account of the factual setting with a summary of the claims and counterclaims brought by the parties, reference to the arbitral clause and the law applicable to the merits, the reasons for the Tribunal's findings, and the conclusions and order issued by the majority opinion.

## IV. FACTUAL SETTING IN LIGHT OF THE POSITIONS OF THE PARTIES

### A. The November 2001 Agreements

19.  In 2001, three of the four parties in this arbitration, Cardell, SAI, and WS, together with "Metropolis Shipping & Business, Inc." ("Metropolis"), formed a Panamanian holding company known as "Brastar Corporation" ("Brastar"), which was the predecessor of Deltec. Brastar issued 100 shares of stock. Pursuant to a Stockholders Agreement, SAI, WS, Cardell, and Metropolis, each acquired a 25% interest in Brastar. Thus, each of SAI, WS, and Metropolis owned 25 shares of common stock, Cardell retaining 25 shares of Series A Preferred Stock.[9]

20.  In November 2001, Brastar merged into Deltec, which was the surviving corporation. Brastar was a shell corporation with no assets, so in order to finance the purchase of all of the shares of Deltec's stock by Brastar, the parties entered in a series of contracts ("the November 2001 Agreements") providing much of the legal framework on which Cardell's claims against the Respondents, and Respondents' Third-Party Demand against Deltec, are based.

---

[7]  Suchodolski Associates Inc. and Consultora Worldstar, Inc's (1) Statement of Material Facts As To Which There is No Genuine Issue To Be Tried; (2) Responsive Statement of Materal Facts As To Which There is No Genuine Issue; (3) Statement of Legal Issues That Can Be Heard and Decided Without Discovery; (4) Statement Outlining Proposed Discovery; and (5) Request For Hearing ("SAI/Worldstar's Statements"), passim.
[8]  Respondents' Answering Statement and Third Party Demand for Arbitration, dated August 16, 2006 ("Answering Statement and Third-Party Demand") at 4.
[9]  Demand for Arbitration at 4; Akhund Decl. Pars. 5-6; Williamson Supp. Decl., Tab 4, at 17142 et seq.). Cardell's preferences over the common stock included a substantial liquidation preference in the event more than 50% of the common stock was sold to a person not a shareholder of the company. Williamson Supp. Decl., Tab 4, at 17142.

21. In addition to creating a capital structure protecting Cardell's preferred stock and liquidation preferences,[10] Cardell demanded and obtained, under the November 2001 Agreements, security interests in various assets belonging to Brastar, Deltec, and Deltec's subsidiaries.[11] The contracts pertaining to the November 2001 Agreements took the form of a contract of pledge (the "Stock Pledge Agreement" or "SPA"), a contract of guaranty ("the Guaranty"), and a subordination agreement ("the Subordination Agreement").

22. The parties differ widely in their assessment of the business expectations arising out of their association. Most significantly, this arbitration is preceded by a previous arbitration and much litigation arising out of the November 2001 Agreements. This wide disparity of views calls for an account of the shared understanding with which the parties entered into the November 2001 Agreements, without losing sight that the jurisdiction of this Tribunal is limited to settle those disputes arising out of the SPA that have not been already submitted to another arbitral tribunal and other courts that have reached a final decision on those disputes.

23. The Loan Agreement.  In anticipation of the acquisition of shares by Brastar, Cardell made a loan for $12.8 million to Deltec pursuant to a Term Loan Agreement dated November 30, 2001 (the "Loan Agreement" or "Cardell Loan"). Under the Loan Agreement, Cardell was the Lender, Deltec was the Borrower primarily responsible for the "Loan Obligations", and Brastar was a guarantor of Deltec.[12] Also pursuant to the terms of this Loan Agreement, Cardell received security interests in various assets belonging to Deltec (formerly Brastar) and Deltec's subsidiaries. Thus, according to Section 4.1 of the Loan Agreement, Cardell obtained a security interest in each of Brastar's, Deltec's, and Deltec subsidiaries' accounts, books, contract rights, intellectual property rights, and accounts. Under Section 6.5(b) of the Loan Agreement, Cardell also obtained "first priority mortgages on selected real estate owned by Deltec".[13]

24. The maturity date for the Cardell Loan was May 30, 2003, when all outstanding principal and interest was to be paid in full. Neither of the Respondents signed the Loan Agreement, so neither SAI or WS  were bound to pay Cardell for Deltec's debt under the Loan Agreement. Therefore, the disputes submitted to this Tribunal do not arise under the terms of the Loan Agreement. However, this $12.8 million loan by Cardell to Deltec is relevant to understand Cardell's interest and expectations in demanding the conclusion of an additional security agreement (i.e., the SPA), as well as to assess Respondents' expectations regarding what they were reasonably entitled to gain and what they risked to lose by entering into the SPA.

25. The parties' positions regarding what Cardell and SAI/WS/Metropolis bargained for under the Loan Agreement. According to Cardell, who advanced most of the funds that made possible the payment for Deltec's shares by Brastar,[14] Deltec was actually

---

[10] See Claimant's and Third Party Defendant's Post-Hearing Brief ("Cardell's PHBrief") at 37.
[11] SAI/Worldstar's Statements, Par. 7, at 4.
[12] After Brastar acquired the shares of Deltec, Brastar and Deltec merged, Brastar changing its name to Deltec (Akhund Decl. Par. 7).
[13] SAI/Worldstar Memorandum in Opposition, at 4, note 2.
[14] Cardell and Deltec's Reply Memorandum at 2 ("...It was Cardell, not Deltec, that demanded such pledge because Cardell, through its Loan, had paid the purchase price for the shares of Deltec...").

a "nominal Borrower" for the benefit of all shareholders.[15] It is also Cardell's position that "Respondents' equity contribution at risk was only $5,000 each," with the rest of the money being put up by Cardell, who insists that full responsibility for the payment of the Cardell Loan rested all along on the Respondents.[16]

26. In contrast, SAI and WS emphasize that each of the four shareholders (SAI, WS, Metropolis, and Cardell) invested $5,000 in equity contributions in return for 25 shares of stock. Respondents do not dispute that Deltec borrowed $12.8 Millon from Cardell, but they emphasize that  $4 Million were repaid within weeks and that the $8.8 Million remaining were secured with assets far exceeding the amount of Cardell's loan.

27. The Subordination Agreement. Respondents also find relevant that Deltec borrowed $1 Million from SAI, WS and Metropolis (each granting a $333,333.33 loan). This $1 Million claim against Deltec stands behind repayment of the Cardell Loan due to a subordination agreement binding on Respondents.[17] Accordingly, SAI and WS were to receive no payments by Deltec until those loan obligations were paid in full to Cardell.[18] In connection with their contention that the Public Auction was not commercially reasonable, it is Respondents' position that through Cardell's decision not to enforce its security interests in Deltec's assets other than the shares owned by Respondents, Cardell left part of Deltec's debt outstanding, somewhat unfairly preventing repayment of the SAI/WS/Metropolis' $1 Million loan.[19]

28. The Stock Pledge Agreement (SPA). On November 30, 2001, the same date that the Loan Agreement was executed, Cardell, as secured party or pledgee, and SAI, Worldstar, and Metropolis Shipping and  Business, Inc., ("Metropolis," a non-party to this proceeding whose 25 shares in Deltec were subsequently acquired by Cardell), as pledgors, entered into a Non-Recourse Stock Pledge Agreement (SPA). The relevance of the SPA to the November 2001 Agreements is that the conclusion of the SPA was a precondition, inter alia, to the closing of the Loan Agreement and the advancement of the funds by Cardell.[20] Thus, pursuant to the SPA, SAI, WS, and Metropolis pledged

---

[15]  Cardell and Deltec's Response to Statements of Material Fact, Response to Material Fact No. 5, at 3.
[16]  Cardell's PHBrief at 2-3 ("*Respondents' equity contribution at risk was only $5,000 each. Respondents were not passive investors, rather, their principals Messrs. Beno Suchodolski and Nelson Baeta, were directors of Deltec, and Mr. Suchodolski, was the Chairman and President of Deltec responsible for running the business. See Ex. 98. It was Respondents' contractual duty to ensure that Deltec had sufficient funding (either from themselves or other entitites) to meet the loan obligations due to Cardell in May, 2003...*").
[17]  See Subordination Agreement, Paragraph B of its preamble (*All of the indebtedness, liabilities and obligations of Brastar [now Deltec] owing to the Subordinated Lender, whether now existing or hereafter arising under the Subordinated Loan Document, whether for principal, interest, fees, costs, expenses or indemnification obligations..are hereinafter referred to as the "Subordinated Debt".*).
[18]  Demand for Arbitration, note 4 at 4.
[19]  Respondents' PH Reply Brief at 5 ("*The SAI/Worldstar/Metropolis loan stands behind repayment of the Cardell loan. By electing not to liquidate its debt despite the directive in the Final Award, Cardell carries the remaining unpaid balance as an outstanding loan obligation. Williamson Decl. Ex. 24. By this artifice, Cardell keeps the SAI/Worldstar/Metropolis loan subordinated, denying SAI/Worldstar/Metropolis any repayment. Cardell could direct payment of the debt at any time, or act to collect the debt at any time. But by leaving a part of the debt "outstanding" it prevents any repayment of the SAI/Worldstar/Metropolis loan.*").
[20]  Loan Agreement, Section 3.1(a)(3) ("*The obligation of Lender to make the Term Loan and the closing on the Closing Date is subject to the condition precedent that Lender shall have received, in form and substance satisfactory to Lender, ...(3)(i) the Stock Pledge Agreement duly executed by the Principals of Brastar (SAI/WS and Metropolis...*").

their shares of stock in Deltec as collateral for Deltec's performance under the Loan Agreement.[21]

29. <u>The parties' positions regarding Respondents' obligations under the SPA.</u> There is no question that the Respondents were not parties to the Loan Agreement, that the primary obligor to Cardell under both the Loan Agreement and the SPA was Deltec, and that SAI's and WS's (and Metropolis') shares of stock in Deltec were to be used to pay Cardell in case of Deltec's default. The parties disagree, however, on whether Respondents were also guarantors or sureties under the SPA, and on the consequences to be derived from such characterization.

