# EXHIBIT 12

**WITNESS STATEMENT OF ANDRES G. OTERO**

My name is Andres G Otero and I am submitting this witness statement on behalf of Suchodolski Associates, Inc. and Consultora Worldstar S.A. in connection with an arbitration proceeding begun by Cardell Financial Corp ("Cardell").

1. Attached to this statement is a copy of my C.V. As reflected on my C.V., I have been involved in business and investment transactions in Latin America for 20 years. In that time I have been a commodities trader, the Vice President for Corporate Finance and a Director of BANINSA/BSDL Group, a Venezuelan investment group that included investment banking, brokerage house and insurance business segments. At BANINSA/BSDL Group I was responsible for client relations and trading in managed accounts. I established the M&A Department that focused on cross-boarder transactions in Latin America. In addition, from 1995 to 1997, I was a shareholder and Director of Banco Santiago de León, a national bank that was involved in investment transactions.

2. In January 1998 I joined BBVA Banco Provincial S.A. in Caracas, Venezuela. BBVA Banco Provincial S.A., a Venezuela subsidiary of BBVA S.A., one of the largest banks in Spain. BBVA has more than 25 million clients in 30 countries. It is headquartered in Madrid, Spain. Beginning with my work as a Corporate Finance Manager at BBVA Banco Provincial, S.A., I was directly involved in investment banking in Latin America. In that role I directed the work out and restructuring practice of the bank. That work involved restructure/refinancing and recomposition of distressed companies, including identification of potential investors for the defaulted companies.

3. In April 2001 I moved from Caracas to New York and became the Investment Banking Director of BBVA Securities, Inc., a subsidiary of BBVA S.A. As the Investment



Banking Director, I focused on transactions that involved taking companies public in Latin America and private placements of Latin American companies in the United States. In addition, I provided support to BBVA's Latin American network involved in work outs and restructuring of Latin American companies. That work included dealings with, among others, Brazilian investors. Also as part of my responsibilities at BBVA Securities, I was the Director of BBVA Security's merger and acquisition activities focused on Latin America. In the M&A practice we obtained mandates, both sale side and buy side, for cross boarder acquisitions, dispositions and mergers throughout the region.

4. In June 2006 I relocated from New York to Madrid, where I became the Equity Capital Markets Director for Latin America at BBVA S.A. In that capacity I coordinated equity capital market activity throughout the region and was directly involved in executing transactions throughout the region.

5. Effective March 1, 2008 I relocated from Madrid, Spain to Miami, Florida, where I became the Chief Executive Officer of Urban Capital Management, a private equity fund involved in investment banking opportunities in Latin America, with a particular emphasis currently on projects in Mexico.

6. In the course of my professional activities, especially those in the last 10 years, I have become familiar with investment banking throughout Latin America and have developed an understanding of the unique features of private equity investments, work outs and restructuring in that region

7. In late February, 2008, I was contacted by David Kelleher, a partner in the Washington, D.C. law firm of Thelen Reid Brown Raysman & Steiner LLP. Mr. Kelleher asked that I review the offering materials that had been prepared and distributed by Brooks Haughton

& Company, Inc. in connection with the sale of approximately 44% of the issued and outstanding capital stock of Deltec Holdings, Inc. ("Deltec Shares"). The sale was intended to liquidate certain securities held by Cardell as the secured party under a Pledge Agreement dated November 30, 2001.

8. Since my engagement by the Thelen Reid law firm, I have reviewed the following materials: (1) the Brooks Haughton & Company Invitation to Bid Letter, including the following attachments: (a) Confidentiality and Non Disclosure Agreement; (b) Form Bid Letter; (c) Form Purchase Agreement; (d) wire instructions; (e) Form Escrow Agreement; (f) Sales Procedures; and (g) Notice of Foreclosure Sale published in the Wall Street Journal and *Valor Economico*, a Brazilian newspaper; and (2) the Deltec Holdings, Inc. and subsidiaries Confidential Information memorandum, including schedules 1 through 9.

9. I have been advised that Cardell engaged the firm of Brooks Haughton & Company ("BH&C") to solicit interest in the above described sale. BH&C announced the planned sale by e-mail, telefax and telephone addressed to potential investors. In addition, I am advised that an individual by the name of Manoel Berenguer, located in Brazil, also sent e-mails and other communications to prospective investors located in Brazil.

10. In response to the materials distributed by BH&C and Mr. Berenguer, I am advised that, four companies executed confidentiality letters entitling them to receive more detailed information regarding the proposed sale of the Deltec Shares, but none of the four and none of the other addresses of these communications participated in the sale.

11. Based on my experience in Latin America detailed above and in my Curriculum Vitae, and my review of the materials listed above, I am of the opinion that the Deltec Shares were not sold in the "most commercially reasonable manner." In fact, it is my opinion that the

marketing of the shares was done in a manner that would not generate any substantial investor interest, much less actual offers to purchase.