30. Respondents allege that SAI, WS, and Metropolis "became secondary obligors bound to Cardell for Deltec's debt under the Term Loan Agreement (Stock Pledge Agreement)."[22] In contrast, it is Cardell's position that Respondents were not secondary obligors under the SPA because neither SAI nor WS (or Metropolis) contracted personal liability to pay Cardell in the event of Deltec's default.[23] According to Cardell, what Respondents contracted was "a non-recourse pledge of their shares of stock in Deltec as collateral for Deltec's performance under the Cardell Loan Agreement."[24]

31. Regardless of the consequences that the parties derive from the different characterization of Respondents' obligatory status, it is not contested at this point in time that in case of Deltec's default Cardell was not bound to try to collect from Deltec first.[25] It is also clear under the terms of the SPA that Cardell's sole recourse, in case of Deltec's default, was to foreclose upon their pledged shares, SAI, WS, and Metropolis not being bound to pay any deficiency.[26]

32. <u>Other Security Agreements.</u> Part and parcel of the November 2001 Agreements, aimed at securing Cardell's financing of the purchase price of Deltec's shares of stock, was a "Guaranty and Security Agreement," also dated November 30, 2001 (the

---

[21] SPA, Section 1(a) ("*As collateral security for the payment and performance in full of the Pledge Obligations, each Pledgor hereby pledges...and hereby grants to Lender a security interest in, [sic] all the Capital Stock of the Issuer which Pledgor may now or herafter own, including, but not limited to, the presently owned Capital Stock described in Schedule 1 hereto, together with the proceeds thereof....hereinafter collectively referred to as the "Pledged Securities"...*).

[22] SAI/Worldstar Statements, Par. 8, at 5. Indeed, Respondents allege that, by virtue of pledging their shares of stock in Deltec, they "*became guarantors/sureties security Deltec's repayment of the debt that it owed to Cardell.*" SAI/Worldstar Memorandum in Opposition, at 4.

[23] Cardell and Deltec's Reply Memorandum at 5 (arguing that Respondents "*were not bound to pay Cardell for Deltec's debt under the Term Loan Agreement; Respondents (and Metropolis) had no personal liability to pay the Loan, and if Cardell foreclosed upon their pledged shares, Respondents (and Metropolis) had no further liability in the event of a deficiency (Stock Pledge Agreement).*"

[24] Cardell and Deltec's Reply Memorandum at 5.

[25] SPA, Section 2 ("*This Agreement is made, and the security interest created hereby is granted to Lender, to secure prompt payment and performance of the Pledge Obligations..... Accordingly, Lender may enforce this Agreement against... the Pledged Securities without first instituting collection proceedings against Borrower.*"). Emphasis added.

[26] SPA, Section 1(b) ("*This is a nonrecourse Stock Pledge Agreement, and, anything hrein to the contrary notwithstanding, Lender agrees... that (a) neither Pledgor...or assigns shall be personally liable on the Pledge Obligations secured by this Stock Pledge Agreement, it being intended that in the event of default, Lender...shall look solely to the Pledged Securities and will not make any claim or institute any action or proceeding against Pledgor...*"). See also SPA, Section 11(d) ("*Pledgor shall not be liable for any deficiency remaining upaid after such application of proceeds to the Pledge Obligations...*").

"Guaranty"). Pursuant to the Guaranty Agreement, Deltec's subsidaries ("Anàstacio" and "Cia City") granted to Cardell "first priority mortgages on selected real estate,"[27] also pledging their shares, receivables, and intellectual property assets in favor of Cardell.

### B. Settlement of Disputes Under the November 2001 Agreements

33. The Loan Agreement and the various security agreements concluded between the parties provide for the application of New York law by New York (federal and state) courts in case a dispute were to arise under those contracts. However, each of the relevant November 2001 Agreements also includes an arbitration clause, to which the choice-of-forum clause is subordinated.[28] Thus, whereas under Section 18 of the SPA the parties expressly consented to the application of New York law, submitting to the exclusive jurisdiction of the New York courts,[29] under Section 19 of the SPA the parties submit to arbitration all disputes arising out of the SPA.[30]

34. Accordingly, the jurisdiction of the New York courts is limited to those issues not falling under the arbitral clause or to reviewing arbitral rulings if and to the extent allowed by the law applicable to the arbitration. Thus, the jurisdiction of this Tribunal extends to those disputes "*arising out of, or in connection with, the execution, interpretation, performance or non-performance*" of the SPA (SPA, Section 19).

### C. Deltec's Default and Respondents' Efforts to Derail Cardell's Foreclosure

35. The principal amount of the Cardell Loan outstanding as of May 30, 2003, had been reduced to approximately $7.8 million . However, the Cardell Loan went into default on May 30, 2003,  triggering  Cardell's rights as a secured creditor, which Cardell had bargained for under the November 2001 Agreements. Those rights included the right to foreclose on the pledges and security interests attached and perfected under the SPA, the Loan Agreement, the Guaranty, and the Subordination Agreement, including Cardell's right to foreclose on the shares and mortgages held by Deltec's subsidiaries as well as on Respondents' shares of Deltec (Loan Agreement, Section 8.1; SPA, Section 11).

---

[27] See SAI/Worldstar's Statements, Par. 7 ("...*In connection with the Cardell Loan... [a]mong the security interests, Cardell received security interests in each of Brastar, Deltec and each Deltec subsidiary's accounts, books, contract rights, intellectual property and receivables. Cardell received first priority security interests in the capital stock of each Deltec subsidiary. Cardell received first priority mortgages on selected real esetate owned by Deltec (Term Loan Agreement)*.".
[28] Conf. Loan Agreement, Section 11.2; Stockholders Agreement, Section 8.6; SPA, Section 19.
[29] SPA, Section 18 ("*This Agreement and any documents and instruments delivered in connection herewith and therewith and the rights and duties of the parties hereunder and thereunder shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of New York, without regard to principles of conflicts of law. Each Pledgor and Lender hereby submits to the exclusive jurisdiction of the state and Federal courts located in the County of New York, State of New York, subject to Section 19.*).
[30] SPA, Section 19 ("*...any dispute arising out, or in connection with, the execution, interpretation, performance or non-performance of this Agreement (including the validity, scope and enforceability of these arbitration provisions) shall be settled by arbitration...*").

36. Foreclosing on Respondents' shares in Deltec was what Cardell saw fit to do from the moment of Deltec's default in May, 2003. However, for more than four years Respondents vigorously opposed Cardell's efforts to collect on its debt, applying for temporary or preliminary injunctions, promoting an arbitration proceeding, and filing lawsuits before New York and Brazilian courts. Those efforts were ultimately unsuccessful, yet it is relevant to trace each of Respondents' steps in order to focus on what is left to be decided by this Tribunal and the extent to which this award may put an end to this arbitration and litigation saga.

37. The 2003 TRO. Arguing that an injunction was necessary to preserve SAI's, WS', and Deltec's rights pending the arbitration of certain claims arising under the SPA, on June 6, 2003, Respondents obtained an *ex parte* temporary restraining order from the U.S. Court for the Southern District of New York (the "U.S. District Court"). The TRO enjoined Cardell from enforcing any of its rights under the Loan Agreement, the SPA, and any other related transactions (the "2003 TRO").[31] The U.S. District Court referred the matter to arbitration and issued a preliminary injunction "pending resolution of the underlying dispute in arbitration."[32]

38. The First Award. A few days after the issuance of the 2003 TRO, SAI, WS and Deltec brought a demand for arbitration (the "Initial Arbitration" or "First Arbitration"), alleging that "Cardell should not be permitted to exercise its rights under the November 2001 Agreements".[33] The arbitral tribunal (the "First Panel") issued an award on July 8, 2004, rejecting each of Claimants' arguments,[34] confirming Deltec's default , and authorizing Cardell to exercise its remedies under the 2001 November Agreements (the "First Award" or the "Final Award").

39. This First Award gave Deltec one final chance to repay the Cardell Loan in order "to stabilize Deltec's operations, and thereby maximize Deltec's value" ("Stabilization Period").[35] At the end of this Stabilization Period, if the loan were to remain unpaid, Cardell was authorized to exercise its foreclosure rights.[36] Acknowledging Cardell's "panoply of potential remedies" under the November 2001 Agreements,[37] the First Award called for "the fashioning of specific remedies"[38] and directed Cardell in its often-cited Paragraph 6 to *"foreclose on its collateral as is required to liquidate its debt in the most commercially reasonable manner given the then-existing circumstances...".*[39]

---

[31] On December 9, 2003, the US District Court issued a preliminary injunction "pending resolution of the underlying dispute in arbitration". Demand for Arbitration, at 7, note 8.

[32] Demand for Arbitration, Para. 21.

[33] First Award, at 7.

[34] First Award, at 7.

[35] See Demand for Arbitration, Para. 24; Respondents' Consolidated Statement, Para. 13.

[36] First Award, at 11 (holding that Cardell *"shall not attempt to foreclose on any collateral or exercise any other remedies under the Loan Documents, except as explicitly set forth herein, until the earlier of October 15, 2004 or the date upon which Claimants other than Deltec attempt to institute bankruptcy proceedings against Deltec or any challenge to this arbitration award in a Brazilian or Panamanian court ("the Stabilization Period").*

[37] First Award, at 9.