12. Among the deficiencies in the offering materials and the manner in which the auction was conducted are the following:

(i) The sale was sited in New York although Deltec and its subsidiaries have no apparent connection to New York. Deltec is a Panamanian company and its subsidiaries are located in Brazil. In addition, the assets are in Brazil. By having the auction sited in New York, the auction and sale of the shares became subject to U.S. securities laws. As a result, and as pointed out in the offering materials, the shares would be subject to severe restrictions on resale. In fact, the offering materials caution that the purchaser may have to hold the shares for an "indefinite" period of time. Had the transaction been sited in Brazil or Panama, there would have been no such restriction. These restrictions had a chilling effect on potential investor interest.

(ii) The offering materials were in English with the exception of the notice in the Brazilian newspaper, *Valor Economico*. In Brazil, business, including investment banking affairs, are conducted in Portuguese. English is not customarily used in such transactions. Indeed, even in international public offerings directed to Brazilian investors, the materials are customarily prepared and circulated in English and Portuguese.

(iii) The offering period occurred during a time of the year when business slows down significantly during the Christmas through New Years period. Many Latin American companies have statutory vacations for their personnel and are closed between December 20 and January 7.



(iv) The fact that the auction was sited in New York, in addition to the securities law issues mentioned above, and the fact that the transaction was in U.S. currency, were also factors that would discourage Latin American investors. Indeed, it is curious that the auction would be conducted in dollars when the assets were in Brazilian Reals, thereby adding a foreign exchange risk to the transaction. I note also that the financial statements were in the Brazilian currency. It should also be noted that in the 2004-2005 period there was great volatility in the currency exchange between the Brazilian currency and the U.S. currency.

(v) The bid procedure required the bidders to submit a formal bid, accompanied by a deposit representing fifteen percent of the bid and not less than US $300,000 by January 13, 2005, and permitted Cardell to review the bids in advance of the auction. In addition, Cardell reserved the right to disclose bids to other bidders, to reject any and all bids without explanation or cause, and to select the winning bid based on factors other than price. These procedures could contribute to the impression that the auction process was illusory.

12. In addition to the deficiencies noted above, perhaps the most important deficiencies relate to (i) the identification of the majority shareholder and its relationship to the prospective investor as a minority shareholder and (ii) the lack of information regarding the financial statements provided. More specifically, the offering materials do not describe or provide meaningful information about the majority shareholder, do not indicate whether the minority shareholder will have any seats on the Board of Directors of Deltec Holdings, whether the minority shareholder will have tag-along rights in the event that the majority shareholder elects to sell, whether the minority shareholder will have drag-along rights in the event that it has an opportunity to sell, whether major decisions will be subject to super majority voting, whether the minority shareholder will have pre-emptive rights regarding sales of shares.



13. Missing from the materials and of prime importance to any prospective investor is a management discussion and analysis of the financials. The financials disclose that in its current state Deltec Holdings cannot service the Cardell debt. In addition, the auction materials state that Cardell reserves all of its rights as a creditor of Deltec. In that circumstance it is possible that Cardell could demand immediate payment of its loan from Deltec and, failing that, proceed to liquidate Deltec and/or its most valuable assets, making the prospective purchasers investment worthless. Customarily in a restructuring transaction the lender – in this instance Cardell – would propose mechanisms to ensure that the new money investor's position is not undermined. For example, Cardell could have proposed a moratorium or standstill period on debt service, it could have proposed a conversion agreement that would allow the prospective investor to assess the potential dilusion of its investment under any potential debt capitalization by Cardell.

14. The offering materials also do not explain what, if any, continued exposure Cardell may have on the sub-debt held by other creditors.

15. The financial statements do not reflect the value of the underlying assets which are held by the Deltec Holdings subsidiaries, Anastacio and Cia City. And, therefore, the financials show huge negative equity. That situation is not clarified by the valuation materials provided. Those materials indicate an asset value of between 70 to 100 million reals, approximately $28.2-$37.5 million USD at the exchange rate in January 2005.

16. It is my further opinion that had the deficiencies described above been addressed properly, the sale of the 44% minority interest would have attracted substantial interest and investors. More specifically, it is my opinion that the sale should have been centered in Latin America, particularly in either Panama or Brazil. Secondly, offering materials should have been



prepared in Spanish, Portuguese and English. A list of prospective private equity investors and equity funds should have been prepared. The potential investment should have been forecasted to those prospective investors in a summary offering memorandum. The prospective investors then should have been contacted directly by telephone and arrangements should have been made for a due diligence process, which would include site visits, management interviews, and data room documentation. In addition, a "road show" should have been organized at least for Sao Paulo and Rio de Janeiro. Typically in Latin America prospective investors would be asked to submit "price ideas", which would then form the basis for further discussions with those who submitted the highest pricing suggestions. Following the identification of the potential investors identified for further discussion, it is customary to invite binding bids from those prospective investors and from those bids to select the successful investor(s). I have been involved in precisely this type of private offering arrangement and have found it to be one that produces the best values for the transaction.

17. It is my understanding that siting the transaction in Panama and Brazil would have allowed the stock to be acquired without restrictions on resale like those imposed by the U.S. securities laws.

I solemnly declare under the penalty of perjury under the laws of the United States that the statements set forth in this witness statement are true and complete to the best of my knowledge, information and belief.

Andres G. Otero

Miami Florida
18 March 2008