[38] Frist Award, at 10 (*"Where therefore believe that commercial reasonableness and principles of equity require the fashioning of specific remedies out of the range of theoretically possible alternatives available to Cardell under the Loan Documents..."*).

[39] First Award, Para. 6 at 12. The Frist Award also authorized Cardell to exercise warrants for the issuance of additional shares of stock in Deltec, In July 2004, Cardell exercised its warrant for 15 new shares of Deltec

40. Pursuant to the SPA and the Loan Agreement, the First Panel was authorized to award reasonable costs and attorneys' fees to the prevailing party. The First Award provided that Respondents were conditionally excused from bearing the costs of the arbitration and attorneys' fees unless Respondents were to challenge the award in Brazil or Panama.[40]  In light of Respondents' subsequent challenge in Brazil of what was decided in the First Award,[41] Cardell *initially sought to* recover the costs, expenses and attorneys' fees incurred in connection with the First Arbitration.[42] *However, in light of intervening decisions of the District Court and the Second Circuit, Cardel subsequently represented to the Tribunal that they are not seeking an award on attorneys' fees and costs in connection with that First Award.*

41. The parties' differing interpretations of the First Award. The parties hold widely divergent views on what was actually decided in the First Award regarding the commercial reasonableness of the foreclosure. Focusing on the First Panel's directive to Cardell to "fashion" specific remedies and "liquidate its debt", Respondents contend  that the First Award's order to proceed "in the most commercially reasonable manner given the then-existing circumstances" was meant to limit Cardell's discretion in exercising the full range of remedies available under the applicable law and the SPA,  thus allegedly imposing on Cardell the obligation to foreclose on Deltec's assets so as to liquidate Deltec's debt.[43]

42. Cardell contends, on the other hand, that the First Award clearly permitted Cardell to liquidate whatever collateral it had available, in whatever order it deemed appropriate, to pay off the debt.[44] Cardell emphasizes that the remedial sections of the November 2001 Agreements were not limited in any way by the First Award, referring to the First Panel's rejection of all claims brought by Respondents including, alleges Cardell, Respondents' request  that Cardell should proceed first to foreclose against Deltec's real estate collateral in Brazil rather than their pledged shares in New York.[45]

43. The parties also dispute whether Respondents (i.e.,  SAI and WS, who are also Third-Party Claimants against Deltec in this arbitration) claimed or should have claimed in that First Arbitration their alleged right to be indemnified for the full value of the shares of Deltec's capital stock lost upon Cardell's foreclosure (the "indemnification claim"). Claimant asserts that this indemnification claim was raised by Respondents before the First Panel,[46] at the time they answered the panel's request for

---

stock. A stockholder meeting was held on September 14, 2004, in which 115 shares of stock were issued and outstanding, modifying accordingly Deltec's Board of Directors. See SAI/Worldstar Statements at 4; Demand for Arbitration, Para. 28, at 10-11.
[40]  First Award at 11-12 (*"Cardell shall not receive any award or attorneys' fees and costs unless Claimants other than Deltec attempt to institute bankruptcy proceedings against Deltec or initiate any challenge to this arbitration award in a Brazilian or Panamanian court".*).
[41]  See Respondents' Answering Statement, Para. 6 at 2.
[42]  Cardell's Response to Answering Statement and Third-Party Demand for Arbitration With Counterclaims ("Cardell's Response to Answering Statement") at 7, Subpara. (e).
[43]  Respondents PH Reply Brief at 9-15.
[44]  Claimants PH Reply Brief  at 22.
[45]  Demand for Arbitration, Paras. 23-24, note 13; Cardell and Deltect Reply Memorandum, at 8.
[46]  Claimant contends that Respondents asserted their indemnification claim once again before the U.S. District Court, when they brought an equitable action for exoneration, which was subsequently dismissed with prejudice by the Stipulation and Order issued by the District Court on January 21, 2005. See Cardell and Deltec Reply Memorandum at 5-6.

12

supplemental post-hearing memoranda on proposed remedies that the First Panel had under consideration.[47] It is Clamant's position that Respondents cannot relitigate this issue before this Tribunal. Respondents reject this contention on the ground that the First Arbitration did not involve any claims by SAI or WS against Deltec, also arguing that Respondents' claim to be indemnified by Deltec could not have arisen but after the sale of SAI/WS's shares to satisfy Deltec's obligation (i.e.,, six months after the rendering of the First Award).[48] The Tribunal will examine further below the impact of the First Award on Cardell's foreclosure rights and the standards of commercial reasonableness observed by Claimant at the Public Auction, addressing at that point whether Respondents are precluded from raising the indemnification claim before this Tribunal.

44. <u>The October 2004 Motion</u>. In July 2004, after Deltec was declared in default, Cardell sought to confirm the First Award.[49] Respondents sought an injunction pending an accounting for the alleged strict foreclosure of Metropolis shares.[50] The request was dismissed on October 22, 2004,[51] and the First Award was finally confirmed in October, 2004.[52]

45. <u>Commencement of the foreclosure process</u>. Cardell sought to commence the foreclosure process sending a "Notification of Taking Possession of the Collateral" ("Notification of Taking Possession") to SAI/WAI and their counsel.[53] This was the first of a series of steps leading to the sale of Deltec shares at a public auction, which finally took place on January 27, 2005 (the "Public Auction").

46. <u>Steps leading to the Public Auction</u>. Starting in November, 2005, Claimant alleges to have engaged the investment banking firm of Brooks Houghton and Company, Inc. ("BHC") to identify and solicit potential bidders. Cardell also alleges that BHC became familiar with the business and financial position of Deltec, assisting Cardell with the preparation of a detailed information package that was subsequently sent to several potential bidders. After sending the bid packages, Cardell alleges to have

---

[47] Cardell and Deltec Reply Memorandum, at 3-4. For a discussion of the "claim preclusion" issue, see Paras....., infra.

[48] SAI and Worldstar Memorandum in Opposition, at 6-8.

[49] In July 2004, as permitted by the First Award, Cardell exercised warrants for the issuance of 15 additional shares of stock in Deltec. A stockholder meeting was held on September 14, 2004, giving Cardell a 56.6% majority control of Deltec and modifying its Board of Directors accordingly. See Demand for Arbitration, Para. 28, Respondents' Memorandum in Opposition, at 4.

[50] Demand for Arbitration at 11-13 (restating SAI and WS's allegations that *"by virtue of the alleged strict foreclosure on the Metropolis shares, (1) Cardell owed SAA and Worldstar an accounting for the value of the alleged foreclosed Metropolis Shares; (2) a Special Master was required to conduct such accounting; and (3) foreclosure on SAA and Worldstar's shares in New York should be stayed indefinitely pending such accounting"*).

[51] Demand for Arbitration at 12 (stating that the U.S. District Court rejected each of Respondents' arguments, holding that *"Cardell has not foreclosed on Metropolis' interest and therefore Cardell's duty to provide an accounting has not been triggered"*). Respondents filed a limited appeal against this decision, which was affirmed by the United States Court of Appeals for the Second Circuit by Summary Order dated April 14, 2006. Demand for Arbitration at 13.

[52] Demand for Arbitration at 11 (reporting that the First Ward *"was confirmed by Stipulation and Order dated August 25, 2004, the preliminary injunction dissolved effective as of July 8, 2004, subsequently re-entered on October 26, 2004, due to a clerical error in the caption)*.

[53] SAI/Worldstar's Statements, Response to Para. B.2, at 8

followed-up contact with each potential bidder, receiving an expression of interest from at least eight parties, four of which executed confidentiality agreements. [54]

47. Cardell also alleges that BHC identified over one hundred non-Brazilian companies, with substantially all receiving the invitation to bid, followed up by contact with seventy-eight potential bidders.[55] Cardell also alleges to have contacted several Brazilian companies, posting advertisements in The Wall Street Journal and Valor Economico of Sao Paulo, providing copies of the advertisements to Respondents. According to Cardell, BHC's efforts yielded expression of interests from at least eight parties. [56]

48. Respondents' notice of the time, place, and manner of the Public Auction. Respondents do not deny that Cardell took many of those steps but, not having had access to the information under control of Cardell, Respondents contend they are "without sufficient knowledge or information to agree" that those steps were actually taken as alleged by Cardell.[57] Thus, while refusing to acknowledge many of Claimant's allegations, Respondents admit having received copies of the advertisements and of the invitation to bid packages, as well as to have received advance notice of the disposition.[58] It is also a matter of record that Respondents were invited on December 10, 2004, to identify any potential bidders they would like to have information sent to, an invitation Respondents chose not to accept.[59]

49. The 2005 NY State Court Action. On January 7, 2005, Respondents obtained an ex parte temporary restraining order from the Supreme Court of the State of New York (the "2005 NY State Court Action") alleging, inter alia, that Cardell was required first to exhaust its remedies against Deltec before conducting any foreclosure sale of Respondents' shares ("the exoneration claim").[60]

50. Cardell alleges that as a result of the 2005 NY State Court Action discussions had to be suspended with several potential bidders, who subsequently failed to appear at the Public Auction that finally took place on January 27, 2005.[61] The testimony of Mr. Freeman was to the effect that the interest of prospective bidders cooled after they learned the Deltec shares were involved in litigation in New York.[62]

51. Judge Pauley's January 2005 Stipulation and Order. The 2005 NY State Action was removed to the U.S. District Court, before which Cardell filed a motion to dissolve the temporary restraining order on the ground that Respondents had sought the same relief from the First Panel and that Respondents' exoneration claim against Deltec had been expressly waived under Section 2 of the SPA.[63]

---

[54] Demand for Arbitration, at 14-15.
[55] See SAI/Worldstar's Statements, at 9-10.
[56] See SAI/Worldstar's Statements, at 11-2.
[57] See SAI/Worldstar's Statements, at 8-15.
[58] SAI/Worldstar's Statements, at 12-13.
[59] SAI/Worldstar's Statements, at 12, Paras. 19-20.
[60] Demand for Arbitration, Paras. 45 et seq.; Respondents' Consolidated Statements, Paras. 23-24 at 13.
[61] Demand for Arbitration, Paras. 49-50 at 18.
[62] Freeman Declaration, Hearing Trans. 51.
[63] Demand for Arbitration, Paras. 46-48 and note 20, at 17.

14

52. Respondents withdrew their complaint and the temporary restraining order was dissolved on January 26, 2005 pursuant to a Stipulation and Order signed by Judge Pauley ("Judge Pauley's January 2005 Stipulation and Order"). Respondents stipulated that the withdrawal was with prejudice, Judge Pauley's order stating that the dismissal of the exoneration claim does not have any effect on Respondents' other past, current, or future claims.[64]

53. The parties' differing views on the preclusive effect of Judge Pauley's January 2005 Stipulation and Order on the viability of the indemnification claim. Cardell refuses to acknowledge that Respondents stand in the role of sureties under the SPA, contending that Respondents are barred from bringing a claim for indemnification that was actually raised and rejected by the First Panel.[65] In addition to the argument that the First Panel rejected Respondents' indemnification claim, Cardell also contends that Respondents' withdrawal of the exoneration claim, as affirmed by Judge Pauley's dismissal with prejudice under the January 2005 Stipulation and Order,  is claim preclusive against the indemnification claim to the extent that  that both claims are "transactionally related".[66]

54. While insisting that their indemnification claim arises from the surety relationship between Respondents and Deltec under the SPA, Respondents contend that an exoneration claim arises before the surety suffers the loss of having to pay the principal obligor, in contrast to an indemnity claim, which does not arise until the surety pays the principal obligor and suffers the loss.[67] According to the Respondents, different elements in both claims, especially the time at which they mature, lead to the conclusion that the indemnification claim could not have been asserted but long after the rendering the First Award. Respondents also object to the claim preclusion argument raised by Cardell, highlighting the language in Judge Pauley's January 2005 Stipulation and Order,  expressly reserving "SAI/WS' right to bring future and different claims, no matter how related they might be to the exoneration action."[68]

C. Respondents' Challenges to the Bidding Process and Public Auction

55. Following the dissolution of the temporary restraining order, the Public Auction was rescheduled for, and finally held on, January 27, 2005. No third-party bidders appeared at the auction and Deltec's minority interest of fifty shares of stock were sold, on a credit bid by Cardell, for an aggregate price of  $2.1 million, which Cardell later increased to $2.5 Million.[69]

---

[64]  Stipulation and Order, January 26, 2005  ("...the dismissal [of the exoneration claim] does not have any effect on any other claim that SAI or Consultora has had, now has, or may hereafter have, against Cardell Financial Corporation, Deltec Holdings Inc., its and their affiliates, officers, directors and/or controlling shareholders...").

[65]  Claimant's PH Brief at 23. Cardell refers to Respondents' supplemental post-hearing memoranda filed in the First Arbitration, where Respondents claim they "would have rights of indemnification against Deltec for the value of their shares". Cardell and Deltec Reply Memorandum at 4 (referring to Williamson Decl., Tab. 31, at 25-26). Cardell  states that the First Panel expressly rejected this indemnification claim when it rejected "as a matter of law each of [Respondents'] arguments."  Cardell and Deltec Reply Memorandum at 4 (referring to the First Award at 7).

[66]  Claimant's PH Reply Brief at 28-29.

[67]  SAI/WS Memorandum in Opposition at 8-10.

[68]  Respondents PH Brief at 32.

[69]  SAI/Worldstar's Statements, at 14.

15

56. Cardell alleges that Respondents were provided with a "detailed accounting" of the Public Auction within 30 days,  furnishing them with copies of the various documents relating to the auction, including the pertinent contact information. It is also Cardell's contention, which remains undisputed to this day, that Respondents did not object or request any information about the Public Auction or its accounting until October, 2005, when Cardell took notice for the first time that Respondents had filed an action before the Brazilian courts.[70]

57. Respondents, on the other hand, take issue with various aspects of the bidding and sale process. [71] They attach the witness statement of Andres G. Otero for the purpose of indicating deficiencies in the offering materials and the manner in which the auction was conducted.[72] Mr. Otero complains that the auction should have been held in Brazil or Panama, rather than in New York, where the eventual purchaser of the shares would be required to comply with U.S. securities laws.[73] He also criticizes that the Public Auction was conducted in US dollars when the assets were valued in Brazilian reals, thereby adding a foreign exchange risk to the transaction.[74]

58. Mr. Otero also takes issue with the timing of the auction around the Christmas season, the insufficient use of the Portuguese language in advertising the public auction, pointing to Cardell's alleged failure to provide clear and  suitable financial information and its alleged unwillingness to commit adequate funding to Deltec.[75] Moreover, Respondents blame Cardell's lack of transparency regarding its future intentions with respect to what it was planning to do with Deltec. Pursuant to what Respondents characterize as a heightened standard of "commercial reasonableness" set forth in the Final Award, Respondents contend that Cardell should have provided assurances that it "would not exercise its creditor rights and bankrupt Deltec soon after a third party bought the stock". [76]

59. Many of Mr. Otero's objections are addressed in the testimony provided by Mr. Freeman and puts into question Cardell's business judgment as to the "time, place, and manner" of the bidding and sale process. Aside from ascertaining the reasonableness of these decisions, the Tribunal must also assess whether Cardell was under a duty to make commitments to potential bidders (and, if so, what kind of commitments). Moreover, even if some of the alternative ways to proceed with the bidding process and sale remain uncontested, it is incumbent on the Tribunal to assess whether those objections raise issues material to the legal question whether the steps taken by Cardell to foreclose on the pledged shares were commercially reasonable, an issue addressed below in this award.

D. Subsequent Challenges to the Public Auction and

---

[70] Demand for Arbitration, Paras. 52-56, at 19-20.
[71] See generally, Respondents PH Brief at 15-17.
[72] Witness Statement of Andres G. Otero, Respondents PH Brief, Ex. 3 ("Otero Statement").
[73] Otero Statement at 12 (i).
[74] Otero Statement at 12 (iv).
[75] Otero Statement at 7.
[76] According to Respondents, such "heightened standard" was mandated by the language of the First Award to the effect that *commercial reasonableness and principles of equity require the fashioning of specific remedies out of the range of theoretically possible alternatives available to Cardell under the Loan Documents"*. Respondents' PH Brief at 10 (referring to the Final Award at 10).

<u>Respondents' Pursuit of its Indemnification Claim</u>

60. <u>The 2005 Brazilian Action</u>. Seven months after the foreclosure process and Public Auction, Respondents commenced an action in the First Judicial District of Sao Paulo, Brazil, against Cardell and Deltec and its subsidiaries (the "Brazilian Action"). According to Respondents, the action was filed in order "to recover the value of the capital stock in Deltec lost to Cardell in satisfaction of Deltec's Obligation".[77] However, the terms of the complaint reveal that, in addition to pursuing "indemnification" from Deltec and Cardell, Respondents challenged once again the commercial reasonableness of the Public Auction.[78]

61. As previously noted, the First Award provided that Respondents were conditionally excused from bearing the costs of the arbitration and attorneys' fees incurred in the First Arbitration unless Respondents were to challenge the award in Brazil or Panama.[79]  In light of Respondents' filing of the Brazilian Action, in which they allegedly contest issues examined and decided in the First Arbitration,[80] Cardell sought to recover the costs, expenses and attorneys' fees incurred in connection with the First Arbitration,[81] a request that was subsequently abandoned in light of intervening decisions of the District Court and the Second Circuit, as discussed above.

62. <u>Judge Pauley's January 3, 2006 Order</u>. On October 24, 2005, Cardell sought an anti-suit injunction against the 2005 Brazilian Action from the U.S. District Court. By decision and order dated January 3, 2006, Judge Pauley enjoined the 2005 Brazilian Action ("Judge Pauley's January 3, 2006 Order").[82] This injunction draws a distinction between, on the one hand, Respondents' claims arising out of Cardell's alleged "breach of fiduciary duties and abusive manipulation" as Deltec's controlling shareholder (i.e, the "Abuse of Control Claims") and, on the other hand, , Respondents' challenge to the commercial reasonableness of the Public Auction (i.e, the "Auction Claims").[83]

63. Judge Pauley's January 3, 2006 Order was confirmed by another order dated July 20, 2006, reaffirming the scope of the injunction and denying Respondents' motion to reconsider.[84] Respondents subsequently filed an appeal to the U.S. Court of Appeals for the Second Circuit ("U.S. Second Circuit Appeal"), challenging the breadth of the "anti-suit" injunction on the ground that claims arising after the date of the First Award (July 8, 2004) are beyond the jurisdiction of this Tribunal. However, to the extent that it pertains to this Tribunal, at least in the first instance,  to decide which disputes fall under the arbitration agreement incorporated into Section 19 of the SPA,

---

[77] Respondents Answering Statement and Third-Party Demand for Arbitration ("Respondents Answering Statement"), Para. 5 at 2.
[78] See Demand for Arbitration, Para. 60 at 22-23. An English translation of the Brazilian Action is attached as Exhibit "D" to the Demand for Arbitration.
[79] Frist Award at 11-12 (*"Cardell shall not receive any award or attorneys' fees and costs unless Claimants other than Deltec attempt to institute bankruptcy proceedings against Deltec or initiate any challenge to this arbitration award in a Brazilian or Panamanian court".*).
[80] See Demand for Arbitration, Paras. 25-27 at 10 and Note 29 at 23. See also Demand for Arbitration, Paras. 58-28 at 21-22.
[81] See Cardell's Response to Answering Statement at 7, Subpara. (e).
[82] January 3, 2006 Order, annexed to the Demand for Arbitration as Exhibit "A".
[83] Respondents Answering Statement, Para. 7 at 2; Demand for Arbitration, Para. 64, at 24.
[84] Respondents Answering Statement, Para. 8 at 3; Demand for Arbitration, Para 65, at 24.

the Tribunal will go forward and decide all aspects relating to the "Auction Claims", consistently with Judge Pauley's January 3, 2006 Order.

## V. THE ARBITRATION CLAUSE AND THE TRIBUNAL'S JURISDICTION

64. The jurisdiction of the Tribunal to entertain this dispute arises out of Section 19 of the SPA, which reads thus: "*19. Arbitration. The parties agree that any dispute arising out of, or in connection with, the execution, interpretation, performance or non-performance of this Agreement (including the validity, scope and enforceability of these arbitration provisions) shall be settled by arbitration conducted in the English language, in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA") by a panel of three arbitrators. Lender shall select one arbitrator, the Pledgors shall select one arbitrator, and the third arbitrator shall be selected by mutual agreement of the other arbitrators. If either Lender or the Pledgors fail to appoint its arbitrator within 30 days from the date of the demand for arbitration, then such arbitrator shall be appointed by the AAA in accordance with AAA rules. If the Lender's and Pledgor's appointed arbitrators fail to reach agreement on a third arbitrator within 30 days after their selection, Lender and Pledgors shall jointly request the AAA to designate, in accordance with AAA rules, a third arbitrator. The Parties agree to facilitate the arbitration by (a) making available to one another and to the arbitrators and the AAA for inspection and extraction all documents, books records, and personnel under their control or under the control of a Person controlling or controlled by such Party if determined by the arbitrators or the AAA to be relevant to the dispute, (b) conducting arbitration hearings to the greatest extent possible on successive Business Days and (c) using their best efforts to observe the time periods established by the AAA rules and the arbitrators for the submission of evidence and briefs. The decision of the AAA shall be final, binding and not subject to further review and judgment on the awards of the AAA may be entered in and enforced by any court having jurisdiction over the parties or their assets subject to the procedural requirements in such jurisdiction. The AAA and the arbitrators shall be authorized and directed to award reasonable costs and attorney's fees to the prevailing party. The AAA and the arbitrators shall base their judgment on the Applicable Laws. The AAA and the arbitrators shall be authorized to award equitable relief, including, but not limited to, specific performance or other injunctive relief. Any monetary award shall be made and payable in U.S. dollars. Notwithstanding the foregoing agreement to arbitrate, the Parties expressly reserve the right to seek provisional relief from any court of competent jurisdiction to preserver their respective rights pending arbitration.*"

65. The main dispute connected with the SPA brought before this Tribunal relates to Cardell's conduct in selling Respondents' shares at the Public Auction. More specifically, as outlined in Cardell's Demand for Arbitration (pp. 25-26), the Tribunal has been asked to settle "any claims [Respondents] may have arising out of the Public Auction, as required by the Court's January 3, 2006 Order, the Judgment and Award, and as the parties agreed," and to "enter an award declaring that the Public Auction and other actions taken by Cardell were conducted in a commercially reasonable manner, in accordance with the Jugment and Award, and New York law."

66. In addition to the allegation that Cardell failed to meet the standard of commercial reasonableness in conducting the Public Auction, Respondents have also brought an "indemnification claim," purporting to recover the "full and true" value of their shares in Deltec.[85] Cardell has consistently maintained that this Tribunal should not hear this indemnification claim. It is Cardell's position that Respondents are precluded from bringing this indemnification claim after having brought, or having had the opportunity to bring, the same claim before the First Panel and after Judge Pauley's January 2005 Stipulation and Order dismissed Respondents' exoneration claim with prejudice.

67. Because the "indemnification" to which Respondents are allegedly entitled is a claim "*arising out, or in connection with, the execution, interpretation, performance or non-performance*" of the SPA, the Tribunal decides to hear and settle once and for all in this arbitration whether Respondents are entitled to recover from Deltec the full and true value of the their shares of stock or whether they are precluded, as a matter of claim preclusion or because they are not entitled under the SPA, to recover such value from Deltec.

68. Cardell alleges that Respondents' string of challenges before different fora "are part of a bad faith campaign of harassment...designed by the principals of SAA and Worldstar ...to perpetuate litigation proceedings against Cardell and Deltec for improper purposes...".[86] It is on the basis of this allegation that Cardell seeks an injunction from this Tribunal to restrain Respondents and their officers, employees, and agents from prosecuting in any other fora further arbitration or litigation against Cardell, Deltec and its subsidiaries, regarding "any matter", unless and until Respondents pay costs and attorneys' fees awarded in the previous arbitration and litigations and to be awarded in this arbitration.[87]

69. In addition to claiming indemnification and asking the Tribunal to deny Cardell's request to be reimbursed for its costs, expenses, and attorneys' fees,[88] Respondents assert that to the extent of the January 3, 2006 Order is still subject to appeal before the U.S. Court of Appeals for the Second Circuit, Respondents seek a declaratory judgment stating that they are not barred or restricted "to assert claims against any party or non-party to the proceeding that may be barred by the January 3, 2006 injunction of the U.S. District Court that is on appeal to the U.S. Court of Appeals."[89] The Tribunal shall examine and dispose of this claim for relief at a later point in this award, together with the disposition of other claims set forth in the following paragraphs.

## VI. THE PARTIES' CLAIMS FOR RELIEF

70. According to the positions of the parties outlined before, the Tribunal has been asked to decide whether:
   - Cardell conducted the bidding process and sale of Respondents' shares in a "commercially reasonable" manner in accordance with the applicable law.

---

[85] Respondents Answering Statement at 4.
[86] Cardell's Response to Answering Statement, Para. 28 at 6.
[87] Cardell's Response to Answering Statement at 7, Subpara. (f).
[88] Respondents Answering Statement, Para. 8(c).
[89] Respondents Answering Statement at 4, Subpara. (2).

19

- Respondents are entitled to be indemnified by Deltec "in the sum of $2.5 Million or such greater amount as the Tribunal may establish as the full and true value of the Deltec's shares that were foreclosed upon by Cardell."
- Cardell and Deltec are entitled to recover the attorneys' fees, costs, and expenses of this arbitration.

71. The parties have also asked the Tribunal to provide declaratory relief thus:

- Respondents request a declaration from this Tribunal that this award does not limit or in any way restrict Respondents' rights to assert claims against Cardell, Deltec or any non-party to this arbitration.
- Cardell requests this Tribunal to enjoin and restrain Respondents and *"their officers, directors, shareholders, employees, and agents, including Beno Suchodolski and Nelson Baeta Neves, and all persons acting under their direction and control, and in concert or participation with any of them, from commencing or prosecuting or assisting in the prosecution of any arbitration, action or proceeding in any country against any of the defendants named in the Brazilian Action, or any of their affiliates, officers, directors, shareholders, employees or agents, regarding any matter, unless and until, SAA and Worldstar have paid the costs and attorneys' fees awarded by (i) the arbitrators in this proceeding, (ii) the U.S. District Court with respect to to the anti-suit injunction, (iii) the U.S. District Court with respect to the previous litigations in New York and the arbitration proceedings prior to the issuance of the Award."*[90]

## VII.  APPLICABLE LAW

72. Section 19 of the SPA provide that the Tribunal shall base its judgment on the applicable law, being authorized to award the same equitable relief as any court of law. Section 18 provides in turn that the SPA *"and any documents and instruments delivered in connection herewith and therewith and the rights and duties of the parties hereunder and thereunder shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of New York, without regard to principles of conflicts of laws…."*.

73. Accordingly, the Tribunal will proceed to apply New York law, taking into account the parties' agreements, to the main issues in dispute in this arbitration, namely, whether the Public Auction was conducted in a commercially reasonable manner, whether Respondents are entitled to be indemnified by Deltec for the loss of their shares, and how to allocate payment of the attorneys' fees and costs accrued under this arbitration.

## VIII  REASONS FOR THE TRIBUNAL'S FINDINGS

### A. "COMMERCIAL REASONABLENESS" OF THE DISPOSITION

74. <u>Remedies and standards under the SPA and the applicable New York law</u>. The main issue in dispute is whether the Public Auction and the steps taken by Cardell to conduct the bidding process and sale was conducted in a commercially reasonable

---

[90] Cardell's Response to Answering Statement at 7, Subpara. (f).

manner. The first question to address is how to allocate, between secured and secured debtor, the burden of establishing that the sale was conducted in a commercially reasonable manner. A second question is whether the standard of commercial reasonableness imposes on the secured creditor the duty to choose specific collateral and the extent to which the First Award may have imposed this duty on Cardell in light of the particular circumstances of this case. Thirdly, the Tribunal must decide whether, after allowing limited discovery and conducting an in-person hearing to hear testimony the Tribunal deemed relevant at the time, there are material issues of fact left outstanding, calling for further evidence on whether the Public Auction was conducted in a commercially reasonable manner.

75.    The appropriate standard of commercial reasonableness must be ascertained in light of the particular circumstances of the case, taking into account the agreement of the parties and the applicable law. Section 9-610(b) of the U.C.C., requiring that *"[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable"* is deliberately vague. The purpose of this provision is to bring the knowledge and ingenuity of the secured party to bear, under the circumstances of the case, in determining a method that is commercially sound to dispose of the collateral that is available. The underlying assumption is that what methods, manners, times, or places are reasonable will differ with the type of collateral, and that the type of collateral will differ with the commercial setting of the transaction and perhaps with other circumstances. The duty of the secured creditor is to make a reasonable decision as to the type of collateral to foreclose and to adopt a reasonable method of disposition.[91]

76.    Thus, a determination of commercial reasonableness calls for a factual inquiry of the circumstances of the sale, including whether the efforts to contact a pool of qualified commercial buyers, the timing and place of the advertising and other steps of the bidding process and sale were reasonable and kept with prevailing responsible practices. Because the definition of a commercially reasonable sale under Section 9-610(b) of the U.C.C. is vague, and because a judgment as to whether or not a sale was reasonable will generally depend upon the circumstances of each particular case, it is incumbent on the secured creditor to submit a "prima facie" case, as part of his burden of proof, that the sale or disposition was performed in a commercially reasonable manner. At this point it is incumbent upon the secured debtor to come up with specific and at least "prima facie" credible allegations that under such factual scenario the steps taken by the secured creditor cannot be deemed reasonably calculated to bring a satisfactory sale.[92]

77.    The record of the proceedings shows that after sending Deltec and Respondents the proper notice of default, obtaining the dissolution of the 2003 TRO, and reaching the First Award's confirmation that Deltec had been in default of its loan obligations since May 30, 2003, Cardell proceeded with a "Notice of Taking Possession of

---

[91] For an illustration of a thorough judicial evaluation of the requirement of a commercially reasonable sale, see generally, Chavers vs. Frazieer, 93 B.R. 366 (Bankr. M.D. Tenn. 1989).
[92] See Oliver-Mercer Elec. Co-op., Inc. vs. Davis, N.D. 2004, 678 N.W.2d 757, on remand 2004 WL 4964155 (*Once secured party makes a prima facie case indicating collateral was sold in a commercially reasonable manner, the burden of persuasion, not the burden of proof, shifts to the debtor to elicit specific evidence of commercial unreasonableness"*). Emphasis added.

Collateral".[93] This step was followed by others, such as seeking the assistance of a financial advisor (Brooks Houghton and Company, Inc., or "BHC"), soliciting bidders for the public auction, preparing bidding procedures, non-disclosure agreements, and information packages, and commencing the solicitation of bids for the pledged shares.[94]

78. After posting notice of the public foreclosure sale in New York and Sao Paulo, Cardell notified Respondents, more than a month in advance, of its intention to foreclose on their pledged shares by public auction. The invitation to bid package was sent to approximately 179 potential bidders (including over 100 non-Brazilian companies). A copy of the bid package was sent to Respondents, who were given the opportunity, a month before the Public Auction, to identify other potential bidders to which they would like to have information sent. On or about December 23, 2004, and January 3, 2005, Cardell sent further notices of disposition of the collateral.[95] Those steps, in the opinion of the Tribunal, appear to have been, at least prima facie, reasonably calculated to bring a satisfactory turnout of bidders. At this point the burden of persuasion shifts to Respondents, who should raise credible allegations of material facts pointing to the unreasonableness of the steps taken by Cardell. Respondents, however, do not deny Cardell having taken those steps. Moreover, Respondents do not dispute that they were kept apprised of the proceedings leading to the Public Auction and were even offered the right of "input" at various points.[96] What Respondents contend is that, not having had access to the same information that was in possession of Cardell, they were kept in the dark as to how the list of potential bidders was arrived at. They also complain about not having received details of any contacts with the potential bidders, before or after the transmission packages, and not having participated in discussions with Cardell and its agent Mr. Freeman as to how the Public Auction was to be conducted. These allegations, however, fall short of raising material issues of fact touching on the absence of proper or timely notice of the sale or other credible challenge to the reasonableness of the disposition.[97]

79. It is true that some of the information available to Cardell was not available to Respondents. However, pursuant to the terms of the SPA and the applicable law (U.C.C. Section 9-610(a)), it was Cardell, the secured party, that was responsible for conducting the bidding process and sale.[98] Moreover, it is not in dispute that Cardell reported on the status of their communications with potential bidders and the expressions of interest received from some of them, asking Respondents whether they could identify any other potential bidders to whom Respondents would like to have

---

[93] Demand for Arbitration, Para. 36 at 14.
[94] Demand for Arbitration, Paras. 36-37, at 14. See also Williamson Declaration, *passim*.

[95] As noted before, a few days later Respondents sought and obtained a temporary restraining order and filed the 2005 NY State Court Action. Only after the dissolution of the temporary restraining order, the Public Auction was rescheduled for January 27, 2005. See Demand for Arbitration, Paras. 44-48 at 16-17
[96] SAI/WS Statements at 12-13.
[97] See 2 Grant Gilmore, Security Interests in Personal Property 1235 (1965), who while referring to the secured debtor's burden of challenging the reasonableness of the disposition states: "*Allegations of fraud or of failure to exercise a required degree of diligence are easily made; the burden of bringing forward convincing proof should be on the party who makes the allegations.*").
[98] SAI/WS Statements, Para. 1 at 20 ("*The decisions regarding to the substance and procedures culminating in the auction were made exclusively by Cardell and its advisers. The information relating to these decisions is under the exclusive control of Cardell. SAI/Worldstar were not involved with these decisions and have have not had access to any information relating to these decisions.*").

the information sent. Respondents did not do so. Having been represented by counsel at the Public Auction and never having asked for specific information or raised an objection, except over a half year later in the Brazilian Action, it is the opinion of the Tribunal that Respondents are not in a position to complain that they were denied access to information necessary to assess fully the fairness of the bidding process.[99]

80. Aside from the size and value of Deltec's real estate holdings, Respondents have also alleged that the value of their pledged shares was worth far more than the $2.5 Million paid by Cardell, thus raising the question whether the fairness of the Public Auction should not be subject to a closer scrutiny in light of the auction results. Indeed, one important factor to be weighed in deciding whether or not a disposition or sale was commercially reasonable will be the price received by the secured party. If a fair sale price was not received, it seems fitting to question whether the bidding and sale process may have prevented a fair price or contributed to an unfair price.

81. Respondents, however, have failed to bring to the attention of the Tribunal any credible allegation of fact questioning the fairness of the price obtained for the sale of the shares. Neither did Respondents provide Cardell with an indication of what steps should have been taken to structure the auction in such a way as to maximize the value of Respondents' shares. In fact, at the outset of the foreclosure process, and as disclosed in the bid solicitation package, Cardell had indicated to Respondents its intention to credit bid $2.1 Million for the pledged shares, who failed to raise any objections at the time.[100] It is Respondents' burden to come forward with convincing evidence about the unfairness of the price, or with an allegation that such evidence is available, because the "fairness" of the price obtained at a public auction is not necessarily material to a determination whether the disposition of the collateral was "commercially reasonable." [101] Moreover, to the extent that the fairness of the price may become relevant to assess the commercial reasonableness of the Public Auction, the Tribunal cannot ignore that Respondents' own conduct seeking and obtaining a temporary injunction against the auction, when preparations for the sale were well under way, may bear more responsibility for dampening the enthusiasm of potential bidders and lowering the price of the shares than any action attributed to Cardell.[102]

---

[99] Despite Respondents' failure to come up with a credible challenge to the auction's commercial reasonableness, the Tribunal decided to hold an evidentiary hearing to receive Mr. Freeman's testimony, allowing Respondents to cross-examine him on the "method, manner, time, and place" of the Public Auction. The dissenting opinion attacks this award for not treating both parties with equality and for denying Mr. Otero the same opportunity given to Mr. Freeman. This assertion fails to take notice that in the view of the majority of the arbitrators, as a careful reading of its rationale indicates, the commercial reasonableness of the Public Auction does not rest on the testimony of Mr. Freeman, but rather on uncontested facts taken from the record, in light of the November 2001 Agreements and basic notions of burden of proof governing the enforcement of security interests in personal property.

[100] Cardell's credit bid at the Public Auction was $2.1 Million, subject to a possible increase upon additional analysis. Cardell subsequently increased its credit bid to $2.5 Million, after receiving a valuation report in early February, 2005. Demand for Arbitration, note 24, at 18. See also Supplemental Declaration of Erik S. Akhund ("Akhund Supp. Decl.") at 5-6, referring to the equity value of Deltec common stock reflecting its expenses and liabilities. See also Akhund Supp. Decl. at 7 ("*If Respondents thought this was too low a value for the shares, why didn't they bid for the shares themselves or come up with a third-party bidder?*").

[101] See U.C.C. Section 9-627(a), providing that "*[t]he fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner*".

[102] The dissenting opinion misleadingly points to the total value of Deltec's assets in order to argue that the price differential with the value obtained for Respondents' shares calls for a hearing. Even admitting that the

23

82. Whether the standard of commercial reasonableness imposes on the secured creditor the duty to choose specific collateral requires, first and foremost, an examination of the parties' understanding and expectations under the terms of the November 2001 Agreements and the applicable law, followed by a closer look at the holding of the First Award in order to ascertain whether that award in any way modified or restricted Cardell's choices as a secured creditor.

83. Looking first to the terms of the Loan Agreement[103] and the SPA,[104] which provides the most important guidance in this field, they appear to provide considerable discretion to Cardell to decide the time, place, and manner of disposition in the way Cardell, the secured party, finds "commercially reasonable". As if Cardell's remedial tools under the November 2001 Agreements were not flexible and discretionary enough, U.C.C. Section 9-610(b) provides the secured party with ample discretion to determine not only the time, place, and manner of the disposition, but also with the choice of collateral to foreclose upon  and even the option  to sell it as a whole or in parts: *"Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms."*

84. Thus, U.C.C. Section 9-610(b) supplies a default rule governing all aspects of the disposition of the collateral, including whether the secured party has the right to choose the collateral to sell and how such sale should proceed. More importantly, however, is the list of remedies granted to Cardell under the November 2001 Agreement, according to which Cardell is not limited in its contractual foreclosure rights to go against a particular collateral.

85. The parties devote much space and time in their post-hearing briefs to the question whether Cardell could have simply foreclosed on real estate owned by Deltec and its subsidiaries, whether the same result could have been achieved indirectly by foreclosing on the shares of  Deltec's subsidiaries that were pledged to Cardell, whether Cardell's security interest only attached to Deltec's rights as owner or merely as a secured lender or mortgagee,[105] and the extent to which foreclosing on real estate

---

"fairness" of the price obtained bears some relevance to assess the auction's  commercial reasonableness, what is at stake to measure "fairness" is  the potential price of the collateral, rather than the total value of the debtor's assets.

[103]  Loan and Security Agreement, Section 9.1 (h) (*"Rights and Remedies, Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, do any or more of  the following...(h) Sell the collateral at either a public or privage sale, or both, by way of one or more contracts...in such manner as Lender determines is commercially reasonable, and apply the proceeds thereof to the Obligations in whatever manner or order Lender deems appropriate...).* Emphasis added.

[104]  SPA, Section 11(b) (...*"If any Event of Default shall have occurred and be continuing:...(b) To the extent permitted by law, Lender may exercise in respect of the Pledged Securities, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a Lender under the UCC in effect in the State of New York at that time, and Lender may also...sell the Pledged Securities or any part thereof in one or more parcels at public or private sale...and upon such other terms as the Lender may deem commercially reasonable..."*). Emphasis added.

[105]  Cardell's PH Brief at 11, note 11 (*"Cardell had no power under its loan documents to cause Deltec or the Deltec Subsidiaries to sell its real estate in bulk in order to pay down the Loan.*).

located in Brazil was commercially sound or too-time consuming from Cardell's point of view.[106] These issues, however, are not relevant to assess commercial reasonableness pursuant to the terms of the bargain concluded between Cardell, Respondents, and Deltec.

86. It is not in dispute in this arbitration whether Cardell could have foreclosed on the stock of the Deltec subsidiaries and subsequently sold Deltec's real estate; neither have the formal requirements of foreclosure sales under Brazilian law been put into question.[107] Whether Cardell could have resorted to foreclose on collateral other than Respondents' pledged shares in Deltec is not relevant under the terms of the November 2001 Agreements and New York law, granting the secured party ample discretion to select the collateral on which it is most convenient for the lender to foreclose and be repaid. The relevant question at this point is whether the First Panel, under the most distinctive circumstances of this case, in which the pledgee is also vested with a controlling interest in the corporation that owns the pledged shares, may have decided to modify Cardell's foreclosure rights, ordering Cardell to liquidate its debt once and for all by foreclosing on whatever collateral was available to repay the Cardell Loan. The parties adopt widely divergent views as to what the First Award understood by "commercial reasonableness" under the circumstances, thus calling for a fair and succinct restatement of their positions.

2.  The standard of "commercial reasonableness" adopted by the First Award

87. Respondents take the position that the First Award imposed restrictions on Cardell's contractual remedies, as suggested in the passage stating: "…*we therefore believe that commercial reasonableness and principles of equity require the fashioning of specific remedies out of the range of theoretically possible alternatives available to Cardell under the loan agreements…*".[108] Moreover, Respondents'understanding of Paragraph 6 of the First Award is that of a command for Cardell, at the end of the Stabilization Period, "*to foreclose on its collateral as is required to liquidate its debt in the most commercially reasonable manner given the then-existing circumstance,*"[109] meaning that Cardell was compelled to sell enough collateral to liquidate its entire debt, reaching if necessary the pledged stock of Deltec's subsidiaries in order to sell their valuable real estate holdings.

88. Thus, Respondents focus on the language of the First Award, invoking "principles of equity" to fashion "specific remedies," to mean that Cardell's discretion to select among the "panoply of potential remedies" available under the 2001 November Agreements had been radically curtailed, ordering Cardell to liquidate its debt and to foreclose on any or all of the collateral available to it in order to cancel in full

---

[106] See Cardell's PH Brief at 10 ("*Foreclosing on these mortgages was never considered a viable option for Cardell as that would have destroyed any remaining "good will" in Deltec.*"). Ibidem at 11 (referring to Moody's article regarding the difficulty in foreclosing upon mortgages in Brazil and Cardell's local counsel'a advice that such foreclosure proceedings may take between 2 to 5 years).

[107] Respondents attach the declaration of Dr. Saud Neto, who provides expert testimony on the requirements to be met in order to undertake a private foreclosure of real property in Brazil. See Declaration of Dr. Salim Jorge Saud Neto, Ex. 3, attached to Respondents PH Brief ("Neto Declaration"). Whether such a foreclosure sale made commercial sense to Cardell under the circumstances is not an issue examined in Dr. Saud Neto's declaration and it is irrelevant to assess the commercial reasonableness of the Public auction.

[108] First Award, at 11-12.

[109] First Award at 12.

Cardell's Loan for $12 Million. Whereas this interpretation does not compel Cardell to foreclose on specific collateral or to proceed with the sale in a particular order, Respondents'interpretation of this language in the First Award would pose severe limitations on Cardell's right to proceed in any way allowed under the November 2001 Agreements, establishing a heightened standard of "commercial reasonableness," indicating Cardell's obligation to foreclose on whatever collateral whose sale would generate enough proceeds to liquidate Cardell's Loan.

89. Respondents' understanding of the First Award seems to rest on the assumption that the First Panel instructed Cardell to follow a liquidation plan inspired by its interest as a secured creditor, rather than by Cardell's business interest as a controlling and eventual majority shareholder of Deltec. Also implied in Respondents' interpretation of the First Award is the contention that by failing to foreclose on other collateral, allegedly "worth more than the amount of the debt," Cardell would not be proceeding as a "typical creditor" pursuing to collect on its debt. Instead, according to Respondents, Cardell would have pursued its remedies with the intention "to take control of the company and run it", ultimately obstructing Respondents' business interest to collect on its junior-ranking loan against Deltec and, eventually, impeding Respondents to be indemnified for the value of the shares lost due to Cardell's foreclosure sale.

90. Claimant's understanding of the First Award is completely different, resting on the premise that the First Award simply confirmed Deltec's default, providing for a period of time during which Deltec was to "stabilize" its operations while suspending Cardell's foreclosure rights, [110] providing for Deltec to honor warrants to Cardell, for a representative of Respondents to join the board of Deltec, and for the waiver of certain penalties and awards of attorneys' fees. The same passage of Paragraph 6 of the First Award, on which Respondents lean so heavily to mandate the liquidation of Cardell's debt, is understood by Cardell to mean that as of that point in time (October 15, 2004, i.e., a month and a half before the Public Auction began), all of Cardell's remedies under the November 2001 Agreements were to be fully restored. According to Claimants, those terms of the contract provide, together with NewYork law, the governing standard as to what is to be understood by "commercial reasonableness".

91. In the opinion of this Tribunal, whether the First Award restricted the remedies granted to Cardell or modified in any significant way the standard of commercial reasonableness, as outlined in the November 2001 Agreements and U.C.C. Section 9-610 (b), calls for a contextual understanding of the whole text of the First Award, rather than on particular language of a given passage or passages of the award. Thus, it is important to note Respondents' misunderstanding that the First Panel somewhat disapproved of Cardell's conduct as a creditor before Deltec's default. In fact, a contextual reading of the First Award indicates that the First Panel assigned much importance to Cardell's justified reliance on the "clear and explicit" remedies it

---

[110] First Award at 11, providing that Cardell *"shall not attempt to foreclose on any collateral or exercise any other remedies under the Loan Documents, except as explicitly set forth herein, until the earlier of October 15, 2004, or the date upon which the Claimants other than Deltect attempt to institute bankruptcy proceedings against Deltec or any challenge to this arbitration award in a Brazilian or Panamanian court ("the Stabilization Period")."*

bargained for under the November 2001 Agreements.[111] The First Panel expressly affirmed Cardell's right to protect its business interests, calling for adherence to the 2001 November Agreements,[112] rejecting Respondents' arguments that it was somewhat unfair for Cardell to rely on the remedies provided in those agreements,[113] and finally admonishing Respondents to abide by their terms.[114]

92. As to the Respondents' understanding that the First Panel looked with disapproval at Cardell's protection of its interest as a secured creditor, it is noteworthy that the First Panel saw nothing wrong with this conduct, Respondents not being justified in assuming that Cardell was to act on their behalf.[115] Indeed, what is reasonable to assume is that the First Panel realized and foresaw full well Cardell's intention to foreclose on Deltec shares in order to become a majority shareholder of Deltec (i.e, to "take control of the company and run it"),[116] at which point Cardell would become a true majority shareholder with fiduciary duties to the minority, without the First Award in any way preventing Cardell from doing so.[117]

---

[111] See First Award at 2, referring to the 2001 November Agreements as "complicated agreements," providing "in substantial part the legal framework for this proceeding". The First Award then went on to indicate Cardell's expectation to rely on those remedial tools of the November 2001 Agreements in the event of Deltec's default ("...[I]t was apparent that Deltec would default under the Term Loan Agreement which, in turn, would trigger clear and explicit rights Cardell had bargained for under the November 2001 Agreements and as to which the other parties to those Agreements had consented..."). First Award, at 3.

[112] First Award at 7 ("Contrary to Claimants' position, we find that Cardell did not act arbitrarily or unconscionably in requiring adherence to the terms of the November 2001 Agreements. These Agreements were the product of negotiations between responsible businessmen represented by sophisticated counsel and the Agreements clearly and explicitly set forth the rights and obligations of the parties. Claimants –with good reason—do not advance the position that there was fraud committed by Cardell in connection with the making of these Agreements or that they had entered into them under some misunderstanding of any of their material terms...").

[113] After addressing the parties' negotiations to resolve Deltec's problems, the First Panel stated "we do not consider Cardell's position to be unfair, over-reaching or irresponsible," rejecting Respondents' arguments thus: "It is against this factual setting that we assess the arguments made by Claimants that Cardell should not be permitted to exercise its rights under the November 2001 Agreements, notwithstanding that the May 30, 2003 deadline for payment of the $4.8million has long since passed. For the reasons set forth below, we reject as a matter of law each of Claimant's arguments.").

[114] First Award, at 7 ("...In short, having signed the Agreements Claims must now abide by their terms and adherence to those terms requires our finding that Claiamnts are in default under the Term Loan Agreement and thus subject to the remedies set forth in the conclusion of this opinion.").

[115] First Award at 8-9 ("Equally specious is Claimants' position that Cardell breached some fiduciary duty owed to them because of their shareholder relationship. We heard no credible claim by the Suchodolski interests that they were placing full trust and confidence in Cardell to come up with a solution to their problem, rather than relying on their own judgment, resources and advisors, or that Cardell was under some duty to act primarily for the benefit of the other Deltec sharerholders rather than its own. The facts establish that at all times and in connection with all of the negotiations the parties were in a routine arms-length relationship. Thus, we find that throughout the negotiations described herein, Cardell could not have made it clearer that it was acting as a lender to Deltec when setting forth its positions, not as a shareholder. Moreover, at no time did it mislead the Claimants' [sic] into believing that anything other than full compliance with the Term Loan Agreement would be required and that, consequently, in no respect can it be said to be at fault for Claimants' utter failure to honor their obligations under that Agreement.").

[116] First Award at 7 ("When asked during the arbitration proceedings what Cardell intended to do to liquidate its collateral, its witnesses could give no clear account of how they intended to proceed, other than to take control of the company and run it (or hire an outside manager to do so) indefinitely. Such is not the behavior of a typical secured creditor intent merely on realizing on its collateral...).

[117] First Award, at 7-8 ("Moreover, as Cardell has made clear from its post-arbitration submissions, it has now entered into an agreement with Respondent Metropolis to acquire Metropolis' ownership interest in Deltec in what would appear to be a strict foreclosure under the Stock Pledge Agreement between them. That acquisition will make Cardell the absolute owner of fifty percent of Deltec's shares. Its exercise of its Warrants for Clas B

93. It is against this background and in this context that, in the opinion of the Tribunal, the First Panel intended to affirm, rather than limit or restrict, Cardell's panoply of remedies under the November 2001 Agreements, when it held: *In the present circumstances, we therefore believe that commercial reasonableness and principles of equity require the fashioning of specific remedies out of the range of theoretically possible alternatives available to Cardell under the Loan Documents.*" By the same token, the Tribunal understands that Paragraph 6 of the First Award, instructing Cardell to "*foreclose on its collateral as is required to liquidate its debt in the most commercially reasonable manner given the then-existing circumstances*" should be reasonably construed as setting in motion the foreclosure process pursuant to the November 2001 Agreements, rather than as taking away Cardell's discretion and rights under those agreements.[118]

94. It is therefore clear, and this Tribunal so holds, that the First Award did not jettison the November 2001 Agreements or change in any way the standard of commercial reasonableness Cardell was to observe under the governing agreements and New York law.[119] The First Award did not order Cardell to sell particular collateral or order where, when, and in which order collateral was to be sold. Neither did the First Award restrict Cardell's discretion how to conduct the bidding process and sale; if anything, the First Award restored and affirmed the primacy of the November 2001 Agreements as the rules governing the Public Sale, allowing Cardell to choose whether to sell the pledged stock of Deltec's subsidiaries, bid for and purchase on Deltec's pledged shares, without mandating the sale of a particular type of collateral or compelling Cardell to liquidate the entire balance due on the loan. This was also the understanding underlying Judge Pauley's January 3, 2006 Decision, referring the parties to arbitrate the "Auction Claim" arising out of the SPA, rather than settling their different views on the First Award.[120]

95. Much of the discrepancies about what the First Award was meant to decide is based on Respondents' misguided interpretation of the November 2001 Agreements where, unlike a "typical" secured transaction, not only the pledgor' (Respondents') shares in Deltec were for sale (for which they had paid $5,000), but the pledgee (Cardell), who financed most of the purchase price of Deltec's shares, had a stake in the future of the company (Deltec) whose shares were to be sold. Moreover, the SPA being a "non-recourse" pledge agreement, the secured party (Cardell) had waived its right to a

---

*Preferred Shares ("the Warrants"), equal to ten percent of Deltec's outstanding equity, as discussed below, will result in a further increase in Cardell's ownership to 56.%, thereby making it a true majority owner and creating in it increased duties toward its minority shareholders in the running of the company if not in its actions as a lender.*").

[118] Actually, Respondents requested from the First Panel an order requiring Cardell to sell Deltec's real estate holdings and they were turned down . See, Demand for Arbitration, note 13 at 9.

[119] The dissenting opinion picks and chooses isolated paragraphs of the First Award to conclude that, had the First Panel intended to assure Cardell full discretion to exercise its creditor's rights, "it could have said so, or simply upheld Cardell's right to act in any way permitted by the agreements." It defies basic canons of construction to reason "a contrario" from the absence of language pointing to the obvious. Moreover, ignoring basic principles of secured transactions law as well as the language of the November 2001 Agreements, the dissenting opinion would place on the secured creditor the burden to demonstrate the reasonableness of such creditor's decision to foreclose on one type of collateral and not on other assets of the debtor.

[120] See Judge Pauley's Decision of January 3, 2006, Demand for Arbitration, Ex. A at 6-7 (ordering the parties to arbitrate the question whether "*Cardell failed to conduct the Auction in a commercially reasonable manner pursuant to the Stock Pledge Agreement*"). Emphasis added.

deficiency, so it was clear from the outset that Cardell would not be able to pursue the Respondents for the balance of the loan that remained unpaid. Significantly, all of the cases relied upon by Respondents supporting the burden of the secured creditor to establish commercial reasonableness are cases in which repossessing secured creditors expected to collect the deficiency from the debtor. [121]In those cases, unlike this one, there was little incentive for the secured party to get a good price at the sale, for it expected to get its money either way by pursuing other assets of the secured debtor.

96. In this case, it was in both parties' interest to maximize the return on the price of the pledged shares and Cardell was bound to seek a fair price for those shares. The assessment of the commercially reasonable standard must take into account Cardell's expectations that its credit bid for the purchase of Deltec's stock may be all it could collect from the balance of its loan. Equally important is to take into account Cardell's legitimate interest to protect its long-term investment in Deltec in light of Cardell's preferred share liquidation value and Deltec's level of indebtedness. Proper understanding of those distinctive features of the 2001 November Agreements, aside from the controversy surrounding the time, cost, and expense in pursuing the value of Deltec's real estate holdings, speak loudly in support of the "commercial reasonableness" of the decision to foreclose on Respondents' pledged stock.

97. Viewed in this light, most of the questions raised by Mr. Andres G. Otero[122] to Mr. Freeman's testimony fail to bring up relevant issues of fact as to the commercial reasonableness of the Public Auction. Other objections in Mr. Otero's testimony, offering alternatives that, according to Mr. Otero, could have lead to a higher price for the shares, do not amount to facts that are material to the outcome of this arbitration. Thus, Mr. Otero's critique that the auction should have taken place elsewhere,[123] aside from failing to indicate why the shares could have fetched a higher price in Brazil or Panama, fails to consider that it was Cardell's clear prerogative to decide where to sell the shares.[124] Other of Mr. Otero's objections are either not supported by the facts or, if true, point to plausible choices made by Cardell, whether or not they were subject to disagreement.. This is the case of the allegation that the bidding process and sale should have taken place at a time more propitious than the Christmas season;[125] that it would have been better to hold the auction abroad so as to exempt investors having to comply with U.S. securities laws if the auction were to have been held abroad;[126] that foreign exchange risks could have been avoided if the sale were to

---

[121]  See.e.g., <u>Vornado PS, L.L.C. v. Primestoen Inv. Partners, L.P.</u>, 821 A.2d 296 (Del. Ch. 2002); In Re <u>Zsa Zsa Ltd.</u>, 352 F. Supp. 665 (S.D.N.Y. 1972), aff'd., 475 F.2d 1393 (2d Cir. 1973); <u>Central Budget Corp. vs. Garrett</u>, 48 A.D.2d 825 (2d Dept. 1975).

[122]  Witness Statement of Andres G. Otero ("Otero's Statement"), Respondents PH Brief, Ex. 4.

[123]  Otero's Statement , Para. 12(i) at 4.

[124]  Term Loan and Security Agreement, Section 9.1(b) (giving the Lender discretion to choose the place of the auction); SPA, Section 11(b) (providing the Lender with discretion to sell the shares *at any exchange..or elsewhere..")*.

[125]  Otero Statement at 4, Subpara. (iii) (*"The offering period occurred during a time of the year when business slows down significantly during the Christmas through New Years period... "*). Mr. Otero fails to address, however, Mr. Freeman's statements to the effect that the bidding process had begun three weeks before Christmas, during which time BHC collected some bids and continued until almost the end of January, except for the interruption brought by Respondents' temporary restraining order, which resumed when the TRO was lifted.

[126]  Otero Statement at 4, Subpara. 12(i) (*...By having the auction sited in New York, the auction and sale of the shares became subject to U.S. securities laws. As a result, and as pointed out in the offering materials, the*