USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/17/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
CARDELL FINANCIAL CORP., et al.,      :

                 Petitioners,          :           ORDER
                                                     &
           -against-                   :    REPORT & RECOMMENDATION

SUCHODOLSKI ASSOCIATES, INC.,          :    09 Civ. 6148 (VM)(MHD)
et al.,
                                       :

                 Respondents.          :
-----------------------------------x

TO THE HONORABLE VICTOR MARRERO, U.S.D.J.:


     Cardell Financial Corp. ("Cardell"), Deltec Holdings, Inc.

("Deltec"), Anastácio Empreendimentos Imobiliáros e Participações

Ltda. ("Anastácio"), and Companhia City de Desenvolvimento ("Cia

City") (collectively, "movants") have filed a motion for civil

contempt and sanctions against Consultora Worldstar S.A.

("Worldstar"), the Estate of Nelson Baeta Neves ("the Estate") and

Beno Suchdolski ("Suchodolski") (collectively, "respondents"). They

seek this remedy for alleged violations of an amended judgment

issued by the District Court on May 24, 2010 (the "Amended

Judgment"). That judgment embodied an arbitral award in favor of

movants.


     Movants allege that respondents have violated an anti-suit

1

injunction contained in the Amended Judgment by filing a pair of lawsuits in Brazil. In addition, in the event that the court does not find sufficient proof of contempt with respect to respondent Suchodolski, movants request permission to conduct discovery on the issue of whether Suchodolski violated the Amended Judgment.

Respondents contest the contempt motion on a variety of bases. Respondent Worldstar has moved to compel arbitration or for a stay of the contempt motion pending arbitration. In essence, Worldstar argues that the issue of whether there has been a violation of the anti-suit injunction is itself an arbitrable issue and therefore must be determined by an arbitral tribunal. It further argues that even the issue of arbitrability must be determined by an arbitral tribunal. Alternatively, Worldstar contests the merits of movants' motion. The Neves Estate and Beno Suchodolski challenge the contempt motion on the basis that the court lacks personal jurisdiction over them. The Estate further asserts that in the event that the court exercises jurisdiction over it, the Amended Judgment is not binding on it and the court should deny recognition and enforcement of the anti-suit injunction as to it. Beno Suchodolski also urges the court that the injunction is not binding on him and additionally challenges the motion on its merits. He opposes movants' request to open discovery.

2

For the reasons that follow, we recommend denial of respondent Worldstar's motion to compel arbitration or stay proceedings and further recommend that movants' motion for contempt and sanctions be granted in part. In particular, we recommend a grant of the motion for contempt against respondent Worldstar, and a denial of the motion with respect to the Neves Estate. We grant movants' request to conduct discovery on the issue of whether Suchodolski has violated the Amended Judgment.

## BACKGROUND

The events giving rise to the contempt motion stem from transactions entered into in New York City in 2001. In that year, four entities -- three of which are parties here -- formed a company called Brastar Corporation ("Brastar"), which issued 100 shares of stock, distributed in equal amounts to the four entities, so that each was a twenty-five percent shareholder. Those four shareholders were Worldstar[1], Cardell[2], Suchodolski Associates, Inc.

---

[1] Worldstar is a corporation organized under the laws of Uruguay. As of 2009, its registered place of business was in Montevideo, Uruguay. (See Decl. of Costa N. Kensington ("Kensington July 26, 2011 Decl.") Ex. B ("Final Award")at 1; see also Pet. to Confirm Arbit. Award ("Conf. Pet.") ¶ 4).

[2] Cardell is a Panamanian corporation. (See Decl. of Luiz E. A. Müller Filho ("Müller Decl.") Ex. D (Subordination Agreement) at 1, 9). As of 2009, its registered place of business was in Panama City, Panama. (See Final Award at 1; see also Conf. Pet. ¶ 1).

("SAI")[3] and Metropolis Shipping and Business, Inc. ("Metropolis")[4].
(See Kensington July 26, 2011 Decl. ¶ 13). Each of those companies
then made loans to Brastar to enable it to purchase Deltec
Holdings, Inc. ("Deltec"). (See id. ¶¶ 13-14). Cardell's loan was
in the amount of $12.8 million. The other three entities each
loaned Brastar $333,333.33 (id. ¶ 14), for an aggregate additional
loan of $1 million.

The interest in purchasing Deltec stemmed from that company's
real estate assets, in particular, a property known as "Jaragua" --
an undeveloped parcel of land in Brazil. (See id. Ex. H, Opinion
("First Award") at 1). It was apparently through the efforts of
Beno Suchodolski that the four entities came together to purchase
Deltec. He saw the "potential for riches" available if proper

_____

[3] SAI is a Panamanian corporation with a mailing address
listed in the care of Suchodolski Avogados Associados S/C in Saõ
Paolo, Brazil. (See Subordination Agreement at 1, 9). As of 2009
its registered place of business was Panama City, Panama. (See
Final Award at 1; Conf. Pet. ¶ 3). SAI is an investment entity,
and its principals include Suchodolski, his wife and some of his
relatives. (See Reply Decl. of Costa N. Kensington on Mot. for
Contempt Against Suchodolski & Estate of Neves ("Kensington Reply
Decl.") Ex. 5 at Tr. 18). Suchodolski Avogados Associados is
Suchodolski's law firm. (Id.; see also Subordination Agreement at
9).

[4] Metropolis is a Panamanian corporation with a 2001 mailing
address listed in Panama City, Panama. (See Müller Decl. Ex. D at
1, 9; see also Decl. of Jose Pereira Wilken Bicudo ("Bicudo
Decl.") ¶ 1).

4

authorization could be obtained to develop Jaragua. (Id. at 1-2).

Brastar purchased all the shares of Deltec, and the surviving corporation assumed the name of Deltec. (See Kensington July 26, 2011 Decl. ¶¶ 21-22; First Award at 2-3; Final Award ¶¶ 19-20). The four shareholders of Brastar thus became shareholders in Deltec, and the rights and obligations of Brastar became the rights and obligations of Deltec. (July 26, 2011 Kensington Decl. ¶ 22). Deltec thus became a Panamanian corporation operating as a holding company for the four shareholders, with assets consisting of real estate properties in Saõ Paolo, Brazil. (See Final Award at 1; First Award at 1).

## I.   The November 2001 Agreements

As part of the transactions that resulted in the acquisition of Deltec, the parties entered into a number of agreements (the "November 2001 Agreements"). (Final Award ¶ 20). These included -- in addition to the loan agreement between Cardell and Brastar/Deltec for the purchase of Deltec -- a contract pledging stock, a contract of guaranty, and a subordination agreement. (Id. ¶ 21; First Award at 2-3). The agreements -- including the subordination agreement -- contain identical arbitration

5

provisions. (See, e.g., Decl. of Helen J. Williamson in Further Supp. of Pet. to Confirm Arbit. Award ("Sept. 2, 2009 Williamson Confirm. Reply Decl." Ex. 12 (Non-Recourse Stock Pledge Agreement) § 19; Kensington July 26, 2011 Decl. Ex. D ("Subordination Agreement") at 10, § 7(e)).

### The Loan Agreement

The Term Loan Agreement between Cardell, Brastar and Deltec (as successor to Brastar) evidences the $12.8 million loan made by Cardell. Under the agreement, Cardell received security interests in assets belonging to Deltec and Deltec's subsidiaries. (Final Award ¶ 23).

### The Subordination Agreement

Of particular importance to both the contempt motion and the motion to compel arbitration, the parties to the transactions also entered into a Subordination Agreement. That agreement defines the aggregate loan of $1 million made by SAI, Metropolis and Worldstar -- referred to collectively in the agreement as the "Subordinated Lender" -- as "Subordinated Debt". (Subordination Agreement at 1, 2). The loan made by Cardell to Deltec is termed "Senior Debt". (Id. at 1). The agreement provides that the Subordinated Debt is "expressly subordinated and made junior to the payment of the

Senior Debt". (<u>Id.</u> at 2, § 2). Specifically, the agreement states

that

> (a) Brastar shall not make, and the Subordinated Lender
> shall not receive, accept or retain any direct or
> indirect payment or reduction (whether by way of loan,
> set-off or otherwise) in respect of the principal of or
> premium on, or interest on, the Subordinated Debt or any
> security therefor, whether such Subordinated Debt shall
> have become payable on the maturity of the installment or
> installments thereof provided for in the Subordinated
> Loan Documents, by acceleration or otherwise, other than
> Permitted Payments (as defined in Section 2(c) below);
> provided however, that any such Permitted Payments shall
> be subject to the provisions of Section 2(b) below.

> (b) Until the Senior Debt shall have been indefeasibly
> paid in full, Brastar shall not make, and the
> Subordinated Lender shall not receive, accept or retain
> any direct or indirect payment or reduction (whether by
> way of loan, set-off or otherwise) in respect of the
> principal of, or premium on, the Subordinated Debt or any
> security therefor . . . .

(<u>Id.</u> at 2-3, § 2(a); <u>see also id.</u> at 2-3, §§ 2(b)-(c) (discussing

Permitted Payments)).


The subordinated promissory notes are each in the amount of

$333,333.33. (<u>See</u>, <u>e.g.</u>, Kensington July 26, 2011 Decl. Ex. E

(Metropolis subordinated promissory note)). Movants aver that no

part of the Senior Debt has yet been paid. (<u>Id.</u> ¶ 20).


The Subordination Agreement also contains an arbitration

7

provision, which states, in relevant part:

> The parties agree that any dispute arising out of, or in connection with, the execution, interpretation, performance or non-performance of this Agreement (including the validity, scope and enforceability of these arbitration provisions) shall be settled by arbitration conducted in the English language, in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA") by a panel of three arbitrators. . . . The decision of the AAA shall be final, binding and not subject to further review, and judgment on the award of the AAA may be entered in and enforced by any court having jurisdiction over the parties or their assets. . . .

(Subordination Agreement at 10-11, § 7(f)).

### The Stock Pledge Agreement

The parties also entered into a Non-Recourse Stock Pledge Agreement ("SPA"). In that agreement, SAI, Worldstar, and Metropolis are the pledgors and Cardell is the secured party. The three pledgor entities each pledged their twenty-five shares of stock in Brastar/Deltec. (See Kensington July 26, 2011 Decl. ¶ 40).

### The Guaranty and Security Agreement

An additional security agreement, the Guaranty Agreement, provided that Cardell was granted priority on certain mortgages by

Deltec's subsidiaries -- Anastácio and Cia City -- as well as on the shares, receivables, and intellectual property assets of those entities. (<u>See</u> Final Award ¶ 32).

## II.  **Default and Prior Proceedings**

The Loan Agreement provided that the final maturity date for all unpaid principal and interest was to be May 30, 2003. (<u>See</u> Kensington July 26, 2011 Decl. ¶ 38). Pursuant to the agreements, upon default by Deltec, Cardell was entitled to foreclose on the Deltec shares held by Worldstar, Metropolis, and SAI. (Final Award ¶ 28). As the date of default approached, Suchodolski undertook to obtain an alternative financing arrangement with a leading Brazilian real estate developer. While it appears that proposals were made, no agreement came to fruition. (<u>See</u> First Award at 3-6; <u>see also</u> <u>Suchodolski Assocs., Inc. v. Cardell Fin. Corp.</u>, 2003 WL 22909149, *2 (S.D.N.Y. Dec. 10, 2003)). On May 30, 2003 Deltec defaulted on the loan (Kensington July 26, 2011 Decl. ¶ 43), triggering Cardell's foreclosure rights. (Final Award ¶ 35).

In June 2003, in the Southern District of New York, Worldstar and SAI filed for, and obtained, a temporary restraining order preventing Cardell from foreclosing on their Deltec shares pending

arbitration of disputes over Cardell's right to exercise its options under the Agreements and its alleged thwarting of the plan for alternative financing -- purportedly done in order to cause Deltec to default. (Id. ¶ 37); see also Suchodolski Assocs., 2003 WL 22909149, at *2. The order enjoined Cardell from enforcing any of its rights under the Loan Agreement, the SPA, or other related transactions. (Final Award ¶ 37). Worldstar, SAI and Deltec then brought a demand for arbitration, arguing that "Cardell should not be permitted to exercise its rights under the November 2001 Agreements." (Final Award ¶ 38; First Award at 7).

In December 2003, the District Court converted the TRO into a preliminary injunction "pending resolution of the underlying dispute in arbitration". Suchodolski Assocs., 2003 WL 22909149, at *5. Arbitration was commenced in New York, and the tribunal issued an award on July 8, 2004 (the "First Award") confirming Cardell's right to foreclose on the collateral, after one more chance for Deltec to repay the loan. (See Kensington July 26, 2011 Decl. ¶¶ 45-49; see also First Award at 7-12). The award also specified that Cardell would not receive any attorneys' fees or costs unless any claimants other than Deltec -- such as SAI or Worldstar -- attempted to "institute bankruptcy proceedings against Deltec or initiate any challenge to this arbitration award in a Brazilian or

Panamanian court." (First Award at 11-12).

Cardell sought confirmation of the First Award, again in the Southern District of New York. (Final Award ¶ 44). The Court confirmed the award in October 2004. (Id.). That same month Worldstar and SAI filed for another TRO, this time assertedly to maintain the status quo pending an accounting of an alleged strict foreclosure of Metropolis's shares by Cardell. (Id.). That motion was denied, a decision that was confirmed by summary order in the Court of Appeals in April 2006. (Id. ¶ 44, n.51).

In early January 2005, SAI and Worldstar obtained yet another TRO, this time in New York State Supreme Court, alleging that Cardell first had to exhaust its remedies against Deltec before foreclosing on their shares. (Id. ¶ 49). That action was removed to federal court, where SAI and Worldstar withdrew their complaint, and the TRO was dissolved on January 26, 2005. (Id. ¶¶ 51-52). A public auction was held on January 27, 2005, at which those respondents' shares were sold to Cardell on a credit bid of $2.5 million. (Id. ¶ 55).

Prior to the public auction, as early as September 2004, Cardell and Metropolis had entered into an agreement constituting

11

a strict foreclosure of Metropolis's shares under the Stock Pledge Agreement (First Award at 10), although Cardell's Assistant Secretary, Erik Akhund, asserts that the foreclosure did not actually take place until February 2005. (Decl. of Eric S. Akhund ("Akhund Decl.") ¶ 5). After the auction and strict foreclosure, Cardell was the sole shareholder of Deltec. (See Conf. Pet. ¶ 1).

In August 2005, Worldstar and SAI, trying a different jurisdiction, filed an action in the First Civil Court of Saõ Paolo, Brazil against Cardell, Deltec, and Deltec's subsidiaries, challenging the commercial reasonableness of the auction as well as alleging that Cardell had breached its fiduciary duty to Deltec shareholders "by undermining the real estate business of the Deltec Subsidiaries to prevent Deltec from its making payments under the Loan Agreement." Suchodolski Assocs., Inc. v. Cardell Fin. Corp., 2006 WL 10886, *2 (S.D.N.Y. Jan. 3, 2006). On October 24, 2005, Cardell filed suit in the Southern District of New York, requesting an anti-suit injunction. Id. at *1; (see also Final Award ¶ 62). On January 3, 2006, The Honorable William H. Pauley III granted the application as to the claims arising out of Cardell's alleged breach of fiduciary duties and abusive manipulation. The order permanently enjoined SAI and Worldstar "from bringing a claim for 'indemnification' under Brazilian law, to the extent that claim

12

arises from an alleged abuse of control or breach of fiduciary duty." <u>Suchodolski Assocs.</u>, 2006 WL 10886, at *3. The January 3, 2006 order was reaffirmed by another order on July 20, 2006. (<u>See</u> Final Award ¶ 63).[5]

Judge Pauley's order also determined that claims regarding the auction of SAI's and Worldstar's shares must be resolved by arbitration in New York, but did not enjoin that part of the Brazil action because no demand for arbitration was pending. <u>Suchodolski Assocs.</u>, 2006 WL 10886, at *3-*4. Cardell then proceeded to file, on July 26, 2006, a demand for arbitration, seeking a declaration that the foreclosure and sale of the SAI and Worldstar shares was commercially reasonable. (Final Award ¶¶ 2, 15).

Based on its initiation of arbitration, Cardell requested that SAI and Worldstar withdraw the remainder of the Brazil action -- those claims relating to the auction that Judge Pauley's order had not enjoined. SAI and Worldstar refused, and on October 3, 2006, Cardell filed for injunctive relief. <u>See</u> <u>Suchodolski Assocs., Inc. v. Cardell Fin. Corp.</u>, 2006 WL 3327625, *1 (S.D.N.Y. Nov. 16,

---

[5] SAI and Worldstar appealed the January 3, 2006 order to the Court of Appeals. That court affirmed the District Court's decision by summary order on January 25, 2008. <u>Cardell Fin. Corp. v. Suchodolski Assocs., Inc.</u>, 261 Fed. App'x 324, 325 (2d Cir. 2008).

2006). On November 16, 2006, Judge Pauley granted an anti-suit injunction against the claims related to the auction. Id. at *4. SAI and Worldstar then withdrew the 2005 Brazil action in late November 2006. (Kensington July 26, 2011 Decl. ¶ 65).

In the arbitration initiated by Cardell in July 2006, it sought a declaration that the sale of the Deltec shares of SAI and Worldstar had been conducted in a commercially reasonable manner. A hearing was held in New York City before an arbitration panel on March 21, 2008. (See Decision and Order dated Dec. 16, 2009 ("Dec. 16 D&O") at 3; Final Award ¶ 16). Initially, Cardell was the only claimant in the case, and SAI and Worldstar the only respondents, but SAI and Worldstar countered with a third-party demand for indemnification from Deltec, bringing Deltec into the case as a third-party respondent. (See Dec. 16 D&O at 2-3; Final Award ¶ 17). The panel issued an award on April 28, 2009 (the "Final Award") finding that the auction had been conducted in a commercially reasonable manner and rejecting respondents' demand for indemnity from Deltec, concluding that even if SAI and Worldstar could be characterized as sureties, Deltec had no duty to indemnify them for their loss. (Final Award ¶ 168; Dec. 16, 2009 D&O at 3). Claimants were also awarded attorneys' fees, administrative fees, and costs. (Final Award ¶ 168(3)-(4)).

14

Most relevant to this contempt motion, the Final Award contained an anti-suit injunction, providing that

> [u]ntil such time as [SAI] and Worldstar have honored this award in full, including payment of the costs and attorneys' fees awarded by this Tribunal, the Respondents and their officers, directors, shareholders, employees, and agents, including Beno Suchodolski and Nelson Baeta Neves, and all persons acting under their direction and control, and in concert or participation with any of them, are hereby enjoined from commencing or prosecuting or assisting in the prosecution of any arbitration, action or proceeding in any jurisdiction against any of the defendants named in the Brazilian Action, or any of their affiliat[es], officers, directors, shareholders, employees or agents, regarding any matter relating to the [Stock Pledge Agreement] and the November 2001 Agreements.

(Final Award ¶ 168(5)).

After the issuance of the Final Award, Cardell and Deltec requested, by letter dated May 11, 2009, that the Tribunal issue an interpretation of the Award clarifying that the Tribunal "interpret[ed] the Award to confirm Cardell and Deltec's understanding that the Award precludes any claims by Respondents against the Deltec subsidiaries arising out of the same transaction or series of transactions (the November 30, 2001 Agreements)". (Decl. of Helen J. Williamson dated Nov. 4, 2011 ("Williamson Nov. 4, 2011 Decl.") Ex. A (May 11, 2009 letter from Cardell and Deltec to Tribunal)). The Tribunal refused to issue a formal

15

interpretation, but in a letter dated June 8, 2009 stated that "the preclusive effect sought by Claimants clearly emerges from the findings of fact in the Award, in combination with Judge Pauley's Order dated January 3, 2006 . . . . as well as from Paragraph 168(5)[6] of the Award." (Id. Ex. B (June 8, 2009 letter from Tribunal)).[7] This correspondence constitutes part of the Final Award and was referred to in the later Amended Judgment. (See Kensington July 26, 2011 Decl. Ex. A ("Amended Judgment") at 1 n.1).

Cardell and Deltec filed a petition for confirmation of the Final Award in the District Court for the Southern District of New York on July 8, 2009. (See Conf. Pet.). SAI and Worldstar filed a cross-petition on July 28, 2009 to vacate the award, arguing that the panel of arbitrators had manifestly disregarded New York law in denying their demand for indemnification and that the panel's proceeding had violated due process, the Federal Arbitration Act ("FAA"), the rules of the AAA and the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). (See Dec. 16, 2009 D&O at 5; see also July

---

[6] Paragraph 168(5) is the provision of the Final Award containing the anti-suit injunction.

[7] One member of the Tribunal dissented from this point. (Id.).

16

28, 2009 Cross-Pet. to Vacate Arbit. Award).

In a decision and order dated December 16, 2009, Judge Marrero found that the panel had not disregarded New York law and that the proceeding had not been conducted unfairly. (See Dec. 16, 2009 D&O at 5-11). The District Court therefore confirmed the Final Award and denied SAI's and Worldstar's petition to vacate. (Id. at 12).

### III. **The Amended Judgment**

On January 12, 2010 SAI and Worldstar filed a notice of appeal to the Court of Appeals from the December 16, 2009 decision. On January 13, 2010, Cardell and Deltec -- two of the movants on the contempt motion here -- filed a motion to amend the same decision. (See Am. J. at 1-2). They requested that the judgment be amended so as to specify "(1) the dollar amount of the arbitration award; (2) the injunctive relief granted by the arbitrators; and (3) the post-award, pre-judgment interest and the post-judgment interest." (See Mem. of Law in Supp. of Pet'rs' Mot. to Amend the J. at 1). The District Court therefore requested a limited remand of the case from the Court of Appeals, which was granted on April 23, 2010. (See USCA Order dated Apr. 23, 2010; Am. J. at 2).

17

The District Court vacated the earlier order and issued a new judgment -- the Amended Judgment -- which reconfirmed the arbitral award and again denied the motion to vacate. It also specified that the amount of the judgment against SAI/Worldstar was, pursuant to the award, $832,998.34, and that the pre-judgment interest amounted to $41,284.77. It further ordered that post-judgment interest would accrue at the federal rate, pursuant to 28 U.S.C. § 1961, from December 18, 2009 until the amount of the judgment is paid in full. (See Am. J. at 3). The judgment then reiterated the terms of the anti-suit injunction from the arbitral award, providing that:

> pursuant to paragraph 168(5) of the Award, until such time as SAI/Worldstar has paid the amount of this Amended Judgment in full, SAI/Worldstar and their officers, directors, shareholders, employees, and agents including Beno Suchodolski and Nelson Baeta Neves, and all persons acting under their direction and control, and in concert or participation with any of them, are hereby enjoined from commencing or prosecuting or assisting in the prosecution of any arbitration, action or proceeding in any jurisdiction against: (1) Cardell Financial Corp,; (2) Metropolis Shipping and Business, Inc.; (3) Deltec Holdings, Inc.; (4) Anastácio Empreendimentos Imobilários e Participações Ltda.; (5) Cia City de Desenvolvimento; (6) José Pereira Wilken Bicudo, and (7) José Carlos Arruda de Camargo Júnior; or any of their affiliates, officers, directors, shareholders, employees or agents, regarding any matter relating to: (1) the Stock Pledge Agreement, dated November 30, 2001, among Suchodolski Associates, Inc., Metropolis Shipping and Business, Inc., Consultora Worldstar, S.A., Cardell Financial Corp., and Brastar Corporation; (2) the Guaranty and Security Agreement, dated November 30, 2001, among Anastácio Empreendimentos Imobilários e Participações Ltda.,

18

Companhia City de Desenvolvimento, Ltda., Deltec
Empreendimentos e Participações Ltda., Financity
Factoring e Representações Ltda., and Cardell Financial
Corp.; or (3) the Subordination Agreement, dated November
30, 2001, among [(i)] Suchodolski Associates, Inc.,
Metropolis Shipping and Business Inc., and Consultora
Worldstar, S.A., (ii) Brastar Corporation, and (iii)
Cardell Financial Corp.

(Am. J. at 3-5).

SAI/Worldstar filed an amended notice of appeal. (See Am.
Notice of Appeal dated June 11, 2010). The Court of Appeals
affirmed the Amended Judgment by summary order on March 2, 2011.
(See USCA Mandate, Summary Order, dated Mar. 2, 2011).

## IV.   The Brazil Actions

### A.   The Worldstar Lawsuit

On May 28, 2010, just days after the issuance of the Amended
Judgment, Worldstar filed a debt collection action in Brazil
against Metropolis, Cardell, Deltec, Anastácio and Cia City,
referred to by movants as the "Worldstar Action". (See Müller Decl.
Ex. A ("Worldstar Complaint")). The suit seeks repayment of a loan
allegedly made by Worldstar to Metropolis in the amount of
$333,333.00, which enabled Metropolis to participate in the $1

19

million aggregate loan to Brastar for the purchase of Deltec. (See id. at 8-9; Kensington July 26, 2011 Decl. ¶ 24; Müller Decl. ¶¶ 7-11).

The loan is evidenced by an August 16, 2002 letter from Metropolis to Worldstar, which states that the credit from Brastar/Deltec -- the $333,333.00 loan to Brastar for the purchase of Deltec -- "is owed to Metropolis according to the terms of Exhibit E of the Loan Agreement entered into between Cardell and Deltec Ho, after its merger with Brastar." (Müller Decl. Ex. B (Aug. 16, 2002 letter)). Exhibit E of the Loan Agreement is the Subordination Agreement. (See id. ¶ 8). The letter further states that "any and all receipts of interest and principal on this credit belongs to [Worldstar], and that, any and all amounts received by Metropolis, referring to this credit, must be immediately deposited into an account and place determined by [Worldstar]." (Aug. 16, 2002 letter).

**B.   The Neves Lawsuit**

Also on May 28, 2010, Nelson Baeta Neves -- owner of Worldstar -- filed a declaratory action in Brazil against Metropolis, Cardell, Deltec, Anastácio and Cia City (the "Neves Action"). (See

20

Müller Decl. Ex. E ("Neves Complaint")). As originally filed, the
Neves Action sought "[1] a declaration of inefficacy in relation to
[Neves] of [the two arbitration decisions] and, [2] regarding the
second decision, the nullification of the final part of the
decision which imposed upon [Neves] . . . the prohibition to bring
any suit against the present defendants" (Cardell, Deltec,
Metropolis, Anastácio and Cia City). (Neves Compl. at 4). Neves's
principal contention was that he was not a party to the
arbitrations, in particular the second arbitration, which had
resulted in the anti-suit injunction. (Id.). The complaint also
requested that Beno Suchodolski "be summoned to take part in these
proceedings." (Id. at 16). Neves died on June 9, 2010. (See Decl.
of Costa N. Kensington in Opp'n to Worldstar's Mot. to Compel
Arbit. ("Kensington Arbit. Opp'n Decl.") Ex. 1 (Neves death
certificate)).


On September 2, 2011, the Neves Estate, as successor, amended
the complaint to remove one claim. According to Worldstar -- which
filed a memorandum of law relating to the Neves Action even though
movants make no claims against Worldstar in relation to that Action
-- the claim that was withdrawn was the second, the one asking that
the Final Award be partially nullified insofar as it grants an
anti-suit injunction as to Neves. (See Worldstar Mem. in Supp. of

21

Cross-Mot. to Compel Arbit. in Rel. to Neves Action ("Worldstar Neves Action Mem.") at 2). Worldstar proffers a copy of a filing in the Brazilian court by the same attorney who had filed the original Neves Action -- Marcelo Roitman -- asking the court "to exclude the request of 'nullity of the arbitrage sentence, to the extent that it prevents the plaintiff to enter with any lawsuit against the defendants herein, in Brazil.'" (Id. at addendum). While movants' dispute the effect of the avowed withdrawal (see Kensington Arbit. Opp'n Decl. ¶¶ 6-8), as the complaint still asked for the court to declare the "inefficacy" of both the arbitral awards as to Neves in Brazil, this issue has, at least for the moment, been mooted by the dismissal of the entire Neves Action on September 16, 2011. (See id. at ¶¶ 10-11 and Exs. 2-3).


### C.   **Brazilian Real Estate**


In addition to having to defend the above-described suits, Cardell alleges -- through the declaration by its Brazilian counsel, Luiz E. A. Müller Filho -- that it has been harmed by the Brazil lawsuits because of their effect on certain real property proceedings in Saõ Paolo in which movants are involved. (Müller Decl. ¶¶ 23-28).

22

Saõ Paolo has expropriated land belonging to Deltec subsidiary Anastácio. (Id. ¶ 26). Müller declares that it is common practice in the Brazilian real estate world for companies participating in transactions to present a certificate of good standing to their potential partners. Those certificates will indicate the existence of any pending lawsuits against the company. In addition, it is mandatory that, before entering into a public deed of purchase and sale of real property, the seller present a certificate of good standing to the buyer and a public notary. (Id. ¶¶ 24-25).

The existence of pending lawsuits can delay receipt of proceeds from expropriation proceedings, as a portion of the proceeds may be held in escrow until the suit is resolved. (Id. ¶ 26). Müller states that it is likely that a significant portion of the proceeds payable to Anastácio from the Saõ Paolo expropriation (proceeds totaling possibly $190 million) "will be held in escrow for many years, unless the Worldstar Collection Action and Neves Action are dismissed." (Id.). Müller anticipates that if the Brazil actions were to proceed, a final judgment could not be expected for at least seven years. (Id. ¶ 23).

## V.    The Current Motions

Movants allege that respondents, in filing and prosecuting the Worldstar and Neves lawsuits in Brazil, have violated the Amended Judgment and they therefore move for an order of contempt and sanctions. They assert that Suchodolski and Neves are named in, and subject to, the injunction, and that Suchodolski acted in concert with Worldstar and Neves in filing the lawsuits. (See Mem. of Law in Supp. of Mot. for Contempt & Sanctions ("Movants' Contempt Mem.") at 1-2).

Respondents offer a number of arguments in response. Worldstar, filing a cross-motion to compel arbitration or to stay proceedings, urges first and foremost that the dispute is an arbitral one and must be decided by an arbitral tribunal. (See Worldstar Mem. of Law in Supp. of Cross-Mot. to Compel Arbit. ("Worldstar Arbit. Mem.") at 2-3). In the alternative, it argues on the merits that the anti-suit injunction order fails to meet the necessary standard to justify contempt because it is not clear and unambiguous and that movants have failed to show by clear and convincing evidence that the filing and prosecution of the Worldstar Action violates the anti-suit injunction. (See Worldstar Merits Mem. of Law at 1-16, 17-20).

24

The Estate of Neves, in place of Nelson Baeta Neves, argues that the court lacks personal jurisdiction over it. (<u>See</u> Estate Mem. Opposing Mot. for Contempt & Sanctions for Lack of Pers. Juris. ("Estate Opp'n Mem.") at 2-3; Sur-Reply of Estate in Opp'n to Cardell's Mot. for Contempt ("Estate Sur-Reply") at 2-6). In the alternative, it argues that the Estate, as a non-party to the arbitrations, is not bound by the injunction. (Estate Opp'n Mem. at 3-7; Estate Sur-Reply at 6-7).

Beno Suchodolski argues mainly that movants have failed to meet their burden of proving by clear and convincing evidence that he participated in initiating or prosecuting either Brazil lawsuit, and he further asserts that he even tried to discourage the filing of the Brazil actions. (<u>See</u>, <u>e.g.</u>, Mem. in Opp'n to Mot. for Contempt Against Suchodolski ("Suchodolski Opp'n Mem.") at 4-8, 9-10).

With the above facts in mind, we turn to an analysis of the current motions.

**ANALYSIS**

We first address the preliminary issue of arbitrability, and

25

then proceed to consider personal jurisdiction. Finally, we turn to an analysis of the merits of the contempt motion and movants' request to open discovery with respect to Suchodolski's role in the Brazil lawsuits. For the reasons that follow, we find no basis to compel arbitration in this dispute or to stay proceedings and recommend that Worldstar's cross-motion to compel be denied. We further find that movants have demonstrated that the court may exercise personal jurisdiction over the Estate of Neves, but have failed to meet their burden in showing that the anti-suit injunction clearly and unambiguously prohibited the Neves Action. We therefore recommend that the contempt motion against the Estate be denied. Movants have, however, shown by clear and convincing evidence that Worldstar has violated the anti-suit injunction, and so we recommend granting the contempt motion as to that respondent. Lastly, we find that movants have shown a prima facie case of a violation of the Amended Judgment by Suchodolski, and so are justified in conducting discovery to determine whether they have a case for clear and convincing evidence of contempt against him. We therefore order that discovery may be conducted on this issue.

I.    **Arbitrability**

The arbitration clause in the Subordination Agreement states

26

that "any dispute arising out of, or in connection with, the
execution, interpretation, performance or non-performance of this
Agreement (including the validity, scope and enforceability of
these arbitration provisions) shall be settled by arbitration. . .
in accordance with the commercial arbitration rules of the American
Arbitration Association ("AAA")." (Subordination Agreement at 10,
¶ 7(f)). Worldstar contends that the dispute at hand involves
interpretation of whether the Worldstar Action "relate[s] to" the
Subordination Agreement and therefore, pursuant to the terms of the
arbitration clause of that agreement, the dispute is subject to
arbitration. (See Worldstar Arbit. Mem. at 6-17; Worldstar's Reply
in Further Supp. of Cross-Mot. to Compel Arbit. ("Worldstar Arbit.
Reply Mem.") at 1-4). Worldstar further argues that even the issue
of arbitrability must be sent to an arbitration panel, pursuant to
those terms. (See Worldstar Arbit. Mem. at 14-17; Worldstar Arbit.
Reply Mem. at 3).

Movants respond that there is no authority for sending to
arbitration a matter relating to a dispute that has already gone
through arbitration and produced a decision that has been confirmed
not just by the district court, but also upon appeal to the Second
Circuit Court of Appeals. (See Movants' Mem. of Law in Opp'n to
Worldstar's Cross-Mot. & in Reply on Mot. for Contempt ("Movants'

27

Arbit. Opp'n Mem.") at 6-7).

As much as Worldstar attempts to divert attention from the provisions at issue, it is the District Court's Amended Judgment that is the focus of our concern. This dispute is a contempt motion involving an analysis of the scope of the injunction contained in the Amended Judgment, not the arbitration clause in the Subordination Agreement. Whether or not the court is required to address any of the terms of the Subordination Agreement in determining that scope, Worldstar offers no authority for its assertions that an arbitration award, once confirmed by judicial order, should be sent back to the arbitrators for interpretation of that award because it may involve an agreement containing an arbitration clause.

Indeed, to rule otherwise would effectively treat the federal courts' confirmation of the arbitral award as a nullity. The purpose of the judicial proceeding under the FAA is to permit the ruling of the arbitrators to be embodied in an enforceable judgment. Any violation of the terms of the judgment is, of necessity, remediable in a court of law, which is authorized to interpret and enforce its own orders and judgments.

Worldstar's further argument that arbitrability is arbitrable is equally unavailing. It states that "Worldstar's position is that an arbitral tribunal must decide whether interpretation of the 'relating to' language of the Award and Amended Judgment is an arbitrable issue or an issue for judicial decision . . . ." (Worldstar Arbit. Reply Mem. at 1). This only serves to demonstrate that the language requiring interpretation is found in the Award and Amended Judgment, not the Subordination Agreement. There is no basis for sending such a dispute to arbitration, and, accordingly, no basis for a stay of movants' motion for contempt.

We recommend that Worldstar's cross-motion to compel arbitration or stay the contempt proceedings be denied.[8]

---

[8] Another preliminary issue not raised by the parties but worth addressing, in the exercise of caution, is that of mootness. The Neves Action was dismissed in September 2011. (See Kensington Arbit. Opp'n Decl. ¶ 11 & Ex. 3). The Brazilian court found that the "right to free access to the court system" asserted by Neves in that action was "not transmissible" and therefore did not survive his death. (Id. Ex. 3). The court explained that the right that Neves was articulating belonged only to him, and there was "no way for heirs to assume the right and continue the present suit." (Id.). The question raised by this dismissal is whether the court may address movants' motion with respect to the Neves Action or whether the motion is moot.

The mootness doctrine is grounded in the 'case or controversy' requirement found in Article III of the U.S. Constitution, which mandates that "federal courts may not adjudicate matters that no longer present an actual dispute between the parties." Catazano v. Wing, 277 F.3d 99, 107 (2d Cir. 2001)(citing Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477

## II.  **Personal Jurisdiction**


Before turning to a merits-based analysis of the contempt

motion, we first address arguments by the Estate of Neves and -- to

an extent -- by Suchodolski that the court lacks personal

jurisdiction over them. Without personal jurisdiction over a party,

a court may not hold that party in contempt. See, e.g., Comverse,

---

(1990)). A case is moot "when the issues presented are no longer
'live' or the parties lack a legally cognizable interest in the
outcome," id. (quoting Powell v. McCormack, 395 U.S. 486, 496
(1969)), and the court can no longer provide any relief that
could effectually redress the plaintiff's claimed injuries. In re
Kurtzman, 194 F.3d 54, 58 (2d Cir. 1999) (per curiam).
    The Neves Action has ceased -- at least for the time being -
- but the filing of that suit and its prosecution up to the point
of dismissal may still warrant sanctions of compensatory damages
in favor of movants. See GMA Accessories, Inc. v. Eminent, Inc.,
2008 WL 2355826, *9 (S.D.N.Y. May 29, 2008) ("Sanctions for civil
contempt are properly imposed . . . to compensate the plaintiff
for losses caused by the defendant's past non-compliance."). The
court can therefore still provide relief that would effectually
redress movants' injuries caused by the Neves Action. See, e.g.,
Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 8-9 (1978)
(where injunctive-relief claim was resolved, the case was not
mooted because there remained claims for actual and punitive
damages). Furthermore, movants allege that a motion has been
filed that may amount to a request to reopen the action. (See
Kensington Reply Decl. ¶ 57 & Ex. 13). Since there remains the
possibility of redress for any harms that movants may prove, the
dismissal of the Neves Action does not moot movants' motion with
respect to the Estate and Beno Suchodolski. See, e.g., Orozco v.
Sobol, 703 F. Supp. 1113, 1117 (S.D.N.Y. 1989) ("[A] claim for
damages remains viable even though claims for injunctive or
declaratory relief are deemed moot.") (citing Powell, 395 U.S. at
496).

Inc. v. Am. Telecommc'ns., Inc. Chile S.A., 2009 WL 464446, *2 n.4
(S.D.N.Y. Feb. 24, 2009) (citing New York State NOW v. Terry, 962
F.2d 390, 400 (2d Cir. 1992)).


A.    **The Estate of Neves**


Nelson Baeta Neves died on June 9, 2010. This suit was
commenced in 2009, while Neves was still alive, but the original
named respondents were SAI and Worldstar, not Neves. (See Conf.
Pet.). The Estate of Neves was added as a respondent on the
contempt motion, filed July 28, 2011.


In evaluating personal jurisdiction over an estate, the court
looks to whether it would have had personal jurisdiction over the
deceased individual. See, e.g., Shakour v. Fed. Rep. of Germany,
199 F. Supp.2d 8, 15-17 (E.D.N.Y. 2002) (analyzing personal
jurisdiction over an estate by determining whether the decedent
would have been subject to personal jurisdiction under N.Y.
C.P.L.R. § 301 or § 302); In re Terrorist Attacks on September 11,
2001, 349 F. Supp.2d 765, 816-17 (S.D.N.Y. 2005) (evaluating
argument by an estate on a motion to dismiss for lack of personal
jurisdiction by examining allegations against the decedent).

Movants argue that there are several bases for the exercise of jurisdiction over the Estate -- under theories of alter ego, agency and waiver. First, they assert that Worldstar was Neves's alter ego and thus that Neves would have been subject to jurisdiction through Worldstar. Under this theory they argue first that, pursuant to the November 2001 Agreements, Worldstar consented to jurisdiction in New York, and so Neves, through Worldstar, also consented. (See Movants' Reply Mem. in Supp. of Mot. for Contempt & Sanctions Against Neves Estate ("Movants' Estate Reply") at 5-7). The contractual provision on which they rely dictates that each of the parties "expressly and irrevocably assents and submits to the personal jurisdiction of any [court of the State of New York or the United States District Court for the Southern District of New York]. . . ." (Id. at 6 (quoting Subordination Agreement § 7(e))). As a second argument under their alter-ego theory, movants argue that Worldstar, as Neves's alter ego, transacted business in New York so as to satisfy the requirements of New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), and thus that provision also permits the exercise of jurisdiction over Neves/the Estate. (See Movants' Estate Reply at 3-5, 7-9).

Movants' agency argument for jurisdiction is also premised on New York's long-arm statute. Movants allege that Worldstar

32

transacted business in New York so as to satisfy New York's long-arm statute, this time as Neves's agent. On this theory, Worldstar need not be found to be the alter ego of Neves, but rather an agent, a status that depends upon different criteria. (<u>See</u> <u>id.</u> at 9-10).

Lastly, movants return to their alter ego theory to argue that Neves, through Worldstar, waived any objection to personal jurisdiction by initiating and defending lawsuits and arbitrations in New York. (<u>See</u> Movants' Estate Reply at 10).

Before turning to the merits of these arguments, we address the issue of what law to apply and the appropriate burden of proof to be carried by movants. We will then turn to the merits of the asserted bases for jurisdiction and whether the exercise of jurisdiction over the Estate comports with due process.

## 1. **Choice of Law, Burden of Proof and Need for a Hearing**

### a.   **Choice of Law**

"Personal jurisdiction over a non-domiciliary defendant in a diversity or federal question case is determined by reference to

33

the law of the state in which the court sits." <u>Senese v. Hindle</u>,
2011 WL 4536955, *6 (Sept. 9, 2011), <u>adopted</u>, 2011 WL 4529359
(E.D.N.Y. Sept. 28, 2011) (citing <u>Bensusan Rest. Corp. v. King</u>, 126
F.3d 25, 27 (2d Cir. 1997)); <u>see also</u> <u>Grand River Enters. Six</u>
<u>Nations, Ltd. v. Pryor</u>, 425 F.3d 158, 165 (2d Cir. 2005). We
therefore presumptively turn to the law of New York, the forum
state. The same result is suggested by the November 2001
Agreements, which provide that they will be "governed by and
construed in accordance with the laws of the State of New York
without regard to its rules pertaining to conflicts of laws." (<u>See</u>,
<u>e.g.</u>, Subordination Agreement at 10, § 7(d)) (emphasis omitted).
The parties further agreed that any legal action "under, arising
out of, or in any manner relating to this agreement may be brought
in any court of the State of New York or in the United States
District Court for the Southern District of New York." (<u>Id.</u> § 7(e))
(emphasis omitted); <u>see also</u> Final Award ¶ 33 ("The Loan Agreement
and the various security agreements concluded between the parties
provide for the application of New York law by New York (federal or
state) courts in case a dispute were to arise under those
contracts.")).

We note also that movants in their submissions to the court
have relied on New York law for their arguments regarding personal

34

jurisdiction over the Estate, and save for one point directed at the alter-ego analysis, the Estate has not contested that choice.[9] For this reason also, we may assume that New York law applies and need not undertake a choice-of-law analysis. See, e.g., Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (where parties' briefs assume that New York law governs, "such 'implied consent . . . is sufficient to establish choice of law'") (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)); Network Enter., Inc. v. Reality Racing, Inc., 2010 WL 3529237, *4 n.6 (S.D.N.Y. Aug. 24, 2010); see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp.2d 593, 604 n.11 (S.D.N.Y. 1998).

### b.    Burden of Proof

The nature of a plaintiff's burden to establish a basis for jurisdiction over a defendant "varies depending on the procedural

---

[9] The Estate makes a brief assertion that the governing law for the alter-ego analysis is that of Uruguay, but offers no legal support for this point. (See Estate Sur-Reply at 7). The Estate is partially correct: for examining whether a corporation has followed corporate formalities, we do look to the law of the place of incorporation -- in this case, Uruguay. However, the remainder of the analysis is under New York law. The Estate does not contest the New York choice of law for movants' agency theory of jurisdiction.

posture of the litigation." Hearst Corp. v. Goldberger, 1997 WL 97097, *6 (S.D.N.Y. Feb. 26, 1997) (citing Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)). On a motion to dismiss, a plaintiff generally need only make out a prima facie case for personal jurisdiction. At that stage, a court may rely on pleadings and affidavits, rather than conduct a full-blown evidentiary hearing. See So. New England Tel. Co. v. Global Naps Inc., 624 F.3d 123, 138 (2d Cir. 2010)). Thus, a "showing may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" Id. (quoting Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001)). The court must "'construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor.'" Id. (quoting Porina v. Marward Shipping Co., 521 F.3d 122, 126 (2d Cir. 2008)).

However, the plaintiff ultimately bears the burden of establishing jurisdiction by a preponderance of the evidence. See Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981); Merrill Lynch Capital Servs., Inc. v. Prairie Pride, Inc., 2011 WL 1044887, *1 (S.D.N.Y. Mar. 10, 2011) (citing A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79 (2d Cir. 1993)); see also

Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d
117, 120 (2d Cir. 1984) (noting that when personal jurisdiction is
decided on the pleadings, a plaintiff need only show a prima facie
case, but "if that initial decision is contested, the plaintiff
must then prove, following discovery, either at a pre-trial hearing
or trial, that jurisdiction exists by a preponderance of the
evidence").

     Because this is a merits stage of the proceedings, the
preponderance-of-the-evidence standard is applicable. In addition,
the relief that movants request involves withdrawal of the
remaining Brazil lawsuit, and as such is more similar to an
application for injunctive relief, where "'[a] prima facie showing
of jurisdiction will not suffice. A court must have in personam
jurisdiction over a party before it can validly enter even an
interlocutory injunction against him.'" Do The Hustle, LLC v.
Rogovich, 2003 WL 21436215, *2 (S.D.N.Y. June 13, 2003) (quoting
Visual Sci. Inc. v. Integrated Commc'ns, Inc., 660 F.2d 56, 59 (2d
Cir. 1981)).

          c.   **Need for an Evidentiary Hearing**

     Having concluded that a preponderance-of-the-evidence standard

                              37

must be applied, we must next determine whether sufficient discovery has taken place on the issue of jurisdiction or whether there is a need for an evidentiary hearing. The need for a hearing turns on whether there are facts in dispute. If the jurisdictional facts are undisputed, no evidentiary hearing is necessary. See Pieczenik v. Dyax Corp., 265 F.3d 1329, 1334 (Fed. Cir. 2001) (parties conducted discovery and advised the court that no evidentiary hearing was necessary because there was no dispute as to the jurisdictional facts, and the court applied the preponderance standard) (citing Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039 (2d Cir. 1990)); see also Hearst Corp., 1997 WL 97097, at *6 (finding it unnecessary to decide whether the prima facie or preponderance standard applied because the court lacked jurisdiction under either standard, but finding that "[t]he dispositive jurisdictional facts . . . are undisputed, and thus a jurisdictional hearing is not necessary").

The parties have not on this contempt motion specifically requested discovery on jurisdictional issues. It is clear, however, that discovery has taken place involving facts relevant to jurisdiction. (See, e.g., Williamson Oct. 7, 2011 Decl. Exs. 1-7 (Movants' Information Subpoena Questions & Responses); Kensington Reply Decl. Ex. 6 (excerpt from 2004 Neves deposition)). The

38

jurisdictional facts that have surfaced do not appear to be in dispute.

Furthermore, both sides stated to the court at an October 20, 2011 conference that they were content with their paper submissions on the issue. (Oct. 20, 2011 Tr. 7, 20). At that conference, movants' counsel summarized the jurisdictional arguments, asserting the position that "Neves was subject to personal jurisdiction based on that Worldstar was his alter ego from the undisputed facts." (Id. at 7). Counsel indicated that movants were content to rest on their submissions. (Id.). Counsel for Worldstar and the Estate[10] agreed that there are certain undisputed facts. He also asserted that there were contested facts, such as the assertions by movants' counsel that Worldstar is a "shell", although he recognized the fact that the court "may or may not treat that as a legal conclusion, but Mr. Kensington proffers it to you as a fact." (Id. at 18). As such, respondent's attorney stated that he would not agree to have those assertions submitted to a prima facie test, but that they needed to be judged by a preponderance-of-the-evidence standard. (Id. at 19). Nonetheless, in the event that the court were to use the preponderance standard, counsel indicated, a

---

[10] The attorney represented the Estate at this hearing, but not in its court filings.

hearing would not be necessary. (<u>Id.</u>). As with movants, Estate counsel stated that he was satisfied with the record as it stood for the purpose of having the court decide the jurisdictional issue -- as long as the standard was to be a preponderance of the evidence. (<u>Id.</u> at 20). Under such a standard, he argued, "statements like 'shell' made in a conclusory way or statements like 'hiding behind a shell' made in a conclusory way will not prove anything by preponderance." (<u>Id.</u>).

Given the discovery that has taken place and the undisputed facts that have emerged, we find no need for an evidentiary hearing. The parties have conducted discovery in this case on issues that are pertinent to jurisdiction, and they presumably also have had ample opportunity to conduct extensive discovery over the years in the multitude of prior related legal proceedings. The declarations proffered by movants demonstrate that documents have been exchanged and that the parties have conducted multiple depositions over the years. (<u>See</u>, <u>e.g.</u>, Kensington Reply Decl. Exs. 6-8 (deposition excerpts)). Moreover, facts relevant to the issue of personal jurisdiction over the Estate do not appear to be in dispute. (<u>See</u> Estate Sur-Reply at 2-3). Rather, it is the legal conclusions to be drawn from those facts about which the parties

40

disagree.[11] Finally, the parties themselves have indicated to the court both that they agree that there are relevant undisputed facts and that they are content to rest on their paper submissions.[12] (Oct. 20, 2011 Tr. 7, 20). Accordingly, we find no basis for holding an evidentiary hearing and we will analyze the jurisdictional dispute by a preponderance-of-the-evidence standard.

In turning to the merits of the jurisdictional question, we first address the arguments based on the assertion that Worldstar was Neves's alter ego, and summarize the evidence pertaining to Neves's relationship to Worldstar. We then discuss the alternative argument grounded in an asserted agency relationship and lastly discuss movants' waiver argument. Finally, we will determine whether the exercise of jurisdiction over the Estate comports with due process.

---

[11] We note that the assertion that Worldstar is a "shell" is a disputed legal conclusion, not a disputed fact.

[12] It should be noted that in a memorandum submitted prior to the October 20, 2011 conference, movants did indicate that they were relying on a prima facie standard. (See Movants' Estate Reply at 10). In this October 7, 2011 submission movants also noted that if there were a factual dispute then discovery would be warranted. (Id. at 10 & n.6). However, the October 20, 2011 conference -- at which counsel agreed that they were content to rest on their papers -- post-dated the submission, and at that conference movants provided no argument for the application of a prima facie test rather than a preponderance-of-the-evidence standard.

## 2.    Alter-Ego Theories of Jurisdiction

### a.    Alter-Ego Legal Standard

Alter egos are treated as a single entity for purposes of personal jurisdiction. See e.g., Bank of America v. Apollo Enter. Sols., LLC, 2010 WL 4323273, *4 (S.D.N.Y. Nov. 1, 2010) ("[I]n general, alter egos are treated as one entity for jurisdictional purposes.") (quoting Transfield ER Cape Ltd. v. Indus. Carriers, Inc., 571 F.3d 221, 224 (2d Cir. 2009)). We assume for present purposes that the court has personal jurisdiction over Worldstar. Indeed, Worldstar has not contested jurisdiction. Therefore, if Worldstar was at pertinent times the alter ego of Neves, the court will have jurisdiction over the Estate.

On an alter-ego claim for liability, the corporate veil will be pierced if a plaintiff can demonstrate that "the alleged dominating party exercised complete domination over the corporation with respect to the subject transaction and that such domination was used to commit a fraud or other wrong which injured [the] plaintiff." Miramax Film Corp. v. Abraham, 2003 WL 22832384, *7 (S.D.N.Y. Nov. 25, 2003) (citing Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997)). The standard for

42

piercing the corporate veil for purposes of personal jurisdiction, however, is "a less stringent one." Id.; accord Telenor Mobile Commc'ns AS v. Storm LLC, 587 F. Supp.2d 594, 618-19 (S.D.N.Y. 2008) ("[T]he standard for finding a shareholder to be an alter ego for purposes of personal jurisdiction is 'a less stringent' standard than that necessary to pierce the corporate veil for purposes of liability.'" (citation omitted)). For purposes of jurisdiction, "[i]f a corporation is merely a shell, the corporate veil may be pierced to impute jurisdiction even without a showing that the shell was used to perpetrate a fraud." Miramax Film Corp., 2003 WL 22832384, at *7; accord Marine Midland Bank, 664 F.2d at 903 (noting that while two prongs must be shown to pierce the corporate veil for liability -- that a corporation is a shell and that it has been used to commit fraud -- for purposes of jurisdiction "it is sufficient to inquire whether the corporation is a real or shell entity"); see also Bank of America, 2010 WL 4323273, at *12 (noting that courts apply a "less onerous standard" when evaluating personal jurisdiction under an alter ego theory than the standard required for piercing the corporate veil for liability purposes); Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd., 475 F. Supp.2d 456, 459 (S.D.N.Y. 2007) (for jurisdictional purposes, it is not necessary to show that the shell was used to commit fraud).

43

In evaluating the question of domination and control, courts look to a variety of factors, including (1) the failure to observe corporate formalities; (2) whether the corporation is undercapitalized; (3) any intermingling of person and corporate funds; (4) the sharing of common office space or telephone numbers; (5) an overlap of ownership, directors, officers or other personnel; and (6) whether the corporation has been used to perpetrate a wrongful act against the plaintiff.[13] <u>Miramax Film Corp.</u>, 2003 WL 22832384, at *8 (citing <u>inter alia</u> <u>Am. Fuel Corp.</u>, 122 F.3d at 134; <u>see also</u> <u>Bank of America</u>, 2010 WL 4323273, at *4 (listing factors). No one factor is determinative, but rather the key inquiry is whether the corporation "is being used by the alleged dominating entity to advance its own personal interests as oppose[d] to furthering the corporate ends." <u>Miramax Film Corp.</u>, 22832384, at *8.

The parties do not address the time period relevant for the alter-ego inquiry and whether it may be different for an argument based on consent versus one based on the New York long-arm statute. In determining whether an entity is the alter ego of another for

---

[13] We again note that a showing of fraud is not *required* for purposes of personal jurisdiction. <u>Miramax Film Corp.</u>, 2003 WL 32384, at *7.

liability purposes, the relevant time period is that of the transaction at issue. See, e.g., GEM Advisors, Inc., v. Corporacion Sidenor, S.A., 667 F. Supp.2d 308, 324 (S.D.N.Y. 2009) (noting, with respect to the first part of a veil-piercing/alter-ego analysis -- domination and control over the alleged shell entity -- that New York courts require "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own" (emphasis added)) (quoting Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985)); see also Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 28 (2d Cir. 1993) (finding liability appropriate under veil-piercing theory where the subsidiary "could have acted as a separate corporation, and from its organization in 1972 until mid-1981 it appears to have done so" but that the relevant inquiry was "whether it did so act in 1984 when the franchise agreement was breached or whether, on the other hand, its action were then dominated and controlled by its parent").

Here, movants are not seeking to hold the Estate liable for the actions of Worldstar. Rather, they are arguing that the Estate is subject to jurisdiction in this court by virtue of Neves's

alter-ego relationship with Worldstar, and it is well-settled that in general "whether or not a court has personal jurisdiction is determined as of the time the action is filed." <u>BHP Trading (UK) Ltd. v. Deep Sea Int'l Shipping Co.</u>, 1991 WL 198747, *6 (S.D.N.Y. Sept. 3, 1991). In this instance, however, the events for which the contempt proceeding was brought occurred after the initiation of the main action. The action was commenced as a petition to confirm the Final Award in 2009, but the Brazil suits were not filed until 2010. The contempt motion was filed in July 2011. It is therefore appropriate, by analogy, to evaluate jurisdiction over the Estate by examining the status of Worldstar as of July 2011. However, as we will discuss, events prior to that date are also relevant.

For purposes of jurisdiction based on consent, caselaw does not definitively set parameters for the relevant period of inquiry, but it is clear that facts contemporaneous with the commencement of the litigation are important. Moreover, events that took place years prior to the suit may well also be relevant. <u>See</u>, <u>e.g.</u>, <u>Packer v. TDI Sys., Inc.</u>, 959 F. Supp. 192, 201-03 (S.D.N.Y. 1997) (analyzing assertion of imputed consensual jurisdiction based on an alter-ego argument by examining facts dating back several years prior to the filing of the complaint); <u>see also Storm LLC v. Telenor Mobile Commc'ns AS</u>, 2006 WL 3735657, *13 (S.D.N.Y. Dec. 15,

46

2006) (finding imputed consensual jurisdiction where the court determined that two corporations were the alter egos of a third by examining the relationship between the corporations with no reference to specific facts dating from the time that the third corporation had consented to jurisdiction). For purposes of movants' consent argument, we therefore will examine Worldstar's status at the time the contempt motion was filed but will bear in mind the relevance of facts prior to that time, such as facts relating to the status of the corporation at the time of the November 2001 Agreements. We also note that the period in which the Brazil suits were filed, as will be discussed, shows Worldstar to be in essentially the same state as it is today -- and indeed the same state it has been in since 2005.

With respect to New York's long-arm statute, caselaw shows that the relevant time period is more expansive than for a general jurisdictional analysis (i.e. under N.Y. C.P.L.R. § 301, which grants general jurisdiction over a foreign corporation "doing business" in New York). When analyzing personal jurisdiction under section 302(a)(1), "it is not the defendant's activities at the time that the action is commenced that are significant, but, instead, what must be shown is that the defendant had some business contacts within this State and that the cause of action sued upon

47

arose out of those business contacts." <u>Lancaster v. Colonial Motor Freight Line, Inc.</u>, 177 A.D.2d 152, 158, 581 N.Y.S.2d 283, 287 (1st Dep't 1992). Courts have analyzed assertions of alter-ego jurisdiction under the long-arm statute (section 302) by relying both on recent facts as well as facts reaching as far back as the incorporation of the relevant entity. <u>See</u>, <u>e.g.</u>, <u>Seema Gems, Inc. v. Shelgem, Ltd.</u>, 1994 WL 86381, *1-*2 (S.D.N.Y. Mar. 16, 1994) (where one corporation was subject to jurisdiction under section 302, the court, in denying a motion to dismiss based on lack of personal jurisdiction filed by a second corporation, took into account in its alter-ego analysis allegations relating both to the current relationship of the corporations as well as the formation of the second corporation); <u>Kinetic Instruments, Inc. v. Lares</u>, 802 F. Supp. 976, 985-86 (S.D.N.Y. 1992) (where corporation was subject to jurisdiction under section 302, finding a <u>prima facie</u> showing that the corporation was the alter ego of the individual defendant for jurisdictional purposes by looking to factual allegations of present control as well as the known facts of the corporation's establishment); <u>see also</u> <u>Miramax Film Corp.</u>, 2003 WL 22832384, at *3-*10 (not specifying the basis of jurisdiction over the individual defendant, but finding that plaintiffs had made a <u>prima facie</u> showing that two corporations were alter egos of the individual for jurisdictional purposes by examining facts ranging

48

from incorporation of the companies several years prior to more recent facts about their relative status). Therefore, for purposes of this asserted basis for jurisdiction, we will look to the entirety of the relationship between Neves and Worldstar, drawing on facts from the time the contempt motion was filed as well as from prior years.

Given that the relevant time period for both of the alter-ego jurisdictional arguments encompasses facts dating back to 2001 (and perhaps earlier), we now turn to a review of the relationship between Neves and Worldstar.

### b.    **Relevant Jurisdictional Facts -- Neves's Relationship to Worldstar**

Movants assert that Worldstar was a shell for Neves, basing this assertion on allegations that the company has no assets and that it was entirely controlled by Neves. (See, e.g., Movants' Estate Reply at 4-5). We find it helpful to begin with an overview of Worldstar as a corporation and Neves's relationship to it. Because 2005 appears to have been a point after which the company became inactive with very little change, we first examine the period prior to that time, and then the status of Worldstar from

49

2005 to the present.

### i. Worldstar Pre-2005

We understand from the record before the court that Worldstar is an Uruguayan corporation of which the majority (and perhaps only) shareholder was Nelson Baeta Neves. (See Final Award ¶ 1; Estate Sur-Reply at 3). Neves owned Worldstar "completely", "[b]y [him]self through family associations". (Kensington Reply Decl. Ex. 6 (Neves Mar. 8, 2004 Dep.) at 39).

Neves appears to have been a saavy businessman who was well-connected in political circles. Prior to the events at issue here, he had a long career in law and business, having obtained a law degree as well as training in business administration. He practiced law for a number of years, and followed that with an illustrious business career, eventually transitioning to the real-estate development market. (See id. at 9-16). He also owned farmland that produced crops, including coffee and corn. (Id. at 16). It is clear that Neves was a sophisticated businessman, adept at managing multiple projects in more than one industry.

We have not been presented with information specifying when

Worldstar was formed or with any documents pertaining to its incorporation, but we know with certainty that the company was at least in existence in 2001, when it pooled resources with Cardell, Metropolis and SAI to loan money to Brastar for the purchase of Deltec. See supra pp. 3-5. It is likely, however, that the corporation was in existence as far back as 1997. A Spanish-language document included with a 2001 power of attorney signed by a Worldstar representative has a date of August 22, 1997, and appears to represent some type of corporate minutes of Consultora Worldstar. (See Kensington July 26, 2011 Decl. Ex. F at last pg.). While difficult to interpret fully, it clearly lists a Ms. Raquel Ines Cadena Boix with a reference to the position of "Presidente", and it also contains a reference to "capital integrado", which may be an indication of the amount of capital in the corporation: US$ 25,000. (Id.); see also http://www.spanish-translator-services.com /dictionaries/finance-spanish-english/c/Capital_integrado.htm.

It is perhaps more informative to view Neves's relationship with Worldstar through the deal to purchase Deltec. Worldstar's involvement in the Deltec deal began with Beno Suchodolski, who approached Neves. (Neves Mar. 8, 2004 Dep. at 18). Suchodolski had known Neves for many years, having been his attorney since at least the early 1990s and perhaps earlier. (Id. at 17-18). Suchodolski

testified at an arbitration hearing in March of 2004 that he had found out about Deltec from a brokerage firm in New York City. (Kensington Reply Decl. Ex. 10 (Mar. 30, 2004 Arbit. Tr.) at 272-73). He saw that it would be important to have both political and business power involved in the company, due to the realities of real-estate development in Brazil. (Id. at 273-74). He went to Neves first, for his political sway, describing Neves as "a celebrity" in the city of Saõ Paolo. (Id. at 275). Neves then turned to his long-time friend Mr. Helio Bicudo to bring him into the deal. (Neves Mar. 2004 Dep. at 23-25). Neves urged that Mr. Bicudo would create more of a political balance and Suchodolski agreed. He described Neves as conservative and Bicudo as liberal, which created "a beautiful combination of political power". (Mar. 30, 2004 Arbit. Tr. 274; see also Mar. 31, 2004 Tr. 517). Bicudo, as deputy mayor of Saõ Paolo, was a prominent political figure, as well as an active human rights advocate. (Mar. 31, 2004 Tr. 517). His son, Jose Bicudo, became involved in the deal as well. (See, e.g., id. at 518-19).

While not entirely clear from the narratives offered by the record, it appears to have been Jose Bicudo who ended up taking a more active role than his father in the dealings with Deltec (see, e.g., Neves Mar. 8, 2004 Dep. at 66-68), and the father and son are

both associated with Metropolis, the third company -- along with
Worldstar and SAI -- that made the $1 million aggregate loan to
Brastar/Deltec. (See, e.g., Kensington Reply Decl. Ex. 2 (June 30,
2003 hearing before Judge Pauley) at 2; Mar. 30, 2004 Arbit. Tr.
299). Jose Bicudo is the individual who signed in the capacity of
attorney-in-fact for Metropolis in the November 2001 Agreements.
(See, e.g., Williamson July 1, 2009 Decl. Ex. 2 (Stock Pledge
Agreement) at 11). He also submitted a declaration in this case
stating that he retains general power of attorney for Metropolis.
(See Bicudo Decl. ¶ 1).


     As discussed previously, Worldstar provided a loan to the
Bicudos/Metropolis in the amount of $333,333.00 in order for
Metropolis to participate in the deal. In his 2004 deposition,
Neves refers to this loan while describing what appears to be a
disagreement about the arrangement of the proposed company. Helio
Bicudo apparently was loathe to put his shares in a holding company
because he wanted to be able to negotiate them. Neves testified
that he had responded to Helio Bicudo's reluctance by asking "How
are you going to negotiate the shares that I put in your hands with
my money?" (Neves Mar. 8, 2004 Dep. at 55-57). In addition, at a
later time (the deposition does not clarify what year), there was
apparently some question of Metropolis selling out and transferring

shares to another individual or entity. Neves reported that in response to this suggestion he had told Helio Bicudo to give the shares to him, "Because the shares were paid by me." (Id. at 62). Bicudo responded that they were his, and that Neves was just a creditor of the company. (Id.).

Neves's role in the deal is further evidenced by his involvement with another individual who seems to have provided access to additional financing, Max Rechulski. It appears that Helio Bicudo first brought Mr. Rechulski into the negotiations (see id. at 35-37) and that Rechulski was to receive a fee in exchange for his involvement. (Id. at 67-69.). A letter to Rechulski dated November 23, 2001 -- just prior to the signing of the November 2001 Agreements -- confirms a four percent commission to Rechulski for the financing for which he was apparently an agent. (Müller Decl. Ex. C). That financing, the letter states, "made it possible to conclude the negotiations bringing about the acquisition of the majority shareholding in [Deltec]." (Id.). The letter expresses "deep appreciation" and is signed by Beno Suchodolski, Nelson Baeta Neves, and Helio Bicudo.

After the various loans were made and the deal moved forward, it appears from the record before us that Beno Suchodolski had a

fair amount of representative authority for Worldstar in carrying out the 2001 Agreements. For instance, in an affidavit that appears to have been signed on January 14, 2002, Suchodolski attests to the fact that on November 8, 2001, he was granted power of attorney to act on behalf of Worldstar and that as of November 30, 2001, Worldstar had not revoked or repudiated that POA. (See Kensington July 26, 2011 Decl. Ex. F). The affidavit is accompanied by the actual power-of-attorney document itself, executed on November 8, 2001 by Ms. Raquel Ines Cadenas Boix, who signed for Worldstar in the capacity of "President". (Id.). That document designates Suchodolski to "negotiate, mainly in respect to clauses and terms of Shareholder Agreements, Contracts of Sales and Purchase of Quotas and/or Shares, financings, guarantees grantings of, effect mortgages, in short, practice all what is necessary to the faithful enforcement of the herein power of attorney." (Id.). Furthermore, Suchodolski is listed as Attorney-in-Fact for Worldstar in the Subordination Agreement. (Subordination Agreement at 12). We also note that he signed the SPA as attorney-in-fact for Worldstar, in addition to signing the same document as president of SAI and as president of Brastar. (SPA at 11). We infer from these facts that Suchodolski was given considerable power as a representative of

Worldstar (as well as other involved corporations).[14] Suchodolski was also a member of Deltec's board of directors as a representative of SAI (as well as chairman of the board) (see Mar. 30, 2004 Arbit. Tr. 299), and at times was asked by Worldstar's board representative, an individual named Jose Antonio de Corvalho, to also represent Worldstar's interests. (See, e.g., Kensington Reply Decl. Ex. 8 (Corvalho Mar. 8, 2004 Dep.) at 52-53, 83-84).

However, there was another individual also charged with power of attorney at the same time as Suchodolski. On November 22, 2001, Worldstar's board of directors appears to have met and approved a power of attorney for an individual named Gilbert Cipullo. (See Kensington Reply Decl. Ex. 11). The power is for "day-to-day management functions and disposal, for Consultora Worldstar Sociedad Anonima", and the document was presented to a notary by an

---

[14] To the extent that movants allege that Suchodolski was the one who controlled Worldstar and was the "ringleader", dictating the strategy of the corporation, we note that this does not undermine their argument that Worldstar was an alter ego of Neves. It is possible for a corporation to be an alter ego for more than one individual. See, e.g., Motorola Credit Corp. v. Uzan, 739 F. Supp.2d 636, 640 (S.D.N.Y. 2010) (finding that "all of the individual defendants have exercised complete control and domination over" the company alleged to be their alter ego); see also Statharos v. NYC Taxi & Limousine Comm'n, 198 F.3d 317, 324 (2d Cir. 1999) ("[U]nder New York law, where the corporation is essentially an alter ego of a family or individual, the veil may be pierced.").

accountant for Worldstar named Juan Ignacio Troccoli. (Id.). The document contains a detailed list of the powers granted to Dr. Cipullo, which include waiving rights, acquiring assets, executing and adjusting contracts, depositing and withdrawing funds, and assuring performance of obligations, to name a few. (Id.).

The Cipullo power of atttorney further lists Worldstar's address as Plaza Independencia 311, Ground Floor, Montevideo (which is not the same as Neves's), and concludes with certifications of the authorizing notary, including the certification that the bylaws of Worldstar were "approved, recorded, and published"; that "[t]his instrument [the power of attorney] was decided upon by the Board of Directors in the meeting of November 20, 2001, designating the deponent to sign this instrument pursuant to the minutes, which I have seen." (Id.). It thus appears that there were two powers of attorney granted, one to Suchodolski and one to Cipullo.

For the years following the Agreements, the record with respect to Worldstar's internal corporate functions is spotty. What we do know is that after the deal two individuals were appointed to Deltec's board of directors as representatives of Worldstar: Neves's son-in-law, Jose Antonio de Corvalho, and an individual named Carlos Figueiredo de Melo. (Neves Mar. 8, 2004 Dep. at 39-40;

57

Corvalho Dep. at 35-39). Aside from those appointments, the record shows that certain individuals purporting to represent the interests of the corporation (generally Neves, Suchodolski or Cipullo) appeared at various depositions, arbitration hearings or court hearings. For instance, there is evidence that in 2003 Dr. Cipullo continued to represent Worldstar. In that year, in his capacity as attorney-in-fact for Worldstar, he signed a ratification that Worldstar had authorized bringing both an action filed in the Southern District of New York against Cardell (No. 03 Civ. 4148) and a demand for arbitration against Cardell and Metropolis. The statement also "ratifies the verification provided by Beno Suchodolski on Plaintiffs' responses to interrogatories" in the 2003 action in district court. (See Kensington Reply Decl. Ex. 11). Also in 2003, at a deposition held in New York on June 27, 2003, Beno Suchodolski testified that Cipullo was the chief executive officer of Worldstar (see Kensington Reply Decl. Ex. 12 (Suchodolski June 27, 2003 Dep.) at 8), and reiterated Cipullo's affirmation that it was the board of directors of Worldstar who had authorized the suit filed in this court by SAI and Worldstar against Cardell in 2003 (No. 03 Civ. 4148) as well as the arbitration proceeding. (Id. at 8-9). However, Suchodolski further testified that he did not know any other individual officers or directors of Worldstar, and that as far as he knew, Worldstar had

only one shareholder -- Nelson Baeta Neves. (Id.).

Worldstar's elusive board of directors -- we have no documentation of any of the names of any board members -- was again mentioned at a June 30, 2003 hearing before Judge Pauley. (See Kensington Reply Decl. Ex. 2 at 4). Cardell had contested Worldstar's status as a plaintiff in that lawsuit, because Beno Suchodolski had signed answers to interrogatories on behalf of both SAI and Worldstar, with no indication that Worldstar had authorized the action. Counsel for SAI and Worldstar responded that he had received an email from Worldstar authorizing the lawsuit in the district court. (See id.). He explained that the email came from Worldstar's local counsel in Brazil, who had informed him that the board of directors had authorized the suit, and had also authorized Beno Suchodolski to appear at that hearing on behalf of Worldstar. (Id. at 4).

The record reflects Corvalho's continued involvement as a representative of Worldstar in 2004. At a deposition held in New York on March 8, 2004, Corvalho stated that he "signed for Worldstar" as "a representative", but that he was not an officer or director. (See Corvalho Dep. at 35-36). Rather, "Worldstar's shareholders" gave him the power of attorney. (Id. at 36-37).

However, he could not testify as to how many shareholders Worldstar had, only that Nelson Baeta Neves was one, and that it was Neves who had asked him to sign documents. (Id.). He testified that Neves was "a shareholder or he ha[d] interest in the company or he controll[ed] it", and that Neves controlled Worldstar either directly or through some corporate vehicle. (Id. at 37). It was Corvalho who, as a board member of Deltec, participated in meetings discussing Deltec's real estate projects. (Id. at 42-53). At times, Corvalho also asked Beno Suchodolski to represent Worldstar. (See, e.g., id. at 53, 84). Corvalho also appeared on behalf of Worldstar, along with Neves, at a March 29, 2004 arbitration hearing. (See Kensington Reply Decl. Ex. 10 at 4th page).

Also in 2004, Neves himself testified at his deposition held in New York in connection with the first arbitration that he owned Worldstar "by myself through family associations". (Neves Mar. 8, 2004 Dep. at 39; see also Estate Sur-Reply at 2-3). And in 2005, Neves signed a declaration that he himself was "Attorney in Fact" for Worldstar. (See Kensington Arbit. Opp'n Decl. Ex. 6 (Neves 2005 Decl.) ¶ 1)). He stated in that declaration -- made in conjunction with the dispute over the foreclosure by Cardell on Worldstar's Deltec shares -- that such a foreclosure would mean that Worldstar would have "irretrievably lost its unique investment in a closely-

60

held real estate development company that holds, among its assets, extremely valuable and unique property in central Saõ Paulo, Brazil." (Id. ¶ 3).

From the above facts, we have a picture of a corporation that was owned in its entirety by Neves, either directly or through other family associations. There are suggestions that a board of directors functioned to approve acts such as granting powers of attorney and the initiation of legal proceedings, but we have no names of any board members, and it is clear from Neves's testimony that he himself was intimately involved in putting together the deal to purchase Brastar. In addition, individuals charged with representing Worldstar in some capacity traced their authority back to Neves and could name no other shareholders.

### ii. **Worldstar Post-2005**

We are presented with a very different picture of Worldstar as a corporation after 2005. It appears that during the last six-plus years Worldstar has essentially been an inert corporation with only two assets. In response to information subpoenas served by movants in 2011, Worldstar admitted that it had no assets during the period of 2005 to 2011 except for the account receivable from Cardell as

61

successor to Metropolis in the amount of $333,333.00 and repayment of the loan under the November 2001 Agreements, also $333,333.00. (See Williamson Oct. 7, 2011. Decl. ¶ 14 & Ex. 2 at 2). It had no bank account during this period and no sources of income. (Id. ¶¶ 18, 22 & Ex. 2 at 3; see also Neves 2005 Decl. ¶ 3). Worldstar also asserts that SAI and Beno Suchodolski paid its legal fees during the period 2005 to 2011. (Williamson Oct 7, 2011. Decl. ¶ 22 & Ex. 2 at 3).[15] Furthermore, Worldstar admits that it has kept no books and records and thus that there is no person to maintain any corporate records. (Id. ¶ 24 & Ex. 2 at 4).

Between 2005 and the present we do not have a clear picture of who has represented Worldstar. The most detailed evidence is of Cipullo's continued involvement with the company. The information subpoenas served by movants in this action in 2011 asked for the identity of "all officers, directors, shareholders or stockholders, and the direct or indirect record or beneficial owners of the equity of, and attorneys-in-fact for", SAI and Worldstar during the period of January 16, 2005 to the date of the responses (some time

---

[15] Suchodolski, however, in response to the subpoena questions sent by movants to him, states that he "does not have any information about the affairs of [Worldstar]" for the period of 2005 to 2011. (Williamson Oct. 7, 2011 Decl. Ex. 6 at 2, ¶ 7).

in 2011). (Id. Ex. 1 at 2, 3, 10). The subpoenas further asked for "the name, address, and title/position of the person answering these questions". (Id. at 10). Worldstar's answers to those questions indicate that "[t]he "attorney with general authority for the affairs of Worldstar is Dr. Gilberto Cipullo". (Id. Ex. 2 at 4). The answers give no other names of individuals associated with Worldstar. Dr. Cipullo also signed those answers on behalf of Worldstar. (Id. at 5).

The Estate therefore concedes that in the last five years Worldstar "has had no bank accounts, property, corporate books and records, or assets other than its $333,333 claim against Metropolis and Cardell as successor (and also its $333,333 share of the Subordinated Debt under the Subordination Agreement)." (Estate Sur-Reply at 3). Morever, there is no indication that anyone besides Neves and Cipullo was involved in running the corporation during that era. In addition, it appears that Worldstar's legal fees were being paid during that period by Suchodolski and SAI (and, as will be discussed, possibly by Neves himself).

c.    **Analysis of Alter-Ego Factors**

In light of these findings, we now turn to an analysis of

63

movants' alter-ego theories of jurisdiction. As noted, the factors to be considered in such an alter-ego analysis include whether there was a failure to observe corporate formalities, evidence of undercapitalization, intermingling of personal and corporate funds, shared office space and phone numbers, any overlap in ownership and directors and whether the corporation was used to perpetrate a wrongful act against the plaintiffs.

Based on an analysis of the relevant time period for this inquiry, we examine the status of Worldstar at the time the contempt motion was filed, but also rely on facts from years dating back to the November 2001 Agreements. See supra pp. 44-49.

i.   **Failure to Maintain Corporate Formalities**[16]

The standard by which corporate formalities are judged may vary with the size and type of corporation. "[I]n the context of closely-held corporations, corporate formalities are more relaxed than in a large public corporate setting, and this should be taken into consideration as a factor in the 'domination' analysis." In re

---

[16] The caselaw analyzing alter-ego status for jurisdictional purposes is less well-developed that for liability purposes. For this factor and others, we therefore look for guidance to cases analyzing these factors in the alter-ego liability context.

Adler, 467 B.R. 279, 288 (Bankr. E.D.N.Y. 2012) (citing Dirs. Guild of Am., Inc. v. Garrison Prods., Inc., 733 F. Supp. 755, 760 (S.D.N.Y. 1998)); see also Tycoons Worldwide Group (Thailand) Pub. Co. v. JBL Supply Inc., 721 F. Supp.2d 194, 205 (S.D.N.Y. 2010) ("[C]ourts recognize that with respect to small, privately-held corporations, the trappings of sophisticated corporate life are rarely present, and we must avoid an over-rigid preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history." (quoting William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600-01 (2d Cir. 1989) (internal quotation marks omitted))). Furthermore, even though we have determined that New York law applies in this case, the issue of corporate formalities is an issue distinct from the law applicable to the larger alter-ego analysis, and courts have held that "when determining whether a foreign corporation has observed the proper corporate formalities, courts apply the law of the country of incorporation." Abu-Nassar v. Elders Futures, Inc., 1991 WL 45062, *12 n.17 (S.D.N.Y. Mar. 28, 1991) (citing Oriental Commercial & Shipping Co. v. Rosseel, N.V., 702 F. Supp. 1005, 1019-20 (S.D.N.Y. 1988)); see also United States v. Funds Held in the Name or for the Benefit of John Hugh Wetterer, 201 F.3d 96, 106 (2d Cir. 2000) (finding that the district court should have considered "the non-profit corporation law of Guatemala in deciding the embedded

question of whether the [corporation] maintained the requisite corporate formalities").


Worldstar is a corporation organized under the laws of Uruguay. The parties have not provided the court with any authority on Uruguayan corporate law. It appears, however, that corporations in Uruguay are required to abide by certain basic corporate formalities. As in the United States, some corporations are publically traded, and others are not. They are designated by the term "Sociedad Anonima", abbreviated "S.A.", like Worldstar, and are required to have at least two shareholders for organization and continued existence. They are to be managed either by an administrator or by a board of directors, and ordinary shareholder meetings are held at least once per year. See Martindale-Hubbell, URUGUAY LAW DIGEST 2.03 (LEXIS 2010); see also Raúl Aníbal Etcheverry, International Academy of Commercial and Consumer Law: Joint Ventures in South American Integration, 107 Dick. L. Rev. 101, 111-12 (2002) (noting that the "S.A." form is equivalent to a corporation -- their capital stock "is represented by shares and it is mandatory to hold periodic shareholder meetings. The board of directors is the executive and administrative body; it is in charge of preparing the annual balance sheet, which is submitted at the periodic meetings."). While the details of the requirements for

66

corporations organized under the laws of Uruguay may be different from those in the United States, it thus appears that some basic corporate formalities are required and may be substantially similar, and we may therefore presume that a corporate structure involving meetings and some kind of oversight board is mandatory for Uruguayan corporations.

During the time period of the November 2001 Agreements there is substantial indication that some corporate formalities were followed by Worldstar. The Spanish-language document from 1997, although unhelpful for its content, does offer evidence that the corporation was in existence and kept records. (See Kensington July 26, 2011 Decl. Ex. F at last pg.). In addition, the two powers of attorney executed in favor of Cipullo and Suchodolski indicate some sort of oversight by a governing board and officers. The power of attorney for Cipullo states that it was approved by the board of directors (see Kensington Reply Decl. Ex. 11), and the power of attorney for Suchodolski was executed by Worldstar's President, Ms. Cadenas Boix. (See Kensington July 26, 2011 Decl. Ex. F). We cannot say, based on these facts, that Worldstar failed to follow corporate formalities during this period. We do note that Neves is the only shareholder anyone seems to have had knowledge of, but given that he may have owned Worldstar through other vehicles we

67

cannot say that the requirement of two shareholders was violated.

However, in more recent years the corporation's situation appears to have changed. Worldstar admits that it has no books or records for the period 2005 to 2011. Such a lack of records has been found to weigh in favor of a finding that a corporation failed to maintain corporate formalities. See, e.g., Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC, 2009 WL 1803458, *15 (S.D.N.Y. June 23, 2009) (finding failure to maintain corporate formalities where defendants' statement that they "possessed no documents that showed who served as officers and directors" of the corporations led to "the reasonable conclusion that neither [corporation] adhered to the corporate formalities that are 'part and parcel' of a separate corporate existence" and although they filed separate tax returns, there was "no evidence that any other corporate formalities, such as electing directors, appointing officers, holding annual meetings, or acting by corporate resolution, were maintained"); JSC Foreign Econ. Ass'n Technostoyexport v. Int'l Dev. & Trade Servs., Inc., 386 F. Supp.2d 461, 473 (S.D.N.Y. 2005) (finding failure to comply with basic corporate formalities where company did not hold annual shareholder meetings or regular director meetings, did not keep corporate records, bookkeeping was inadequate and the corporation failed to abide by several corporate

68

obligations under New York law, such as filing tax returns or a statement identifying its CEO).

Another oddity in Worldstar's corporate structure is the designation in Worldstar's responses to movants' information subpoena queries of only one individual -- Cipullo -- as having any authority in the corporation. While the designation of Cipullo and signing by him of the answers to the queries does not necessarily point to Neves as having had control of the corporation prior to his death, it certainly points to a lack of corporate structure.

The Estate asserts that Worldstar has simply been "inactive" since 2005. (Estate Sur-Reply at 5). However, the failure by Worldstar to keep any kind of records at all during this time, or, we presume, to hold any official corporate meetings, points to a clear failure to maintain even a low threshold of the most basic corporate formalities. This factor therefore weighs in favor of an alter-ego finding for the time period in which the contempt motion was filed stretching back to 2005.

### ii.  **Undercapitalization**

"Evidence   of   substantial   undercapitalization   .   .   .   is

69

significant because it can be evidence of a company's lack of independent substance." Classic Mar. Inc. v. Limbungan Makmur SDN BHD, 646 F. Supp.2d 364, 371 (S.D.N.Y. 2009). Of course, "undercapitalization alone is not a sufficient ground for disregarding the corporate veil, [but] it nevertheless is an additional factor to be weighed in the balance." Abu-Nassar, 1991 WL 45062, at *13 (quoting Oriental Commercial & Shipping Co., 702 F. Supp. at 1020); see also Tycoons Worldwide, 721 F. Supp.2d at 206-07. Indeed, it "weighs heavily in favor of a finding that the corporate form of an entity should be disregarded." Eagle Transp. Ltd., Inc. v. O'Connor, 470 F. Supp. 731, 733 (S.D.N.Y. 1979).

Undercapitalization is "to be measured in terms of the size of the corporation's undertakings." Id. at 733; see also Abu-Nassar, 1991 WL 45062, at *13. A corporation will be deemed undercapitalized "if it is wholly reliant on [an individual] for the operating funds necessary for its continuing existence." Abu-Nassar, 1991 WL 45062, at *13 (citation omitted); see also Classic Mar. Inc., 646 F. Supp.2d at 371 ("Evidence of the payment of debts on behalf of a company . . . can also be significant evidence of an alter ego relationship because it evidences control and a lack of regard for corporate formalities."). In other words, a corporation is undercapitalized when its liabilities exceed its assets,

requiring personal loans to meet operating expenses. See, e.g., Abu-Nassar, 1991 WL 45062, at *13 (finding corporation "currently undercapitalized and essentially insolvent, in that its liabilities exceed its assets, it is no longer in business and it can no longer meet its obligations without financial assistance from [the shareholders-principals]"); see also In re Adler, 467 B.R. at 288-90 (finding inadequate capitalization where corporations received funds for start-up costs but not capital, were funded mainly by factor financing, never realized an annual net profit and were likely insolvent at times); Oriental Commercial & Shipping Co., Ltd., 702 F. Supp. at 1021 (finding corporation undercapitalized where it was "wholly reliant" upon the majority shareholder "for the operating funds necessary for its continuing existence" and its assets were "meager" compared to the size of the transaction it had entered into).

With respect to the time period relevant for the inquiry, we recognize that a corporation's initial capital can be an important factor in determining whether it was sufficiently capitalized for its corporate undertaking. See, e.g., Stephens v. Am. Home Assurance Co., 811 F. Supp. 937, 953 (S.D.N.Y. 1993) ("[A] corporation that commences business with adequate capital and subsequently suffers insolvency is not undercapitalized as the term

71

is used in a 'piercing the corporate veil' question.") (citing J-R Grain Co. v. FAC, Inc., 627 F.2d 129 (8th Cir. 1980)), rev'd on other grounds by Stephens v. Nat'l Distillers & Chem. Corp., 70 F.3d 10 (2d Cir. 1995). However, such an inquiry cannot end the analysis, as "an examination of the adequacy of capitalization should entail a review of both initial capital contributions, and subsequent capital infusions prior to the corporation distinctly changing the nature or magnitude of its business." Id. at 952. Thus, the decline of a company due to purely economic reasons should not be viewed in the same light as one in which, for example, a shareholder "bled the corporation of its assets." Harvey Gleb, Piercing the Corporate Veil -- The Undercapitalization Factor, 59 Chi.-Kent L. Rev. 1, 15 (1982).

Movants assert that Worldstar "has no assets, aside from its alleged account receivable of $333,333 . . . no bank or other account, no property in escrow, and no interest in any attorney's trust account." (Movants' Estate Reply Mem. at 5). Further, movants allege, Worldstar "does not use its own funds to pay its legal fees, but apparently those of Beno Suchodolski". (Id.). The Estate admits that the company "has been inactive since 2005" but argues that "for an entity with no operations, Worldstar's capital cannot be said to have been inadequate". (Estate Sur-Reply at 5).

We have no information about how much, if any, capital Worldstar started with, but we do know that in 2001 it had at least enough money to make two loans in the amount of $333,333.00 -- one to Brastar and one to Metropolis. We know nothing else about the rest of the finances of the company for that time period. We have more information from Worldstar itself about the more recent years. The corporation admits that from 2005 to 2011 it had no assets other than its $333,333.00 claim against Metropolis (and Cardell as alleged successor) and its share in the repayment of the Subordinated Debt. (See Williamson Oct. 7, 2011 Decl. ¶ 14 & Ex. 2 at 2). Further, it and SAI together have liabilities in excess of $874,281.11, the amount awarded against them by the Tribunal and the District Court in the Amended Judgment plus the pre-judgment interest (see Am. J. at 3), and Worldstar admits that it has had no income since at least 2005. (Williamson Oct. 7, 2011 Decl. ¶ 22 & Ex. 2 at 3). It is also apparent that certain legal expenses incurred by Worldstar have been paid by Suchodolski Associates. Counsel at the October 20, 2011 conference intimated that Neves was supposed to pay Worldstar's share of the fees once Suchodolski had made the payments for both Worldstar and SAI (Oct. 20, 2011 Tr. 28), and although the terms of any such payment are not definitively characterized in the record, such an understanding is an indication that Neves himself was responsible for the

corporation's debts.

In sum, at the time that this contempt motion was filed in 2011, Worldstar certainly had liabilities exceeding its assets and had been reliant on outside funds -- of Neves/the Estate or Suchodolski, or both -- to pay its legal fees. Such insolvency supports a finding that the corporation is undercapitalized. <u>See</u>, e.g., <u>Atateks Foreign Trade Ltd.</u>, 2009 WL 1803458, at *15 (finding that "during the relevant time periods [the corporation's] liabilities exceed[ed] its assets and that [it] was thus inadequately capitalized" and also insolvent) (citing <u>Balmer v. 1716 Realty LLC</u>, 2008 WL 2047888, *5 (E.D.N.Y. May 9, 2008) (defendant corporation was insolvent and therefore inadequately capitalized)); <u>Abu-Nassar</u>, 1991 WL 45062, at *13 (evaluating company as "currently undercapitalized and essentially insolvent" where its liabilities exceeded its assets and it required personal loans to meet its operating expenses).

Therefore, as of the filing of the contempt motion and as far back as 2005, we conclude that this factor weighs in favor of a finding of alter ego. The corporation admits to having no funds and no income, its liabilities exceed its assets, and there is also the strong suggestion, given the legal fees that it must be incurring,

that it has been dependent upon an individual for the payment of those fees. It is therefore insolvent and undercapitalized and has been so since 2005. With respect to the signing of the November 2001 Agreements, we cannot say that at that specific time Worldstar was definitely undercapitalized, but for purposes of analysis here, the more recent state of affairs of the corporation is sufficient to support our findings, as the time that the contempt motion was filed is most relevant for movants' consent argument, and also an important factor for the long-arm jurisdiction theory.

### iii. **Intermingling of Funds**

This factor, under the circumstances of this case, overlaps in large part with the previous analysis on undercapitalization of Worldstar. The payment of debts on behalf of a company can be evidence of undercapitalization, and at the same time can demonstrate that the funds of the corporation were not distinct from those of its owner. Evidence of such payments can be "significant evidence of an alter ego relationship because it evidences control and a lack of regard for corporate formalities." Classic Mar. Inc., 646 F. Supp.2d at 371; see also Telenor Mobile Commc'ns, 587 F. Supp.2d at 620 (finding intermingling of funds where alleged shell's debts were paid by its dominating parent

75

company and its assets were used to secure a loan for the parent company).

The record reflects assertions that Mr. Suchodolski and/or SAI have paid Worldstar's legal fees. (See, e.g., Williamson Decl. Ex. 2 at 3; Oct. 20, 2011 Tr. 28). Furthermore, as noted, the Estate's counsel articulated his understanding that Neves himself was to pay Worldstar's portion of the fees. (Oct. 20, 2011 Tr. 28). We have been presented with no other evidence that Neves in fact did so, but we attribute the attorney's knowledge to his client, and treat it as an admission that there was such an understanding that Neves was responsible for payment. Cf. Purgess v. Shamrock, 33 F.3d 134, 144 (2d Cir. 1994) ("[S]tatements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney.") (citation omitted). Thus, even if Neves did not actually pay his portion of the fees, he at least had some kind of agreement that he was to pay them, which would constitute the use of personal funds to pay corporate expenses. We also observe that Neves's 2004 testimony about his comments to Helio Bicudo regarding the use of "my money" to fund Metropolis's November 2001 loan to Brastar/Deltec, see supra pp. 53-54, is indicative that in Neves's mind, his money and that of his company were interchangeable. Thus this factor weighs in favor of a finding

76

that Worldstar was Neves's alter ego at the time of the November 2001 Agreements and continuing through this litigation.

### iv.  Shared Office Space or Phone Numbers

Worldstar has a corporate address listed, as of 2009, in Montevideo, Uruguay. (Final Award ¶ 1). Neves at his 2004 deposition gave his address as a residence in Saõ Paolo, Brazil. (See Neves Mar. 8, 2004 Dep. at 5). We have seen no evidence that Worldstar's space was shared by Neves for other uses and therefore this factor does not weigh in favor of a finding of alter ego.

### v.   Overlap of Ownership/Directors

It is clear that simple ownership does not warrant a finding of alter ego[17]. This factor of overlap can therefore be difficult

---

[17] The fact that Neves owned Worldstar is not sufficient to establish jurisdiction. "Mere ownership" by itself is not enough to assert jurisdiction over a foreign defendant. See, e.g., Tripmasters, Inc. v. Hyatt Int'l Corp., 696 F. Supp. 925, 935 (S.D.N.Y. 1988) (discussing Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117 (2d Cir. 1984) ("The officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject the parent to New York jurisdiction.")); see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp.2d 593, 604 (S.D.N.Y. 1998) ("Mere ownership by a parent company of a subsidiary that is subject to personal

to apply to closely-held corporations. In a case where one individual was the sole owner, officer, employee, director and thus the "sole decision-maker" of a number of corporations, all of which were operated out of the same office with the same telephone and fax numbers, the court found that "in the case of closely-held corporations these facts are not uncommon, and often create a scenario where a sole principal dominates corporate decision-making." In re Adler, 467 B.R. at 291. Thus, the court concluded, "these facts are neutral in the context of closely-held corporations and are not enough to pierce the corporate veil." Id. (citing William Wrigley Jr. Co., 890 F.2d at 601). Furthermore, even in cases of substantial overlap, a plaintiff must show not only the opportunity to exercise control, but actual domination. See, e.g., Ayco Co., L.P. v. Frisch, 2012 WL 42134, *8 (N.D.N.Y. Jan. 9, 2012) ("[O]verlap among personnel is 'commonplace as generally-accepted corporate form, and [is] insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness.'" (quoting McGananey v. Astoria Fin. Corp., 665 F. Supp.2d 132, 144-45 (E.D.N.Y. 2009)).

---

jurisdiction is insufficient to establish jurisdiction over the parent."). Cf. Oppenheimer & Co., Inc. v. Deutsche Bank AG, 2010 WL 743915, *4 (S.D.N.Y. Mar. 2, 2010) ("A parent corporation's complete ownership of a subsidiary's stock is insufficient, by itself, to pierce the corporate veil.").

Movants allege that Neves was the sole shareholder of Worldstar, and we know from documents and testimony that he himself admitted to owning the corporation completely. At one point in 2005 he also was attorney-in-fact for the corporation, and he was the one who appointed representatives to Deltec's board (including his own son-in-law) on behalf of Worldstar. (See Neves Mar. 8, 2004 Dep. at 39-40). Even if Neves functioned in multiple capacities for the corporation, such overlap is common-place among closely-held corporations of this type and thus does not weigh significantly in favor of a finding of domination and control by Neves for purposes of alter-ego status.[18]

### vi.   Use of the Corporation for Perpetration of a Wrongful Act

We reiterate that a showing of fraud in an alter-ego analysis is not necessary to the determination that a corporation was an alter ego for an individual. Miramax Film Corp., 2003 WL 22832384, at *7. However, courts have cited the use of the corporation to commit a wrongful act as one of a number of factors that may be considered in an alter-ego analysis. See, e.g., id. at *8.

---

[18] However, we do take note of the above facts as a general indication of Neves's intimate involvement in the company.

The record includes allegations, discussed _infra_, _see_ pp. 186-89, that from August 2010 through early 2011 Suchodolski and Neves's son -- Nelson Baeta Neves, Jr. -- demanded payment from Cardell in exchange for the withdrawal of the Brazil lawsuits. (_See_ Akhund Decl. ¶¶ 12-15). While such actions would likely constitute a wrongful act for alter-ego purposes, we observe that the demands were not made by Neves and indeed post-date the death of Neves himself. There has been no assertions by movants that the actions of Neves, Jr. should be taken into account for this alter-ego analysis.

However, the use of the corporation to _file_ a lawsuit that is alleged to be having a detrimental impact on movants' real estate deals in Brazil could be viewed as a wrongful act. The filing of the suit took place prior to Neves's death, and if he did so file in an attempt to hold up movant's real estate plans, this factor would weigh in favor of a finding of alter ego. We do not have concrete documentary evidence that Neves filed suit with such a purpose in mind, but given the circumstantial evidence -- the history of the litigation as well as the incentive for filing such a suit -- it is certainly a reasonable inference to conclude that he may have done so. _Cf._ Telenor Mobile Commc'ns, 587 F. Supp.2d at 610-11 (noting that, among other factors, the timing of lawsuit and

80

alignment of interest between parties, while conceivably coincidental, supported an inference that the litigation was undertaken to advance the defendants interests and prevent enforcement of an arbitration award). This factor therefore weighs in favor of a finding of alter ego.

* * *

In sum, we find that movants have demonstrated by a preponderance of the evidence that Worldstar was an alter ego for Neves/the Estate at the time this contempt motion was filed. First, Worldstar admits that it has had no corporate books or records since 2005. The failure to follow corporate formalities for this period points toward a finding that Worldstar operated as a shell corporation for Neves. Worldstar also admits to having no assets other than the $333,333.00 credit owed to it by Metropolis and its share of the Subordinated Debt, and to having no source of income. We can therefore say that Worldstar has been insolvent and undercapitalized since 2005. Further, there is strong circumstantial evidence that Neves paid the debts of the corporation in that he had an agreement with SAI/Beno Suchodolski that SAI or Suchodolski would pay Worldstar's legal fees along with SAI's, and then Neves would pay for Worldstar's portion of those

81

fees. This fact both supports a finding of undercapitalization and points to the use of Neves's personal funds to pay corporate debts.

It is true that some factors do not point as strongly towards a finding of alter ego. The fact that Neves was both attorney-in-fact at one point as well as owner is not unusual for closely-held corporations. However, given the substantial evidence -- both direct and circumstantial -- that Worldstar has operated as a shell corporation for Neves, we find that movants have shown by a preponderance of the evidence that Worldstar functioned as an alter ego for Neves for the period when the contempt motion was filed, and dating back as far as 2005. This finding supports movants' argument the Worldstar's consent to jurisdiction may be imputed to Neves.

For purposes of movants long-arm jurisdiction theory, we reach the same conclusion. The evidence in support of alter-ego status at the time this contempt motion was filed is only buttressed by looking back to prior years. While it is true that a number of corporate formalities appear to have been followed in 2001, there is also evidence that Neves considered the corporation's funds to be "[his] money", pointing both to a lack of corporate formalities and intermingling of personal and corporate funds. Furthermore, he

appointed representatives to Deltec's board on behalf of Worldstar, and he was intimately involved in the deal surrounding the 2001 Agreements, a key link to personal jurisdiction over Worldstar in New York. Weighing the various factors leads us to find that movants have demonstrated by a preponderance of the evidence that Worldstar was an an alter-ego of Neves not only when the contempt motion was filed but far earlier as well. This finding supports movants' theory that jurisdiction may be imputed to the Estate under New York's long-arm statute, as long as the other requirements under that statute are satisfied.

###     d.    Alter-Ego Consensual Jurisdiction

Having determined that Worldstar functioned as an alter ego of Neves/the Estate at the time that this contempt motion was filed, we conclude that movants' consent theory has merit. That theory was based upon the argument that Worldstar in the November 2001 Agreements consented to the jurisdiction of this court, and therefore Neves, as Worldstar's alter-ego, also must be deemed to have consented. Because alter-egos are treated as one for jurisdictional purposes, and Worldstar consented to this court's jurisdiction, we therefore find that we also have jurisdiction over Neves. See, e.g., Storm, LLC, 2006 WL 3735657, at *13-*14 (finding

sufficient evidence that corporations were alter egos such that consent to jurisdiction by one could be imputed to the others); cf. Int'l Equity Investments, Inc., 475 F. Supp.2d at 458-60 (finding prima facie showing of personal jurisdiction over entities based on consent to jurisdiction by an alleged dominating entity).

### e.   Alter-Ego Long-Arm Jurisdiction

Our finding that movants presented sufficient evidence that Worldstar operated as a shell entity also means that movants' argument for jurisdiction under New York's long-arm statute is viable if Worldstar, as Neves's alter ego, falls within New York's long-arm statute. See, e.g., Pandeosingh v. Am. Med. Response, Inc., 2012 WL 511815 (E.D.N.Y. Feb. 15, 2012) (granting further discovery where plaintiff alleged that entities were alter egos of each other and thus if one was subject to jurisdiction under section 301 or 302(a)(1), then the other was also subject to jurisdiction); see also Kinetic Instruments, Inc., 802 F. Supp. at 985-86 (where corporation was subject to jurisdiction under § 302(a)(1), finding prima facie evidence that the individual defendant was subject to jurisdiction also under an alter-ego theory).

84

Worldstar has not contested jurisdiction. We nonetheless find the exercise of jurisdiction over Worldstar to be appropriate under section 302(a)(1), as argued by movants.

### i.    Long-Arm Jurisdiction Over Worldstar

#### a.    Legal Standard

New York's long-arm statute provides that "a court may exercise personal jurisdiction over any non-domiciliary or his executor or administrator, who in person or through an agent . . . transacts any business within the state". N.Y. C.P.L.R. § 302(a)(1). To establish jurisdiction under this provision, "two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (citing McGowan v. Smith, 52 N.Y.2d 268, 273, 437 N.Y.S.2d 643 (1981)).

Should the court determine that jurisdiction is available, it must then of course also assess whether the exercise of jurisdiction comports with the requirements of due process in that the defendant "has certain minimum contacts . . . such that the

maintenance of the suit does not offend traditional notions of fair play and substantial justice." In re Sumitomo Copper Litig., 120 F. Supp.2d 328, 342 (S.D.N.Y. 2000) (citing inter alia Calder v. Jones, 465 U.S. 783, 788 (1984) (internal quotation marks omitted)).

A foreign defendant "transacts business" under this section when he "purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." Grand River Enter. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 166 (2d Cir. 2005) (citation and emphasis omitted). Furthermore, "[n]o single event or contact connecting [the] defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." Id. (citation omitted, emphasis original).

A claim "'aris[es] from' a particular transaction when there is 'some articulable nexus between the business transacted and the cause of action sued upon' . . . or when 'there is a substantial relationship between the transaction and the claim asserted'". Sole Resort, 450 F.3d at 103 (citing McGowan, 52 N.Y.2d at 272, 437 N.Y.S.2d at 645; Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460,

86

467, 527 N.Y.S.2d 195, 198-99 (1988)).

### b.   "Transacted Business"

It is clear from the record that Worldstar "transacted business" in New York for purposes of section 302 by entering into the November 2001 Agreements here. The Agreements not only were signed here, but also contain a choice-of-law clause designating New York law to govern the agreements as well as a clause providing for consent to jurisdiction in New York courts. While courts often examine a number of factors in making determinations of transacting business under § 302(a)(1), "[p]roof of a single transaction may suffice, provided it is purposeful." Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C., 319 F. Supp.2d 352, 358 (S.D.N.Y. 2004); see also Kreutter, 71 N.Y.2d at 467, 527 N.Y.S.2d at 198-99 ("[P]roof of one transaction is sufficient to invoke jurisdiction [under § 302(a)(1)] . . . so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."). "Indeed, the negotiation and execution of [a] contract in New York may alone suffice to confer personal jurisdiction over [a corporation] in an action arising out of that contract." Nat'l Union Fire Ins. Co., 319 F. Supp.2d at 359 (finding corporation's "negotiation, execution, and other acts in

connection with the contract . . . more than suffice . . . to establish personal jurisdiction on a cause of action arising out of that contract"). Other factors that the court may look to include

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [the defendant] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

Id.; see also Sunward Elec., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004) (citing factors).

With respect to the first factor, we recognize that none of the corporations involved in this action were incorporated in New York. However, Cardell, in the Subordination Agreement, provides a New York address for all "notices, requests, demands or other communications" relating to that agreement. (See Subordination Agreement at 9). Thus Worldstar entered into an agreement with a corporation that had at least some operations based in New York.

Second, while we do not know the full extent of any

88

negotiations that occurred in New York, the fact that the
Agreements were entered into here is a strong indication of
sufficient contacts. Coupled with the New York choice-of-law clause
found in the Agreements -- relevant to the third factor -- this
weighs strongly in favor of a finding of jurisdiction. See, e.g.,
Sunward Elec., 362 F.3d at 23 ("A choice of law clause is a
significant factor in a personal jurisdiction analysis because the
parties, by so choosing, invoke the benefits and protections of New
York law."); Sacody Techs., Inc. v. Avant, Inc., 862 F. Supp. 1152,
1156 (S.D.N.Y. 1994) (finding a New York choice-of-law clause in an
agreement "a significant contact" for purposes of jurisdiction
under § 302(a)(1) (collecting cases)). By electing to include such
a choice-of-law clause, the parties "invok[ed] the benefits and
protections of New York's laws." Sunward Elec., 362 F.3d at 23.

As for the last factor, whether the contract requires notice
or payments to be sent into the forum state, we do not know if any
notices were in fact sent by Worldstar to Cardell in New York, but
as noted, the Subordination Agreement provided that any
correspondence was to be so handled.

In addition, as movants note, Worldstar has been party to
multiple arbitrations and legal actions in this state, including as

a plaintiff, thereby further invoking the benefits and protections of New York's courts. (See Movants' Estate Reply Mem. at 7-8). We therefore find that Worldstar has "transacted business" in New York so as to satisfy the first requirement of § 302(a)(1).

### c. "**Arises From**"

The second requirement under section 302 is also easily met here. The Second Circuit has held that, with respect to a petition to vacate an arbitration award, that "New York contacts underlying a contract that provides for arbitration have the requisite relationship under section 302(a)(1) to a claim challenging the results of that arbitration", because there is "a substantial relationship between a challenge to the arbitrators' decision and the contract that provided for the arbitration." Sole Resort, 450 F.3d at 104.

This action was commenced as a petition to confirm an arbitration award -- the Final Award. (See Conf. Pet.). If there are enough New York contacts surrounding the contract that led to arbitration (the November 2001 Agreements), then the "arising from" requirement of section 302 is met. As discussed above, the November 2001 Agreements were entered into in New York, chose New York law

to govern, and were the basis for the arbitration underlying the
initiation of this lawsuit. Thus the action, brought to confirm
that award, arises from Worldstar's business activity in New York.

### ii.   Imputed Long-Arm Jurisdiction Over Neves/the Estate

Having determined that both requirements of section 302(a)(1)
are met, we find that Worldstar falls within the reach of New
York's long-arm jurisdiction statute. Therefore Neves/the Estate,
as Worldstar's alter ego, is subject to jurisdiction under that
provisions as well, provided the requirements of due process are
met.

### 3.   Agency Theory of Jurisdiction

Movants also assert that the court has personal jurisdiction
over the Estate under a theory of agency. In support of this theory
they assert that Worldstar, as Neves's agent, transacted business
in New York within the meaning of New York's long-arm jurisdiction
statute, thus providing for jurisdiction over Worldstar and through
it, Neves and thus the Estate. We have found that the court may
properly base the exercise of jurisdiction over the Estate on a
theory of alter ego. However, in the alternative, we find that

movants' agency argument provides another basis for exercising jurisdiction over the Estate. Worldstar was Neves's agent, and thus, also under section 302, Neves/the Estate is subject to jurisdiction under that theory.

### a.   **Legal Standard**

We have already determined that Worldstar is subject to jurisdiction under section 302(a)(1). That section provides that "a court may exercise personal jurisdiction over any non-domiciliary or his executor or administrator, who in person *or through an agent* . . . transacts any business within the state". N.Y. C.P.L.R. § 302(a)(1) (emphasis added). "[T]he requirements of a formal agency relationship are not necessary for purposes of New York long-arm jurisdiction." Time Inc. v. Simpson, 2002 WL 31844914, *3 (S.D.N.Y. Dec. 18, 2002) (internal citation omitted) (finding discovery appropriate because "evidence that [entities] conducted business in New York while acting as [the individual defendant's] agent, even if not his alter ego, would be probative of the Court's authority to exercise personal jurisdiction over him"). Rather, a plaintiff "'need only convince the court that [the agent] engaged in purposeful activities in this State in relation to [its] transaction for the benefit of and with the knowledge and consent

92

of [the] defendants and that they exercised some control over [the agent] in the matter.'" Cooper, Robertson & Partners, LLP v. Vail, 143 F. Supp.2d 367, 371 (S.D.N.Y. 2001) (quoting Kreutter, 71 N.Y.2d at 467, 527 N.Y.S.2d at 199); see also In re Sumitomo Copper Litig., 120 F. Supp.2d at 336. However, the allegations must "'sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a 'primary actor' in the specific matter in question; control cannot be shown based merely upon a defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation.'" Id. (quoting Karabu Corp. v. Gitner, 16 F. Supp.2d 319, 324 (S.D.N.Y. 1998)). Just because a corporation is subject to jurisdiction does not mean that every officer of that corporation will be subject to jurisdiction "simply by virtue of the officer's position within the company". Basquiat v. Kemper Snowboards, 1997 WL 527891, *2 (S.D.N.Y. Aug. 25, 1997) (citation omitted). Rather, the individual must have been a "primary actor" in the transaction carried out by the corporation, requiring "knowledge of and consent to the transaction carried out by the agent-corporation, and that the officer [] exercised control over the corporation in the transaction." Id. at *3; see also Reynolds Corp., 73 F. Supp.2d at 303-04.

93

b. **Analysis**

Movants argue that Worldstar was Neves's agent, within the meaning of N.Y. C.P.L.R. § 302(a)(1). (See Movants' Estate Reply at 9-10). In order to establish that Worldstar served as Neves's agent in New York, movants must show that "(1) [Worldstar] engaged in purposeful activities in New York, (2) for the benefit of and with the knowledge and consent of [Neves], and (3) [Neves] exercised some control over the corporation in that transaction." In re Sumitomo Copper Litig., 120 F. Supp.2d at 336.[19]

Movants assert that Worldstar engaged in purposeful activities in New York by negotiating the 2001 Transaction Documents -- including the consent to the application of New York law and to this court's jurisdiction -- and by filing suits and demanding arbitration here (see Movants' Estate Reply at 9-10), and that the corporation did so "as Neves' agent and for Neves' benefit as

---

[19] The fact that Neves is an individual and his alleged agent is a corporation does not alter the analysis. It has been established that in New York, while the traditional scenario is one where jurisdiction over a corporation is obtained through the exercise of jurisdiction over an individual defendant, a corporation may likewise act as an agent for an individual for purposes of § 302(a)(1). See Retail Software Servs., Inc. v. Lashlee, 854 F.2d 18, 22 (2d Cir. 1988) (discussing Kreutter, 71 N.Y.2d 460, 527 N.Y.S.2d 195); see also Reynolds Corp. v. Nat'l Operator Servs., Inc., 73 F. Supp.2d 299, 303 (W.D.N.Y. 1999).

Worldstar's majority and controlling shareholder, and with his knowledge and consent." (Id. at 10). They further assert that "as the majority and controlling shareholder, Neves exercised control over Worldstar relative to these activities." (Id.).

We have already determined that Worldstar engaged in purposeful activities in New York for purposes of this provision by entering into the 2001 Agreements. We therefore turn to the second two requirements.

### i.    Benefit, Knowledge and Consent

Because Neves was the controlling (and only, as far as we are aware) shareholder of Worldstar, the corporation cannot have entered into the 2001 Agreements, the lawsuits or arbitrations without his knowledge and consent. We also have reviewed Neves's testimony about his involvement in the Agreement negotiations and take note of the fact that he testified in New York in connection with the first arbitration. Furthermore, the goal of the original deal was ultimately for a financial investment that would have benefitted Neves. See, e.g., Basquiat, 1997 WL 527891, at *3 ("[T]he relatively high ranking position of Gardner within a small company necessarily implies that Gardner will derive financial

benefit from the [transaction]".) We therefore find that the
November 2001 Agreements were entered into by Worldstar for the
benefit, and with the knowledge and consent, of Neves. See, e.g.,
Retail Software Servs., Inc., 854 F.2d at 21-22; MoneyGram Payment
Syst., Inc. v. Consorcio Oriental, S.A., 2007 WL 1489806, *5
(S.D.N.Y. May 21, 2007).


## ii.  **Exercise of Control**


As the controlling shareholder/owner of Worldstar, it is
reasonable to infer that Neves had some degree of control over the
corporation's actions. However, as previously noted, a plaintiff's
allegations must "'sufficiently detail the defendant's conduct so
as to persuade a court that the defendant was a 'primary actor' in
the specific matter in question. In re Sumitomo Copper Litig., 120
F. Supp.2d at 336 (quoting Karabu Corp., 16 F. Supp.2d at 324).


We know from Neves's 2004 deposition that he was intimately
involved in bringing the Bicudos into the 2001 negotiations and
thus in the overall structure of the deal resulting in the November
2001 Agreements. He described how Helio Bicudo was reluctant to
assent to participating in a holding company, and his reference to
having "put in your [Bicudo's] hands" "my money" compels the

96

inference that the loan to Metropolis was made with Neves's authority. (See Neves Mar. 8, 2004 Dep. at 55-57 ("How are you going to negotiate the shares that I put in your hands with my money?")).

It is true that Beno Suchodolski was listed in the 2001 Agreement documents as attorney-in-fact for Worldstar; Neves did not sign them. Also, we have been shown no evidence that at the time the documents were negotiated, Neves was technically a corporate officer for Worldstar; rather, it appears that Ms. Boix was acting as president of the company. Despite Suchodolski's and Ms. Boix's involvement, however, the control that Neves appears to have exerted over Worldstar's role in the deal -- as seen through his own testimony -- weighs in favor of a finding that Neves was a "primary actor" in the transactions. Cf. MoneyGram Payment Syst., Inc., 2007 WL 1489806, at *5-*6 (finding jurisdiction over a "majority shareholder" where he benefitted from the corporation's New York transactions, "exercised (at least) 'some control'" over the corporation as president of the board of directors, signed an agreement for the corporation, met with the plaintiff's representatives in New York at least once, and appeared to have "directed the negotiations" over a dispute which gave rise to the litigation); Bradley v. Staubach, 2004 WL 830066, *5-*6 (S.D.N.Y.

Apr. 13, 2004) (finding no agency basis for jurisdiction over one defendant who "[m]erely authoriz[ed] one part of a previously negotiated agreement" but finding that another defendant was a "primary actor" subject to jurisdiction as he was a "key figure" in the negotiations, serving as a primary contact for the bank involved, participating in negotiations and authorizing payment of deposit); Basquiat, 1997 WL 527891, at *3 (finding that plaintiffs alleged a sufficient level of control to make a corporate officer a "primary actor" for agency purposes under § 302(a)(1) where they alleged that the individual defendant had caused the distribution of infringing products through the corporation's retail activities in New York).

Therefore, we find that Worldstar engaged in purposeful activities in New York, for the benefit, and with the knowledge and consent, of Neves, and that Neves exercised control over the corporation in the 2001 transactions so as to be a "primary actor". As a result, we find that Worldstar was an agent for Neves at that time, and thus Worldstar's actions and jurisdiction may be imputed to Neves under § 302(a)(1).

4.    **Waiver**

Lastly, Movants argue that Neves, through his alter ego Worldstar, has waived any objection to personal jurisdiction by virtue of the fact that Worldstar has fully participated in the litigation. (Movants' Estate Reply at 10). The Second Circuit has held that where a corporation fully participated in a litigation, its alter ego is deemed to have waived any objections to service of process, and thus personal jurisdiction is proper. See, e.g., Kidder, Peabody & Co. v. Maxus Energy Corp., 925 F.2d 556, 562 (2d Cir. 1991); see also Transfield Cape, 571 F.3d at 224 (citing Kidder, Peabody & Co.). In Kidder, relied upon by movants, the corporation submitted papers in the name of both itself and its alter ego. While that was not the case here, as will be discussed infra, see pp. 115-21, Neves's interests were represented by Worldstar in the litigation by virtue of their relationship. It therefore may be appropriate to deem him/the Estate to have waived any objections to personal jurisdiction. However, given that we have already determined there is personal jurisdiction over Worldstar and the Estate on other, substantive bases, we need not delve into this issue.

### 5.   **Due Process**


#### a.   **Legal Standard**


As noted, the personal-jurisdiction analysis is comprised of
two parts. First, the court must determine whether jurisdiction
exists under the laws of the forum state and, second, it must
determine "whether an exercise of jurisdiction under these laws is
consistent with federal due process requirements." Lyons v. Rienzi
& Sons, Inc., __ F. Supp.2d __, 2012 WL 1203688, *2 (E.D.N.Y. Apr.
11, 2012) (quoting Grand River Enters. Six Nations, Ltd., 425 F.3d
at 165). We have already determined that jurisdiction exists over
the Estate under the laws of New York, and we therefore turn to the
due-process analysis.


The due-process inquiry itself is composed of two parts: "the
'minimum contacts' inquiry and the 'reasonableness' inquiry". 101
McMurray, LLC v. Porter, 2012 WL 997001, *5 (S.D.N.Y. Mar. 26,
2012) (quoting Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50,
60 (2d Cir. 2012) and citing Calder, 465 U.S. at 788). The minimum-
contacts requirement will be met if the defendant "purposefully
availed itself of the privilege of doing business in the forum
state and could reasonably anticipate being haled into court

100

there." Id. (internal quotation marks and citations omitted). In determining whether the exercise of jurisdiction is "reasonable", a court should look to a number of factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010) (citing Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113-14 (1987)).

### b.   Alter-Ego Consent Jurisdiction -- Due Process

It is well established that exercising personal jurisdiction over a corporation or individual is consistent with due process where the alter ego has consented to jurisdiction. See, e.g., Packer, 959 F. Supp. at 203 (in discussing jurisdiction by consent based on an alter-ego finding, noting that "[d]ue process concerns are not implicated by such an exercise of personal jurisdiction because consent to jurisdiction in a given forum obviates the necessity of a minimum contacts analysis"); cf. So. Ne. Tel. Co. v.

Global NAPs Inc., 624 F.3d 123, 138 (2d Cir. 2010) ("It is . . . well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process."). The exercise of personal jurisdiction over Neves/the Estate under an alter-ego theory based on consent to jurisdiction by Worldstar therefore comports with due process.

### c.   Alter-Ego or Agency-Based Long-Arm Jurisdiction -- Due Process

The exercise of personal jurisdiction over the Estate likewise comports with due process under a long-arm jurisdiction theory, stemming from either an alter-ego or an agency relationship. First, "[b]ecause the 'purposeful availment' requirement of N.Y. C.P.L.R. § 302(a)(1) derives directly from" the controlling Supreme Court case, Hanson v. Denckla, 357 U.S. 235 (1958), "satisfaction of the section 302(a)(1) criteria will generally meet federal due-process requirements." Nat'l Union Fire Ins. Co., 319 F. Supp.2d at 365 (citations omitted); see also Bradley, 2004 WL 830066, at *6 ("Contacts sufficient to establish jurisdiction under C.P.L.R. § 302(a)(1) are sufficient to meet the minimum contacts requirements of the Due Process clause.").

The analysis is the same whether the corporation is alleged to be an agent or an alter ego. See, e.g., MoneyGram Payment Syst., Inc., 2007 WL 1489806, at *5-*6 (finding exercise of jurisdiction over an individual defendant based on an agency theory and New York's long-arm statute comported with due process); Kinetic Instruments, Inc., 802 F. Supp. at 986 (where individual defendant was subject to jurisdiction based on an alter ego theory, finding that defendant had "purposefully availed" himself of the forum and that after considering other factors, the assertion of personal jurisdiction would not offend due process).

We find that Neves's contacts with New York through Worldstar constitute "purposeful availment". Given Neves's close association with the Agreements entered into in New York, the Agreements' inclusion of a New York choice-of-law clause along with a consent-to-jurisdiction provision, and Worldstar's engagement in numerous litigation and arbitral proceedings in New York over the years, it is reasonable to have expected Neves (and thus to expect the Estate now) to defend its actions here. The exercise of jurisdiction therefore comports with the minimum contacts requirement under either an agency or an alter-ego theory.

With respect to the reasonableness inquiry, we likewise

103

conclude that the relevant factors weigh in favor of a finding that jurisdiction over the Estate comports with due process. The burden on respondent is that of litigating in the United States, but it is clear that Neves came here for previous legal proceedings, and that a number of those proceedings were initiated by Worldstar, thus demonstrating the ability of both parties to litigate here. Both the Estate and Worldstar also have counsel based either here in New York or in Washington, D.C. New York's interest in this case may be considered neutral, given the global nature of the disputing parties and the fact that the suits were filed in Brazil, but the general interest in efficiently resolving the controversy and the shared interests of furthering social policies is supported by exercising jurisdiction over the Estate. Courts of this district should not be forced to rely on courts of other jurisdictions to interpret or enforce their own orders. Lastly, movants' interest in obtaining efficient relief is furthered by the exercise of jurisdiction over the Estate. Movants might otherwise be forced to bring suit in another forum more inconvenient for them.

Based on the foregoing, we find that the court's exercise of personal jurisdiction over the Estate does not offend due process.

104

**B.    Beno Suchodolski**

Beno Suchodolski initially asserted that he was reserving the right to object to personal jurisdiction, but he has never actually offered any argument on the issue. Thus not only does the court lack any basis upon which to assess an objection to personal jurisdiction over him, but he has waived the right to raise it. "[L]ack of personal jurisdiction is a privileged defense that can be waived by failure [to] assert [it] seasonably, by formal submission in a cause, or by submission through conduct." Walker v. Keyser, 2001 WL 1160588, *5 (S.D.N.Y. Oct. 17, 2001) (internal quotation marks and citation omitted).

**III. Applicability of the Anti-Suit Injunction**

In order to be found in contempt for violating the injunction, the alleged violators must have been bound by the injunction. Movants assert that the Estate and Suchodolski are validly bound by the injunction in the Amended Judgment, even as non-parties, because of their relationships to Worldstar and SAI. (Movants' Contempt Mem. at 15, 20-21). Worldstar does not contest that it is bound. Both the Estate and Suchodolski argue that the injunction did not bind them.

## A.    **The Estate of Neves**

The Estate argues that, even if this court has personal jurisdiction over it, (1) the Amended Judgment has no res judicata effect as to Neves's ability to challenge the Final Award because personal jurisdiction was not established over Neves in the confirmation proceeding, and (2) upon a de novo review of the Award, the court should deny recognition and enforcement of the anti-suit injunction contained in the Award as to Neves. (Estate Opp'n Mem. at 1-2).

In essence, the Estate wishes to contest the enforceability of the Award and the Amended Judgment as to Neves. On the merits of that question, it makes several arguments that the arbitral panel exceeded its powers in issuing the Award, in that it had no authority to bind a non-party under Fed. R. Civ. P. 65, that there is no other manner in which non-parties may be bound in arbitration proceedings -- unless the parties agree to such a procedure, which, the Estate asserts, Neves did not -- and that the panel followed procedures that violated the Inter-American Convention on International Commercial Arbitration (the "Panama Convention"). (Estate Opp'n Mem. at 3-7). Moreover, the Estate argues, the Amended Judgment is not a proper Rule 65 injunction because the

106

District Court did not make the requisite findings under that Rule, such as irreparable harm and a balance of the hardships weighing in favor of the moving party. (Id. at 4). The Estate further requests that if the court finds that there is personal jurisdiction over it, additional briefing be permitted on the issue of res judicata and whether the Award can be enforced as to Neves. (Id. at 7).

In reply, movants focus primarily on the issue of personal jurisdiction, offering little in the way of rebuttal to the Estate's other contentions, but they do note that the arguments raised by the Estate regarding the validity of the injunction (both that the court did not make the proper findings for a Rule 65 injunction and that non-parties cannot be bound by it) were already raised and rejected by both the District Court and the Court of Appeals. (See Movants' Estate Reply at 11 n.7; see also Kensington Reply Decl. ¶ 60). Movants point to a letter submitted to the District Court by Worldstar and SAI in opposition to Cardell's and Deltec's motion to amend the judgment, as well as to briefing in the Court of Appeals addressing the Amended Judgment itself. (See Kensington Reply Decl. ¶ 60 & Exs. 15-16).

For the reasons that follow, we decline to review the Award de novo and instead adhere to the mandate of the Court of Appeals

107

upholding the Amended Judgment. We therefore conclude that the anti-suit injunction is valid in its entirety and thus enforceable against Neves/the Estate. In the alternative, we find briefing on the issue of res judicata unnecessary, and hold that the Estate is barred by that doctrine from relitigating the validity and enforceability of the Award. Lastly, we find that by virtue of Neves's relationship to Worldstar, Neves was bound by the injunction as a non-party under Rule 65(d)(2).

### 1.   **Mandate Rule**

The Estate argues that it is not barred by res judicata from challenging the recognition and enforcement of the anti-suit injunction as to it. Because we are bound by the mandate rule in this case, we are not permitted to reconsider the decision of the Court of Appeals, and the Estate's argument that it may challenge the validity of the Award as to Neves must therefore fail.

### a.   **Legal Standard**

The mandate rule is "a branch of the law-of-the-case doctrine." Burrell v. United States, 467 F.3d 160, 165 (2d Cir. 2006). While the law-of-the-case doctrine in certain instances

permits a trial court to reconsider its own decisions, the rule is different when the case has gone up on appeal. <u>See</u>, <u>e.g.</u>, <u>Am. Hotel Int'l Group Inc. v. OneBeacon Ins. Co.</u>, 611 F. Supp.2d 373, 378 (S.D.N.Y. 2009). In that case, the rule requires that "where issues have been explicitly or implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court." <u>Burrell</u>, 467 F.3d at 165 (quotation marks and citation omitted); <u>see also</u> <u>APL Co. Pte Ltd. v. Blue Water Shipping U.S. Inc.</u>, 779 F. Supp.2d 358, 366 (S.D.N.Y. 2011); <u>Am. Hotel Int'l</u>, 611 F. Supp.2d at 378 ("When an appellate court has once decided an issue, the trial court, at a later stage in the litigation, is under a duty to follow the appellate court's ruling on that issue." (citation omitted)). The lower court is "barred from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals." <u>Burrell</u>, 467 F.3d at 165. If an issue was not decided by the appellate court, that issue may be considered by the trial court, but in determining whether an issue is open for reconsideration, the court "should look to both the specific dictates of the remand order as well as the broader 'spirit of the mandate.'" <u>Id.</u> (quoting <u>United States v. Ben Zvi</u>, 242 F.3d 89, 95 (2d Cir. 2001)).

b.    **The District Court and Court of Appeals Decisions**

In its original December 16, 2009 confirmation of the Final Award, the District Court granted Cardell's and Deltec's petition to confirm, but did not reiterate the terms of the Award. To correct that omission, on January 13, 2010 Cardell and Deltec filed a motion to amend the judgment to specify "(1) the dollar amount of the arbitration award; (2) the injunctive relief granted by the arbitrators; and (3) the post-award, pre-judgment interest and the post-judgment interest." (See Movants' Am. Mem. of Law at 1; see also Am. J. at 2). The District Court therefore requested a limited remand of the case from the Court of Appeals, which granted that relief on April 23, 2010. (See USCA Order dated Apr. 23, 2010; Am. J. at 2).

By letter dated May 17, 2010, SAI and Worldstar opposed the motion to amend. They argued that the motion to amend the judgment amounted to an application "to convert an arbitral injunction of suspect enforceability into a federal court injunction enforceable by the powers of the federal judiciary, without a hearing, without findings, without a showing that Petitioners[] lack an adequate remedy at law or that they will face an irreparable injury, and without the protections afforded parties to federal court

110

proceedings." (Kensington Reply Decl. Ex. 15 (May 17, 2010 letter to the Court from Michael Evan Jaffe, Esq. & David L. Kelleher, Esq.) at 3). SAI/Worldstar further argued that the injunction would "condition the ability of persons not party to the Award, not party to the November 2001 Agreements, and not party to this proceeding, to bring legal actions to enforce their rights anywhere in the world." (Id. at 5). Thus, they asserted, the arbitral injunction "is in derogation of the very arbitration agreement upon which the arbitral proceedings were founded." (Id.).

The District Court issued the Amended Judgment on May 24, 2010, and specifically noted what it had considered in its decision, which included the May 17, 2010 letter, as well as a number of other letters and two telephone conferences held by the court. (Am. J. at 2 n.2). It is clear that the District Court in its decision rejected SAI/Worldstar's arguments made in the May 17, 2010 letter, because the Amended Judgment went on to confirm the Award again (see id. at 2-3), and to specifically "enjoin[] from commencing or prosecuting or assisting in the prosecution of any arbitration, action or proceeding in any jurisdiction" all respondents, including Nelson Baeta Neves and Beno Suchodolski. (Id. at 3-4). The District Court therefore considered and rejected the arguments that the anti-suit injunction inappropriately bound

111

non-parties and that it had been made without the requisite Rule 65 findings.

SAI and Worldstar appealed the Amended Judgment to the Court of Appeals by filing an amended notice of appeal on July 10, 2010, and made the same arguments to that court that had been rejected below. In a brief by SAI and Worldstar submitted in support of their appeal, they argued that the injunction was improper because the District Court had not made findings or required a showing of irreparable harm. (Kensington Reply Decl. Ex. 16 (SAI/Worldstar Appellate Br.) at 58-60). They further argued that the arbitral injunction was improper in that it went beyond the agreement of the parties regarding arbitration and extended to individuals who were not parties to the agreement (specifically, the SPA). They noted that Beno Suchodolski and Nelson Baeta Neves were not parties to the SPA or to the arbitration, and thus by extending to them, the injunction exemplified improper "coercion." (Id. at 61) (citing Stolt-Nielson S.A. v. Animal Feeds Int'l Corp., 130 S. Ct. 1758, 1767-68 (2010)).

The Court of Appeals rejected these arguments, affirming the Amended Judgment by summary order dated March 2, 2011. (See Mandate of USCA dated Mar. 2, 2011). In that order the court affirmed the

112

District Court's decision to confirm the arbitral award, and also observed that "We have considered all of Appellants' remaining arguments and find them to be without merit." (Id. at 3). The appellate court therefore considered and rejected the arguments raised by SAI/Worldstar regarding the validity of the injunction both in general and as applied to non-parties.

The Estate now wishes to make again essentially the same arguments -- that the arbitral panel violated basic principles of arbitration by including Neves in the injunction and that the District Court failed to make the findings necessary for a Rule 65 injunction. As above, these arguments have been made to, and rejected by, both the District Court and the Court of Appeals and, pursuant to the mandate of the Court of Appeals, we are bound by those decisions. We therefore conclude that the injunction is valid and enforceable against the Estate.[20]

---

[20] We note that there are three exceptions to the mandate rule: "an intervening change in the controlling law; the need to correct a clear error of law or to prevent an obvious injustice; and the availability of substantially different evidence on remand." Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A., 2001 WL 185134, *2 (S.D.N.Y. Feb. 23, 2001). None of these exceptions apply in this case. We have been presented with no indication that there has been a change in the controlling law, and the Estate does not offer substantially different evidence. We also find that it is not an injustice to bind Neves even though he was not personally a party to the confirmation proceeding or arbitration. Neves clearly had notice of the

## 2.   Res Judicata

As  an  alternative  holding,  we  conclude  that,  even  if  the
Estate's  arguments  were  more  appropriately  analyzed  under  res
judicata  principles  rather  than  the  law-of-the-case  doctrine,  the
Estate  would  be  barred  by  res  judicata  from  challenging  the  Award
de  novo  here.

### a.   Legal Standard

The   doctrine   of   res   judicata   precludes   parties   from
relitigating  claims  that  were  or  could  have  been  raised  in  a  prior

---

arbitration  and  litigation  and  did  not  intervene  in  his  own  name.
Moreover,  the  very  arguments  that  the  Estate  wishes  to  raise  in
support  of  the  Estate's  contentions  were  already  raised  and
considered  by  the  Court  of  Appeals.  Thus  it  cannot  be  said  that
following  the  court's  mandate  would  constitute  an  obvious
injustice.  The  only  slightly  different  argument  made  this  time
around  is  the  assertion  that  under  the  Panama  Convention  the
court  may  deny  recognition  to  an  award  made  pursuant  to
procedures  not  agreed  upon  by  the  parties.  (Estate  Opp'n  Mem.  at
2).  The  Estate's  arguments  on  the  point  consist  of  vague
generalizations  that  an  anti-suit  injunction  binding  a  non-party
"concerns  a  dispute  not  envisaged  in  the  agreement  between  the
parties  to  submit  to  arbitration",  that  by  applying  Rule  65
"directly  or  by  analogy"  the  tribunal  "followed  'arbitration
procedure  .  .  .  [not]  in  accordance  with  the  terms  of  the
agreement  signed  by  the  parties'"  or  in  accordance  with  state
law,  and  that  an  arbitral  adjudication  against  a  non-party
violates  public  policy.  (See  id.  at  6-7  (citing  Article  5  of  the
Panama  Convention)).  Other  than  quoting  the  Panama  Convention,
respondent  offers  no  legal  support  for  these  assertions.

action. Akhenaten v. Najee, LLC, 544 F. Supp.2d 320, 327 (S.D.N.Y. 2008). Res judicata applies when "(1) the previous action involved an adjudication on the merits, (2) the previous action involved the [parties] or those in privity with them [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Id. (quoting Pike v. Freeman, 266 F.3d 78, 91 (2d Cir. 2001)).

There is a general rule against preclusion of non-parties in that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process," Taylor v. Sturgell, 553 U.S. 880, 893 (2008) (quoting Hansberry v. Lee, 311 U.S. 32, 40 (1940)). However, as noted above, the Second Circuit has consistently held that the res judicata effect of a prior judgment extends to nonparties "who are in privity with the parties to the first action," and that the doctrine is to be "applied with flexibility." The Amalgamated Sugar Co., LLC v. NL Indus., Inc., 825 F.2d 634, 640 (2d Cir. 1987). While traditionally the doctrine of privity was applied most commonly to a "successive relationship to the same rights of property", it has evolved in the context of res judicata to apply where a defendant has "a sufficiently close relationship to the original defendant" so as to justify preclusion. Akhenaten,

115

544 F. Supp.2d at 328 (citations omitted).


Furthermore, the Supreme Court recently clarified in <u>Taylor v. Sturgell</u> the exceptions to the rule that non-parties may not be bound by a prior judgment:


> A non-party may be bound by a prior determination if: (1) they agree to be bound; (2) preclusion is justified by a "pre-existing 'substantive legal relationship[]' between the person to be bound and a party to the judgment;" (3) the nonparty was adequately represented in the earlier action; (4) the nonparty assumed control over the earlier action; (5) the nonparty is attempting to relitigate through a proxy in order to avoid preclusion; or (6) if 'a special statutory scheme [] expressly foreclose[s] successive litigation by nonlitigants. . . ."

<u>U.S. Underwriters Ins. Co v. LCFR Enter., LLC</u>, 2012 WL 993502, *4 (S.D.N.Y. Mar. 26, 2012) (quoting <u>Taylor</u>, 553 U.S. at 893-95). The High Court in its analysis avoided the use of the term "privity"[21], but it continues to be used by courts in this circuit as an equivalent to the second exception listed in <u>Taylor</u> for "pre-existing substantive legal relationships". <u>See</u>, <u>e.g.</u>, <u>Xu v. City of</u>

---

[21] The Court stated that "The substantive legal relationships justifying preclusion are sometimes collectively referred to as 'privity'" but that that term "has also come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground". The Court therefore avoided using the term "privity" "[t]o ward off confusion." <u>Taylor</u>, 552 U.S. at 894 n.8.

New York, 2010 WL 3060815, *4 (S.D.N.Y. Aug. 3, 2010) (citing Taylor for the proposition that non-party preclusion may be based on "pre-existing legal relationship", in support of a finding that two individuals were "in privity" with a City department); see also Esquire Trade & Fin., Inc. v. CBQ, Inc., 562 F.3d 516, 520-522 (2d Cir. 2009) (per curiam) (discussing the exceptions noted in Taylor and finding that "the required privity" was not present to justify non-party preclusion). We therefore treat the term "privity" as interchangeable with the term "pre-existing substantive legal relationship" for this analysis.[22]

We note that federal law applies when determining the preclusive effect of a federal-court judgment, and New York law

---

[22] The majority of the exceptions to the prohibition against non-party preclusion discussed in Taylor do not apply here. There is no indication that Neves agreed to be bound by the outcome of Worldstar's litigation or that he assumed control of the confirmation litigation. He also did not bring a new suit as a representative of Worldstar and there is no statutory scheme specifically limiting subsequent actions in this case. For there to be adequate representation, under Supreme Court precedent there must have been either special procedures to protect the interests of the non-parties or "an understanding by the concerned parties that the first suit was brought in a representative capacity", such as found in class actions. Esquire Trade & Fin., Inc. v. CBQ, Inc., 562 F.3d 516, 521-22 (2d Cir. 2009) (citing Taylor, 553 U.S. at 897). Neves's relationship to Worldstar is not akin to a class action, and we cannot say with certainty what the specific understandings of Neves and Worldstar were or if there were any special procedures implemented by the court.

117

applies when determining the effect of a New York State court judgment. See Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002); see also Krepps v. Reiner, 377 Fed. App'x 65, 66 (2d Cir. 2010). We deal here with a federal-court judgment; however, there is "no discernible difference between federal and New York law concerning res judicata and collateral estoppel." Marvel Characters, 310 F.3d at 286; see also Linden Airport Mgmt. Corp. v. N.Y.C. Econ. Dev. Corp., 2011 WL 2226625, *4 n.5 (S.D.N.Y. June 1, 2011). We therefore rely on cases drawing on either body of law.

  **b.** **Analysis**

  It is clear that the confirmation proceeding in this case involved an adjudication on the merits, as the District Court determined on the merits that the Award should be confirmed. Similarly, the Court of Appeals decided the appeal on the merits of the parties' arguments. The first requirement for the application of res judicata is thus satisfied. With respect to the third requirement, the claims that the Estate now asserts -- that the injunction is not binding as to it as a non-party and is an invalid injunction under Rule 65 -- could have been and indeed were raised in the confirmation proceeding. The remaining question is thus

whether Neves was in privity (or had a "pre-existing substantive legal relationship"[23]) with Worldstar such that he (and thus the Estate) is bound by the Amended Judgment so as to preclude re-ligitating the question of the injunction's enforceability now. For the reasons that follow, we find that Neves was in privity with Worldstar and that the doctrine of <u>res judicata</u> therefore bars the Estate from re-litigating the validity of the Award and the injunction as applied to it.

In the specific context of a shareholder and a corporation, "there is no bright line rule as to whether or not shareholders are in privity with their corporation for <u>res judicata</u> purposes", but rather "a finding of privity between a shareholder and the corporation depends on whether, under the circumstances, the interests of the nonparty were adequately represented." <u>Amalgamated</u>, 825 F.2d at 640; <u>see also</u> <u>JSC Secs., Inc. v. Gebbia</u>, 4 F. Supp.2d 243, 251-52 (S.D.N.Y. 1998) (finding that "[a]s

---

[23] Even without using the term "privity", it can fairly be said that Neves had a "pre-existing substantive legal relationship" with the corporation. The Supreme Court in <u>Taylor</u> gave such examples in this category as "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor", but emphasized that such a list was not exclusive. 553 U.S. at 894. Neves's ownership of Worldstar was certainly a long-standing substantive legal relationship between him and the corporation.

shareholders, and/or officers and directors" of a corporation that was party to a previous action, defendants were "in privity" with the corporation for res judicata purposes) (citing cases). Here, Neves was the sole shareholder, or else owned Worldstar through various family associations. Since he was the sole owner either by himself or through family associations, we can assume that his interests were aligned with the corporation's. Cf. Feitshans v. Kahn, 2006 WL 2714706, *4 (S.D.N.Y. Sept. 21, 2006) (noting that because the individual defendants were the sole owners, as well as officers and directors of the entity defendants "that their interests were at stake in the prior arbitration which they likely controlled, there is a sufficiently close relationship between the parties in both actions such that privity exists"). In this instance, not only was Neves the controlling shareholder of Worldstar, but the actual arguments offered by Worldstar in the confirmation proceedings were the same ones that the Neves Estate wishes to offer again now. Worldstar's position at the time of the Amended Judgment, identical to that of the Estate now, was squarely presented to both the District Court and the Court of Appeals, and accordingly Neves's interests were adequately represented in the confirmation proceeding by Worldstar. Cf. Akhenaten, 544 F. Supp.2d at 329 (finding a sufficiently close relationship for res judicata purposes where the defendants invoking res judicata would be liable

120

under the same theory as the defendants in the prior action, and "share[d] a common interest in the issue that [was] dispositive as to the liability of *all* defendants").

Given that Neves was the sole owner of Worldstar either directly or indirectly, that he clearly had notice of the suit by virtue of that ownership -- also evidenced by the fact that he filed the Neves Action -- and that his interests were represented by Worldstar in the District Court and the Court of Appeals, we find that he was in privity with Worldstar. As the sole owner (whether directly or indirectly) of Worldstar, we can presume that he had notice of and control over decisions involving the corporation and therefore that his interests and those of Worldstar were aligned. We thus find that although he was not a party to the prior proceedings, Neves had a substantive legal relationship and was in privity with Worldstar, and that the Estate is therefore validly precluded by the Amended Judgment from challenging the Award de novo here.

### 3.    **Rule 65(d)**

Movants also argue that even if not barred from re-litigating the application of the injunction to him, Neves -- and thus the

Estate -- were permissibly bound by the injunction under Federal
Rule of Civil Procedure 65(d)(2), even though Neves was not a party
to the proceedings. For the reasons that follow, we agree with
movants and find that the injunction was binding upon Neves.


    a.   **Legal Standard**


It is well established that a court "cannot lawfully enjoin
the world at large." <u>New York v. Operation Rescue Int'l</u>, 80 F.3d
64, 70 (2d Cir. 1996) (citation omitted). However, under Federal
Rule 65(d)(2), certain non-parties may be bound by an order. The
Rule states that those bound include

> only the following who receive actual notice of [the
> order] by personal service or otherwise: (A) the parties;
> (B) the parties' officers, agents, servants, employees,
> and attorneys; and (C) other persons who are in active
> concert or participation with anyone described in Rule
> 65(d)(2)(A) or (B).

Fed. R. Civ. P. 65(d)(2). The provision is a codification of the
common-law rule that a non-party may be bound by an injunction, and
held in contempt for a violation of that injunction, where he "is
legally identified with the party named in the order or aids and
abets the party named in the order in its noncompliance." <u>GMA</u>
<u>Accessories</u>, 2008 WL 2355826, at *12.

122

"A non-party may be found to be 'legally identified' with an enjoined party where, 'as a practical matter,' the two individuals or entities are 'one and the same.'" GMA Accessories, 2008 WL 2355826, at *12 (quoting Spectacular Venture, L.P. v. World Star Int'l, Inc., 927 F. Supp. 683, 684-85 (S.D.N.Y. 1996) (finding defendant corporation's president and principal to be "one and the same" as the corporation)). In making the determination of whether an individual is acting independently or remains "legally identifiable" with the corporation, the court must examine "whether or not the individual is so identified in interest with those named in the decree that it would be reasonable to conclude that [his] rights and interests have been represented and adjudicated in the original proceeding." Matrix Essentials v. Quality King Distribs., Inc., 346 F. Supp.2d 384, 391-92 (E.D.N.Y. 2004) (internal quotation marks and citations omitted).

### b. Analysis

The anti-suit injunction contained in the Amended Judgment states that it applies to "SAI/Worldstar and their officers, directors, shareholders, employees, and agents including Beno Suchodolski and Nelson Baeta Neves . . . ." (Am. J. at 3-4).

123

Movants argue that "Worldstar as a corporation cannot act except through individuals who are directors, officers and agents, like Neves." (Movants' Contempt Mem. at 15). We have no evidence that Neves was officially a director, agent or other officer, other than his 2005 affidavit stating that he was attorney-in-fact. However, we know that as owner of Worldstar Neves had actual notice of the injunction (as shown by the filing of the Brazil suit), and furthermore, as discussed above, Neves's interests were represented in the prior proceeding through Worldstar. Indeed, Worldstar advanced arguments on Neves's behalf, and on behalf of all non-parties to the injunction. (See Kensington Reply Decl. Exs. 15-16). Therefore, given that Neves was the controlling shareholder of Worldstar and that the corporation's interests were clearly aligned with his, we can conclude that Neves was "so identified in interest" with Worldstar that it is reasonable to conclude that Neves's rights and interests were "represented and adjudicated" in the confirmation proceeding. Matrix Essentials, 346 F. Supp.2d at 392. We therefore conclude that Neves and his Estate were bound by the anti-suit injunction.

## B.   Beno Suchodolski

Like Neves, Suchodolski is a principal of a corporation that

124

was a party to the Award and the confirmation proceedings, including the appeal to the Court of Appeals. Movants argue that he is bound by the injunction because he aided and abetted an enjoined party in violating the injunction (Worldstar), and is "substantially intertwined" with Worldstar, Neves and SAI. (Movants' Contempt Mem. at 20-21). Suchodolski argues in response that movants have shown no evidence that Suchodolski aided and abetted Worldstar or Neves in the filing or litigation of the Brazil suits. (Suchodolski Opp'n Mem. at 7-8). We agree that there is not sufficient evidence on the current record to find that Suchodolski aided and abetted a violation, but we find him to be bound by the injunction.

First, for reasons similar to those laid out above with respect to Neves, we are bound to follow the mandate of the Court of Appeals and therefore conclude that the injunction is valid as to Mr. Suchodolski. Alternatively, we find that under Rule 65(d) Suchodolski is bound by the injunction as a non-party.

## 1. **Mandate Rule**

The standard for the mandate rule has been laid out above, and all of the relevant facts compel application of the appellate

125

court's mandate to Suchodolski as well as to Neves/the Estate. We are obligated to follow the mandate of the Court of Appeals that the Amended Judgment is valid in its entirety. Furthermore, it is not an injustice to bind Suchodolski, since his interests were represented by SAI and Worldstar and he likely had substantial opportunity to participate through SAI given his role in that corporation. He testified to being president of the board of directors of SAI in 2003 (see Kensington Reply Decl. Ex. 12 (Suchodolski June 27, 2003 Dep.) at 7), and he also appeared as a representative of SAI in the arbitral proceedings (see, e.g., Kensington Reply Decl. Ex. 10 (2004 Arbit. Hearing Tr.) and in district court. (See, e.g., id. Ex. 2 (June 30, 2003 hearing before Judge Pauley) at 2; id. Ex. 4 (Aug. 25, 2003 hearing before Judge Pauley) at 2).

### 2.  Rule 65(d)

With respect to Rule 65(d), we recall that that Rule provides that those bound by an injunction include "the parties' officers, agents, servants, employees, and attorneys". Fed. R. Civ. P. 65(d). "An injunction issued against a corporation or association binds the agents of that organization to the extent they are acting on behalf of the organization." Operation Rescue, 80 F.3d at 70. There

126

is ample evidence that Mr. Suchodolski acted as an agent of SAI. See, e.g., Agent, Black's Law Dictionary (9th ed. 2009) (defining agent as "[o]ne who is authorized to act for or in place of another; a representative").

First, Suchodolski testified at a 2003 deposition that he was the president of the board of directors of SAI, as well as a shareholder. (See Suchodolski June 27, 2003 Dep. at 7-8). While that deposition was taken some time ago, we also have more recent evidence that he has acted in the capacity of an agent of the corporation. On this contempt motion Suchodolski submitted a declaration in which he states that he instructed his counsel to write to Neves's lawyers saying that he had "no interest in participating in a lawsuit" that might violate the anti-suit injunction. (See Further Submission in Opp'n to Pet'rs' Mot. for Contempt Against Suchodolski ("Suchodolski Further Submission") Ex. A (Oct. 24, 2011 Suchodolski Decl.) at ¶ 3). He also proffers a copy of the resulting letter, which is formally written on behalf of SAI: "at the request of Suchodolski Associates, Inc. ("SAI")". (Oct. 24, 2011 Suchodolski Decl. at Ex. A (May 21, 2010 Letter to Gilberto Cipullo Esq. from Michael Evan Jaffe, Esq.)). His current counsel, Michael Jaffe, Esq., similarly submitted an affidavit stating that he had sent the letter "at the request of Mr.

127

Suchodolski" to former counsel for Worldstar. (Decl. of Michael Evan Jaffe, Esq. in Supp. of Mem. in Opp'n to Mot. for Contempt Against Suchodolski ("Sept. 21, 2011 Jaffe Decl.") ¶ 2 & Ex. 1). The declaration, affidavit and letter together clearly demonstrate Suchodolski's continued authority to act for and make decisions on behalf of SAI. Furthermore, Suchodolski also answered movants' subpoena questions directed to him (there is no response from SAI itself) and stated that he was in possession of a number of corporate records of SAI. (See Williamson Oct. 7, 2011 Decl. Ex. 6 at 8).

Given Suchodolski's representative and authoritative capacity, demonstrated by his actions and involvement in the litigations and arbitrations, there is sufficient evidence to find that he is an agent and/or officer of SAI for purposes of Rule 65(d). He is therefore bound by the anti-suit injunction.

Movants also argue that Suchodolski is bound under Rule 65 because he aided and abetted the named enjoined parties in violating the injunction. Rule 65(d) does allow for non-parties to be held in contempt for failure to comply with an injunction "where the non-party received actual notice of the injunction and was acting in active concert with the parties named in the injunction."

<u>Quantum Corporate Funding, Ltd. v. Assist You Home Health Care</u>
<u>Servs.</u>, 2002 WL 726666, *3 (S.D.N.Y. Apr. 24, 2002) (citing <u>Vuitton</u>
<u>& Fils., S.A. v. Carousel Handbags</u>, 592 F.2d 126, 129-30 (2d Cir.
1979)). Suchodolski was intimately involved in the litigations and
arbitrations as a representative and principal of SAI (<u>see</u>, <u>e.g.</u>,
Kensington Reply Decl. Exs. 2, 5, 10) and therefore clearly had
notice of the injunction. However, whether he was involved in the
Brazil lawsuits at all is a question that goes to the merits of
this contempt motion insofar as it targets Suchodolski. As will be
discussed below, movants have made out a <u>prima</u> <u>facie</u> case for
contempt against Suchodolski for aiding or abetting in the Brazil
litigation, and we will permit discovery on that issue. Thus we
cannot say at this point whether or not Suchodolski may be bound
under Rule 65(d)(2) based on his allegedly having acted in concert
with the parties named in the injunction.[24]

---

[24] Lastly, while Suchodolski does not make an argument that
he is not bound by <u>res judicata</u>, we note that Suchodolski now is
represented by the same counsel that represented SAI in the
arbitration resulting in the Final Award and the confirmation
proceedings. (<u>See</u>, <u>e.g.</u>, Williamson Sept. 2, 2009 Decl. Ex. 5
(SAI/Worldstar Arbit. Br.); Resp't's Mem. of Law in Opp'n to
Conf. Pet.; Suchodolski Contempt Opp'n Mem.). For purposes of <u>res</u>
<u>judicata</u>, "[t]hat the two actions are both brought by the same
attorneys or law firm is 'of singular importance'". <u>Hunt v. Enzo</u>
<u>Biochem, Inc.</u>, 2009 WL 1683990, *5 (S.D.N.Y. June 15, 2009)
(citation omitted). Combined with the above facts demonstrating
Suchodolski's ownership and authority within the company, there
is ample evidence to support a finding that Suchodolski was in
privity with SAI such that he is bound by the Amended Judgment

In sum, we find that the anti-suit injunction is valid and binding as to Suchodolski as well as to Neves and the Estate. We therefore turn now to an analysis of the merits of the contempt motion and movants' request to open discovery with respect to Suchodolski's role in the Brazil suits.

**IV.   Merits**

**A.   Legal Standard on a Motion for Contempt**

The court has inherent authority to hold a party in civil contempt for violation of a "clear and unambiguous" court order, even if the violation was not willful. See, e.g., McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949); Perez v. Danbury Hosp., 347 F.3d 419, 423 (2d Cir. 2003); EEOC v. Local 638, 753 F.2d 1172, 1178 (2d Cir. 1985), aff'd, 478 U.S. 421 (1986). An order is "clear and unambiguous" if it is "'specific and definite enough to apprise those within its scope of the conduct that is being proscribed'". Telenor Mobile Commc'ns AS, 587 F. Supp.2d at 615 (quoting New York State NOW v. Terry, 886 F.2d 1339, 1352 (2d Cir. 1989)).

_____

under res judicata principles.

130

The party moving for contempt bears the burden of proving the violation by "clear and convincing" evidence. See, e.g., Perez, 347 F.3d at 423; Local 638, 753 F.3d at 1178; N.A. Sales Co. v. Chapman Indust. Corp., 736 F.2d 854, 857 (2d Cir. 1984). The standard of clear and convincing evidence, although "no stranger to the civil law," Woodby v. INS, 385 U.S. 276, 285 (1966), is perhaps less susceptible to a precise definition than the more commonly invoked standards of "preponderance of the evidence" and "beyond a reasonable doubt." See, e.g., Addington v. Texas, 441 U.S. 418, 425 (1979). Plainly, however, it requires more persuasive proof than the "preponderance" standard, and for present purposes can be adequately defined as requiring sufficient evidence to give the court substantial confidence in the correctness of the plaintiff's material factual allegations. Thus, although virtual certainty is not required, see, e.g., id. at 432 (proof need not be "unequivocal"), a plaintiff must demonstrate that the defendant has very likely violated one or more of the court's previous orders in specified ways. In other words, the contempt standard "requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." Levin v. Tiber Holding Corp., 277 F.3d 243, 250 (2d Cir. 2002) (quoting Callanan Indus., Inc. v. White, 123 A.D.2d 56, 58, 510 N.Y.S.2d 230, 231 (3rd Dep't 1986)).

To establish a basis for contempt, the movant must demonstrate at least that the accused "'has not diligently attempted to comply in a reasonable manner,'" <u>Perez</u>, 347 F.3d at 424 (quoting <u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051, 1058 (2d Cir. 1995)), though the noncompliance need not be willful. <u>See</u>, <u>e.g.</u>, <u>Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.</u>, 369 F.3d 645, 655 (2d Cir. 2004). In sum, a finding of contempt is appropriate where "(1) the order a party fails to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the violating party has not been reasonably diligent and energetic in attempting to accomplish what was ordered." <u>Telenor Mobile Commc'ns</u>, 587 F. Supp.2d at 615.

## B.    "Clear and Unambiguous Order"

As noted, a clear and unambiguous order is one that is "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." <u>Leadsinger, Inc. v. Cole</u>, 2006 WL 2266312, *8 (S.D.N.Y. Aug. 4, 2006) (citations omitted). It should "leave[] 'no uncertainty in the minds of those to whom it is addressed' . . . who 'must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" <u>Id.</u> at *9 (quoting <u>Hess v. New Jersey Transit Rail Ops., Inc.</u>, 846 F.2d 114,

132

116 (2d Cir. 1998); Drywall Tapers, Local 1974 v. Local 530,

Operative Plasterers Int'l Ass'n, 889 F.2d 389, 395 (2d Cir.

1989)); accord A.V. by Versace, Inc. v. Gianni Versace S.p.A., 87

F. Supp.2d 281, 290 (S.D.N.Y. 2000) (quoting Allied Vision, 65 F.3d

at 1058). Furthermore, ambiguities in the order should be construed

in favor of the person charged with contempt. A.V. By Versace,

Inc., 87 F. Supp.2d at 291.


     The language of the anti-suit injunction found in the Amended

Judgment states in relevant part that

> SAI/Worldstar and their officers, directors, shareholder,
> employees, and agents including Beno Suchodolski and
> Nelson Baeta Neves, and all persons acting under their
> direction and control, and in concert or participation
> with any of them, are hereby enjoined from commencing or
> prosecuting or assisting in the prosecution of any
> arbitration, action or proceeding in any jurisdiction
> against (1) [Cardell]; (2) [Metropolis]; (3) [Deltec];
> (4) [Anastácio]; (5) Cia City; (6) [José Bicudo], and (7)
> Jose Carlos Arruda de Camargo Júnior; or any of their
> affiliates, officers, directors, shareholders, employees
> or agents, regarding any matter relating to . . . (1) the
> Stock Pledge Agreement, . . . (2) the Guaranty and
> Security Agreement, . . . or (3) the Subordination
> Agreement.

(Am. J. at 3-4).[25]

---

[25] The wording in the Final Award differs slightly only with
reference to the names of the parties.

1.    **Worldstar**

Worldstar argues that the order is not "clear and unambiguous". (Worldstar Merits Mem. at 1-16). First, it argues that the phrase "[r]elating to . . . the 2001 Agreements" can be reasonably interpreted not to bar its challenged conduct. (Id. at 2-7). Second, it asserts that Second Circuit caselaw on anti-suit injunctions "adds to the uncertainty" of the scope of the injunction as incorporated into the Amended Judgment. (Id. at 8-11). Third, Worldstar argues that even when we examine the language of the injunction in the context of the entire Award, the phrase "relating to . . ." remains ambiguous. (Id. at 12-14). Lastly, it argues, the post-award correspondence between Cardell and the Tribunal in June 2009 serves to create additional uncertainty about the intended scope of the injunction language. (Id. at 14-16).

"Relating to", as noted by the Second Circuit, is a broad term, generally defined as "connected by reason of an established or discoverable relation". See Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123, 128 (2d Cir. 2001) (quoting Webster's Third New Int'l Dictionary 1916 (1986)). As used in the Amended Judgment, the term is not ambiguous, but clearly prohibits the commencement or prosecution of a particular kind of lawsuit. Cf.

134

id. at 129 (finding term "related to" as used in an insurance policy to be "clear and unambiguous"). For the reasons that follow, we find that the term is clear enough to "apprise those within its scope of the conduct that is being proscribed", Leadsinger, Inc., 2006 WL 2266312, at *8 (citation omitted), and that it is therefore clear and unambiguous for purposes of this contempt motion with respect to Worldstar.

### a.   Worldstar's Reasonable-Interpretations Argument

Worldstar's main argument is that the definition of "relating to . . . the 2001 Agreements" embraced by movants is not the only reasonable interpretation of that language. (Worldstar Merits Mem. at 2). Movants' primary argument, as Worldstar sees it, is that the Worldstar Action is a prohibited "Enforcement Action" as defined in the Subordination Agreement. Movants' fallback argument, Worldstar asserts, is that "relating to . . ." should have a very broad meaning: "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with . . ." (Movants' Contempt Mem. at 13 (quoting Hirsch v. Am. Airlines, 160 Misc.2d 272, 277, 608 N.Y.S.2d 606, 609 (N.Y. City Civ. Ct. 1993)). Thus, Worldstar argues, movants' position shows that they effectively admit that the language could be reasonably

135

construed "to prohibit only those proceedings that seek to determine rights and obligations arising under, and governed by, one or more of the November 2001 Agreements." (Worldstar Merits Mem. at 3).

Moreover, Worldstar asserts, such language as "to have bearing or concern" proposed by movants would lead to "absurd results". (Id.). By example, it argues that entirely different business dealings with Cardell could conceivably "relate to" the November 2001 Agreements if Cardell thought that those Agreements were important in an interpretation of the later business dealings. (Id. at 3-4). Ultimately, Worldstar concludes that interpretation would mean that "in any lawsuit or proceeding between these parties that does not involve rights and obligations under the November 2001 Agreements, if Cardell wrongly claims that such rights are involved, the fact that the court or tribunal must understand the November 2001 Agreements to gain appreciation of their non-application to the rights in dispute, means that the proceeding is barred by the injunction." (Id. at 4). And in this very instance, Worldstar asserts, the court must construe the November 2001 Agreements in order to (1) "understand why the Metropolis Action involves a separate and distinct antecedent debt" and (2) "evaluate Worldstar's pleaded allegations in the Metropolis Action, that

136

Metropolis came under common ownership with the Movants here in a business transaction after 2003 that was separate from the November 2001 Agreements." (Id. at 4).

This mode of argument is misguided. In substance, Worldstar cites potential and hypothetical circumstances in which it would not be obvious whether the injunction barred the hypothesized conduct. But the relevant question is whether the language of the injunction is clear and unambiguous as applied to the facts of this case. See, e.g., Perez, 347 F.3d at 424 (on contempt motion, finding order to be not clear and unambiguous while faulting the district court for ruling "in a vacuum" and failing to evaluate whether the order was "'clear and unambiguous' with reference to the conduct in question"); Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296-97 (11th Cir. 2002) (on contempt motion addressing allegations of complaints and grievances filed in violation of an anti-suit injunction, finding that the order was clear and unambiguous with reference to certain filings but not to others, thus finding that there was a violation only with respect to some of the complaints); GMA Accessories, 2008 WL 2355826, at *4 (finding order prohibiting defendant from selling goods under a mark "similar to" plaintiff's mark should not be applied "without any individualized consideration of the particular mark in

137

question" but that in this case it was "sufficiently clear to be enforceable by the Court when [the defendant] chooses to use a mark that, based on all relevant criteria, is unquestionably 'similar to' [the plaintiff's] mark"); A.V. by Versace, Inc., 87 F. Supp.2d at 291-92, 294-95 (finding an order to be ambiguous as to certain acts of defendants, but clear and unambiguous as to others). Moreover, because injunctions "necessarily rely on descriptive language", "not every conceivable example of the prohibited conduct must be spelled out in the text of the order." GMA Accessories, Inc., 2008 WL 2355826, at *3 (citation omitted). A defendant "may not avoid a contempt citation simply because the judgment does not predict and describe his conduct in detail." Bear U.S.A., Inc. v. Kim, 71 F. Supp.2d 237, 247 (S.D.N.Y. 1999). Thus, contempt "cannot be 'avoided by some literal or hypertechnical reading of an order. It is the spirit and purpose of an injunction, not merely its precise words, that must be obeyed.'" Drywall Tapers, Local 1974 v. Local 530 of the Operative Plasterers, 2002 WL 31641597, *8 (E.D.N.Y. Nov. 19, 2002) (quoting Nat'l Research Bureau, Inc. v. Kucker, 481 F. Supp. 612, 615 (S.D.N.Y. 1979)).

In short, the issue here is whether the Amended Judgment is clear and unambiguous in its prohibition of Worldstar's conduct --

138

the filing and prosecution of the Worldstar Action.[26] The question

is whether that particular lawsuit "relates to" the Subordination

Agreement. We conclude that the answer is yes -- the Worldstar

Action clearly "relates to" the Subordination Agreement.


Given that the meaning and scope of the injunction turns in

large part on the key phrase "relating to", we look to caselaw that

has interpreted this exact phrase. As noted, the Second Circuit has

discussed the term "relating to" as one that is broad in scope, and

that it is equivalent to such phrases as "in connection with" and

---

[26] By helpful comparison, in GMA Accessories, 2008 WL
2355826, *2-*4, the court found an injunction to be "clear and
unambiguous" where the key language included the phrase "similar
to". The defendant was prohibited from selling goods under any
mark that was "similar to" or "substantially indistinguishable"
from the plaintiff's mark. The defendant argued that the phrase
"similar to" was not clear and unambiguous as applied to his
conduct. He relied on Perez (cited supra) for the proposition
that the question of whether an order is clear and unambiguous
must be answered "with reference to the conduct in question".
However, the GMA Accessories court noted that in Perez, the court
had found that the conduct did not fall within the four corners
of the injunction because there was no specific command that the
defendants had violated. In GMA Accessories, on the other hand,
the issue was "whether the words 'similar to' create an ambiguity
such that [the defendant] is unable to understand what conduct
would be proscribed by the injunction". Id. at *4. The court went
on to find that there was no ambiguity because although --
agreeing with the defendant -- it believed that the injunction
should not be read to per se include any and all marks within a
certain scope "without any individualized consideration of the
particular mark in question," in that case the injunction was
"sufficiently clear to be enforceable". Id.

"associated with". <u>Coregis Ins. Co.</u>, 241 F.3d at 128-29; <u>see also</u> <u>Camferdam v. Ernst & Young Int'l, Inc.</u>, 2004 WL 1124649, *2 n.3 (S.D.N.Y. May 19, 2004) (noting that the term "relates to" means has "a connection with or reference to" (citing <u>Ingersoll-Rand Co.</u> <u>v. McClendon</u>, 498 U.S. 133, 138 (1990))). Of particular note, our circuit court has suggested that "related to" is broader in scope than the term "arising out of". <u>See</u>, <u>e.g.</u>, <u>Coregis Ins. Co.</u>, 241 F.3d at 129 ("[R]egardless of whether coverage for the Lawsuits would constitute a claim 'arising out of' the Companies' insolvency . . . the ordinary meaning of the broad term 'related to' as used in the Provision is clear and unambiguous in its application to exclude such coverage."); <u>see also Phillips v. Audio Active Ltd.</u>, 494 F.3d 378, 389 (2d Cir. 2007) (noting that the term "arise out of" does not encompass "all possible claims that have some possible relation to the contract", such as those that only "relate to" . . . . the contract"); <u>In re Optimal U.S. Litig.</u>, 813 F. Supp.2d 351, 367 (S.D.N.Y. 2011) (quoting <u>Coregis</u>, 241, F.3d at 128-29, in support of the proposition that the term "relating to" is one that has been held to be "broader in scope than the term 'arising out of'"). Furthermore, this term does not require a causal relation. <u>See In re Spiegel, Inc.</u>, 2006 WL 2577825, *10 n.4 (Bankr.S.D.N.Y. Aug. 16, 2006) (noting that "relating to" is broader in scope than "arising out of" and does not require a causal relation).

Application of the broad meaning adopted by courts in this circuit for the term "relating to" to the facts of this case shows that the Worldstar Action is most certainly "related to" the Subordination Agreement. The suit is an attempt to collect a debt based on a letter that states:

> In October 2001, your company [Worldstar] made a deposit of US$ 333,333.00, from the account and at the order of Metropolis Shipping and Business Inc., to Brastar Corporation, for the completion of the purchase of shares of Deltec Ho., pursuant to purchase and sale agreement of the latter company's shares.
>
> This credit is owed to Metropolis according to the terms of Exhibit E of the Loan Agreement [the Subordination Agreement] entered into between Cardell and Deltec Ho[.], after its merger with Brastar.
>
> We hereby state that any and all receipts of interest and principal on this credit belongs to Consultora Worldstar [sic] S/A, and that, any and all amounts received by Metropolis, referring to this credit, must be immediately deposited into an account and place determined by Consultora WorldStar [sic].

(Müller Decl. Ex. B). Worldstar invokes this letter as evidence of the debt owed, but in its Brazil suit complaint it conveniently omits, by ellipses, the part of the letter stating that the $333,333.00 that Metropolis loaned to Brastar is credit "owed to Metropolis according to the terms of [the Subordination Agreement]." (Id.; see also Müller Decl. Ex. B (Aug. 16, 2002 letter)). Based on a reading of the full letter, it is clear that

141

the loan to Brastar is only to be repaid subject to the terms of the Subordination Agreement, and any credit received by Metropolis on that loan is then to be passed immediately to Worldstar.

The lawsuit brought to collect the funds loaned to Metropolis, -- funds that are described as credit owed from Deltec to Metropolis "according to the terms of the [Subordination Agreement]" -- clearly has a "connection with" or is "associated with" that Agreement. See Coregis Ins. Co., 241 F.3d at 128-29. Thus it is clear that the Worldstar Action "relates to" the Subordination Agreement and that the anti-suit injunction clearly and unambiguously prohibits the suit.

In an effort to avoid this conclusion, Worldstar makes a number of assertions, its principal argument being that both broad and narrow interpretations of the anti-suit injunction are permissible and therefore the order cannot possibly be clear and unambiguous. However, the narrow interpretation proffered by Worldstar (that the injunction can reasonably be read to "to prohibit only those proceedings that seek to determine rights and obligations arising under, and governed by, one or more of the November 2001 Agreements" (Worldstar Merits Mem. at 3)) is akin to the scope that courts have determined accompanies the phrase

142

"arising under". See, e.g., Phillips, 494 F.3d at 389-90 (finding in interpreting a forum selection clause that plaintiff's claims did not "arise out of" of the contract because he "asserted no rights or duties under that contract"); see also In re Optimal U.S. Litig., 813 F. Supp.2d at 365 (discussing the term "arising out of" as requiring a causal connection and meaning "to originate from a specified source"). Worldstar itself uses the term "arising under" in its arguments, asserting, for instance, that the August 16, 2002 letter does not show that the suit is related to the November 2001 Agreements because it does not show that "the rights invoked in the [Worldstar] Action *arise under* or are governed by the Subordination Agreement." (Worldstar Merits Mem. at 5) (emphasis added). As noted, the law is clear that the term "arising under" is narrower than "relating to", and we deal here with the term "relating to". Movants do not need to show that the rights invoked "arise under" the Subordination Agreement, but only that the lawsuit is about a matter connected, or associated, with one of the November 2001 Agreements. Movants have clearly done so. Based on the August 16, 2002 letter and the Worldstar Complaint, which itself invokes that letter as the evidence of the debt owed to it (see Worldstar Compl. at 8), it is clear that the Worldstar Action, brought to collect the debt, "relates to" the Subordination Agreement and thus is clearly and unambiguously prohibited by the Amended Judgment.

Worldstar also contends that the August 16, 2002 letter agreement between Metropolis and Worldstar confirming the $333,333 loan between the two companies does not necessarily demonstrate that the Worldstar Action is "related to" the Subordination Agreement. Rather, Worldstar concludes, all the letter means is that Metropolis "used the funds it borrowed from Worldstar to participate as a Subordinated Lender in the Subordinated Loan, and that if and when Metropolis receives repayment of its Subordinated Loan, Worldstar (if not already repaid by Metropolis) would have a claim on, in effect a security interest in, those funds." (Id.). Worldstar itself thus concedes that the funds were used as part of the Subordinated Loan, and therefore cannot now credibly argue that the letter evidencing the transfer of those funds in no way demonstrates that its suit to collect those funds relates to the Subordination Agreement governing that Subordinated Loan. Furthermore, as discussed above, movants do not need to show that specific rights under the Agreements are invoked by Worldstar's suit, but only that the suit relates to one of those Agreements.

Worldstar goes on to say that "none of those possible events under the Subordination Agreement is involved in the [Worldstar] Action -- Deltec . . . has not repaid Metropolis, and Worldstar is suing for money owed to it by Metropolis, even though Metropolis

144

has not received Subordinated Loan repayment." (Id.). Instead, it

asserts, a judgment in Worldstar's favor against Metropolis "would

not extinguish any portion of the $1 million Subordinated Loan"

because "Deltec would remain obligated to Metropolis, Worldstar,

and [SAI] for $333,333 each under the terms and conditions of the

Subordination Agreement." (Id. at 5-6). Rather, such a judgment

would only extinguish Metropolis's obligation under the August 16,

2002 letter agreement "to apply any repayment eventually made by

Deltec to Metropolis, consisting of Metropolis's share of the

Subordinated Loan, to repay Worldstar's antecedent enabling loan to

Metropolis." (Id. at 6). Thus, respondent concludes, the Worldstar

Action relates to the August 16, 2002 letter agreement but not to

any of the agreements named in the anti-suit injunction. (Id.).

This attempt to side-step the clear terms of the letter is

unpersuasive. A judgment in favor of Worldstar would clearly affect

funds that constitute part of the Subordinated Loan, and thus it

relates to that Loan and to the Subordination Agreement, which

governs the terms of that Loan, not just to the letter evidencing

that those funds originated with Worldstar.


    Worldstar in essence argues that, judged by the face of its

Brazil complaint, its lawsuit there does not "relate to" the

Subordination Agreement and thus is not clearly and unambiguously

prohibited by the injunction. Instead, it says, the only way the Subordination Agreement is implicated is because Cardell is planning to make assertions in the Brazil action that (i) it is being sued as a borrower under the Subordination Agreement, (ii) the action is an "Enforcement Action" as described in the Subordination Agreement, and (iii) it is therefore prohibited because that Agreement bars "any Enforcement Action by a Subordinated Lender before Cardell's senior loan of \$12.5 million is repaid". (Id. at 7). However, Worldstar argues, movants have not shown by clear and convincing evidence that the Worldstar Action is a prohibited enforcement action, and so it has not proven a violation "insofar as the injunction is clear and unambiguous - i.e. to the extent that it bars new proceedings involving rights and duties governed by the Subordination Agreement." (Id.).

The upshot of Worldstar's argument is that there is more than one possible interpretation of the order, and it is therefore not clear and unambiguous.[27] For the reasons discussed, however, the

---

[27] Worldstar also makes the argument that Metropolis clearly "is not one of the entities that the antisuit injunction prevents Worldstar from suing" (Worldstar Merits Mem. at 6), and by virtue of Cardell's foreclosure on Metropolis's Deltec shares in 2003, Cardell, Deltec, Anastácio and Cia City are named in the Worldstar Action not as successors to Deltec but rather as successors to Metropolis as a Subordinated Lender. (Id.). And, it notes, the Subordinated Agreement does not cover the rights and

relevant question is whether Worldstar's conduct here was clearly and unambiguously prohibited by the order in that the Worldstar Action "relates to" the Subordination Agreement, and the answer is plainly yes. The term "relating to" is consistently read as sufficiently broad in scope to dictate the conclusion that the suit brought to collect a debt evidently subject to the Subordination Agreement is unquestionably a matter that "relates to" that Agreement.

### b.   Second Circuit Caselaw

Worldstar next argues that Second Circuit caselaw on the application of anti-suit injunctions to foreign litigation operates to create uncertainty as to the scope of the anti-suit injunction at issue here. It cites China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987), and Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645 (2d Cir. 2004), for the standard applied in this

---

obligations *among* the Subordinated Lenders. (Id. at 7). This argument holds no weight. Metropolis is clearly named as one of the entities that Worldstar is prohibited from suing. (See Am. J. at 4). Furthermore, it is not necessary to determine whether the Subordinated Agreement covers the rights and obligations among the Subordinated Lenders. We need only determine if Worldstar's suit relates to that Agreement.

circuit to determine when foreign litigation may be enjoined. (Worldstar Merits Mem. at 8). The two threshold requirements are: "(1) the parties must be the same in both matters, and (2) resolution of the case before the enjoining court must be dispositive of the action to be enjoined." China Trade, 837 F.2d at 35. Further, a court should also consider a number of other factors, including "(1) frustration of a policy in the enjoining forum; (2) [whether] the foreign action would be vexatious; (3) [whether it would be] a threat to the issuing court's in rem or quasi in rem jurisdiction; (4) [whether] the proceedings in the other forum prejudice other equitable considerations; or (5) [whether] adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistence, or a race to judgment." Id.

Both cases cited by Worldstar also articulate the importance of principles of comity in that "injunctions restraining foreign litigation [should] be 'used sparingly' and 'granted only with care and great restraint.'" Paramedics, 369 F.3d at 652 (quoting China Trade, 837 F.2d at 36). Furthermore, the Court in Paramedics stated that, "'an anti-suit injunction will issue to preclude participation in the litigation only when the strongest possible equitable factors favor its use.'" Paramedics, 369 F.3d at 654

(quoting Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 931-32 (D.C. Cir. 1984)). Worldstar urges that this standard has become even more stringent in that if both the threshold requirements and the prudential factors are satisfied, the court must then undertake an analysis akin to that applied on a preliminary injunction application. (Worldstar Merits Mem. at 9 (citing Software AG v. Consist Softwar Sols., Inc., 325 Fed. App'x 11, 2009 WL 792839, **1 (2d Cir. Mar. 27, 2009))). Respondent then asserts that it has come across no other case in this court or the Second Circuit in which a prospective foreign anti-suit injunction was granted "whose purpose is to coerce voluntary compliance with the award of money damages in the judgment by prohibiting further litigation until the judgment is satisfied, irrespective of whether the enjoined potential suits would satisfy the Second Circuit's test." (Id.). Moreover, Worldstar posits, enforcement of judgments in this court is governed by N.Y. C.P.L.R. Article 52, which "does not authorize a prospective foreign antisuit injunction as a judgment enforcement device." (Id. at 10).

Worldstar argues on the basis of the cited standard that "entry of this injunction in an original proceeding in this Court, or in a proceeding to enforce an arbitral award that did not include such an injunction, almost certainly would have been

149

unlawful, and at the least unprecedented." (Id.). Further, it
states, Worldstar/SAI chose to challenge the decisions concerning
the reasonableness of the Deltec shares auction and the
surety/indemnification claim, but "did not litigate whether the
Tribunal exceeded its powers by entering a prospective foreign
antisuit injunction as an enforcement lever in contravention of
Second Circuit law." (Id.).

     In sum, Worldstar urges, the caselaw in this circuit on
foreign anti-suit injunctions "certainly would factor into the
analysis that Worldstar, or any reasonable person, would make of
the scope of the antisuit injunction in this case." (Id.). Thus it
is "reasonable to consider that the Tribunal majority that entered
the injunction . . . would have considered Second Circuit law in
fashioning their decision" and likewise that this court "would take
into account Second Circuit law in construing the scope of the
injunction." (Id.). Therefore, it argues, it was "reasonable for
Worldstar to expect that 'relating to . . . the November 2001
Agreements' would be interpreted by this Court in narrow fashion to
relate to matters actually determined by the Arbitral Tribunal, or,
perhaps, to other rights and obligations under the 2001 Agreements
that could have been raised as claims or counterclaims in the prior
arbitrations." (Id. at 11) (emphasis omitted). Worldstar urges that

in interpreting the scope of this injunction and how Second Circuit caselaw applies to such a prospective injunction, this court "would be treading on new ground" and the "lack of legal clarity" weighs strongly in favor of the position that the injunction itself "lacks the clarity and certainty of application to the alleged offending conduct that the law requires as a predicate for a civil contempt order." (Id.).

Movants respond that Worldstar has again ignored the fact that the Second Circuit has already upheld the anti-suit injunction in this case. (Movants' Reply to Worldstar's Supplemental Mem. Opposing Mot. for Contempt ("Movants' Worldstar Reply") at 6). They assert that the cases cited by Worldstar for the applicable standard arose in distinguishable scenarios, and that regardless, the affirmance by the Second Circuit demonstrates that the anti-suit injunction satisfies any pertinent criteria. (Id. at 6 & n.7).

We agree with movants. The arguments regarding the validity of the injunction as a whole have already been disposed of; Worldstar may not raise them here. See, e.g., supra pp. 108-21. The further use of those arguments by Worldstar to support the assertion that the order is not clear and unambiguous -- or, in substance, that the order does not mean what it plainly says -- is not explained by

151

respondent. The standards articulated by the Second Circuit and to which Worldstar alludes refer to the propriety of certain anti-suit injunctions, but they do not dictate that the term "related to" in an otherwise proper injunction should be read narrowly. Worldstar fails to offer any coherent explanation of how those standards dilute or override the clear directive of the anti-suit injunction, which applies to Worldstar's conduct.

Finally, we note that courts may, when evaluating claims of ambiguity, look to the actions of the alleged contemnor. See, e.g., Bear U.S.A., Inc., 71 F. Supp.2d at 248 (citing Drywall Taper & Pointers, Local 1974, 889 F.2d at 395). Worldstar itself in this proceeding indicated an expansive understanding of the injunction when it argued to the District Court, on review of the arbitral award, that the injunction would inappropriately "condition the ability of persons not party to the Award, not party to the November 2001 Agreements, and not party to this proceeding, to bring legal actions to enforce their rights anywhere in the world." (May 17, 2010 letter to the Court from Michael Evan Jaffe, Esq. & David L. Kelleher, Esq. at 5). In short, when it was opportune, Worldstar was intent on reading the injunction as broadly as possible.

In sum, Worldstar's argument that Second Circuit caselaw dictates that the order is unclear and ambiguous is wholly unpersuasive.

## c. **The Injunction in the Context of the Award**

Worldstar next argues that, even when viewed in the context of the entire Final Award, the phrase "relating to . . ." does not support its application to the Worldstar lawsuit. (Worldstar Merits Mem. at 12). In this regard, it asserts that the language used by the Tribunal was constructed as a limitation on the scope of the injunction that Cardell had requested. (Id.).

In pursuing this argument, Worldstar first notes that the prior proceedings brought by Worldstar and SAI involved the issues of Cardell's right to sell Worldstar's and SAI's shares at public auction and those two entities' claim to recover the value of those shares from Deltec. (Id.). It further states that a previous anti-suit injunction against Worldstar and SAI, issued by Judge Pauley in 2006, enjoined only the prosecution of a then-pending action in Brazil (commenced by Worldstar) which addressed the same issue of the commercial reasonableness of Cardell's sale of the shares at public auction. That injunction, Worldstar argues, conformed to

153

Second Circuit caselaw on anti-suit injunctions in that it was
aimed at a specific action between the same parties and involved an
issue "within the jurisdiction of an arbitral tribunal whose award
Judge Pauley had jurisdiction to confirm." (Id.).

Worldstar goes on to note that the scope of injunctive relief
requested by Cardell from the second arbitral panel would have
extended to "any matter", and that it made this request based on
the assertion that Worldstar/SAI had brought the prior proceedings
in bad faith and for improper purposes. (Id. at 13; see also Final
Award ¶ 68). According to Worldstar, the Tribunal made no finding
that the prior proceedings had been brought in bad faith or for
improper purposes, and instead of extending the injunction to "any
matter", the arbitrators limited it to "any matter relating to the
[SPA] and the November 2001 Agreements." (Worldstar Merits Mem. at
13 (citing Final Award ¶ 168(5)) (emphasis omitted)). Worldstar
concludes that, as a result, Cardell "did not prevail" on the
issues of whether there was bad faith and improper purposes in the
prior proceedings and the scope of the injunction, and that the
language chosen by the Tribunal was intended to limit the
injunction proposed by Cardell. (Id.).

Citing this context, Worldstar asserts that there are three

154

factors that favor a more limited interpretation of the injunction -- specifically, that the language means "pertaining to the rights and obligations of the parties under the 2001 Agreements." (Id.). First, Judge Pauley's anti-suit injunction was addressed to specific pending litigation involving the same issues and same parties as the first arbitration. Second, all of the prior proceedings initiated by Worldstar/SAI involved "the same essential issues concerning the public auction of Worldstar's Deltec shares and the availability of indemnification from Deltec for the value of those shares." Third, the language chosen by the Tribunal was one of limitation, in preference to the extremely broad "any matter" language suggested by Cardell. (Id. at 13-14).

Worldstar's argument seems to be two-fold. First, because of the history of the prior proceedings and how Judge Pauley's order was structured, it follows that the injunction currently at issue must also have been meant to cover only issues litigated in the second arbitration, i.e., the public auction and the availability of indemnification. It thus would not cover the filing of a suit in Brazil that did not raise either of those issues. Second, and seemingly unrelated, Worldstar urges that because the Tribunal substituted for the language suggested by Cardell the term "relating to" the Agreements, such a change limited the scope of

155

the injunction in a way that makes Cardell's interpretation here incorrect.

In response, movants urge that the Tribunal awarded the injunctive relief "based on the unrelenting litigiousness of the Respondents". (Movants' Worldstar Merits Reply at 6). Movants quote the Tribunal's statement that the case has involved "'four years of litigations, hearings for injunctions, judicial proceedings in New York and Brazil, and a prior arbitration, in none of which Respondents have prevailed" and that "[t]here must come a time when there is an end to litigation.'" (Id. at 6-7 (quoting Final Award ¶ 9)). Movants assert, moreover, that "a person with intimate knowledge of the prior proceedings" and of the anti-suit injunction (we presume they are referring to Suchodolski, or, perhaps, Neves) intended to harass Movants with "further frivolous litigation", and in so doing has "attempted to fashion an 'end run' on this Court's Injunction." (Movants' Worldstar Merits Reply at 7). The implication of movants' allegations is that this injunction is different from the earlier injunction issued by Judge Pauley in 2006 -- that this one is intended to put "'an end to litigation'". (Id. (quoting Final Award ¶ 9)).

The Tribunal's statement in the Final Award invoking an "end

156

to litigation" -- compelling and applicable as it is -- is taken slightly out of context when quoted by movants in their papers. The section of the Final Award where it appears responds to the dissent's view that the matter could have gone to trial rather than being disposed of, as it was, by summary disposition after a hearing -- a disposition triggered by the majority's view that there were no material disputed issues. (Final Award ¶ 9). However, the sentiment behind the Tribunal's words was entirely appropriate, and, indeed, contrary to Worldstar's contention that Cardell "did not prevail" on the scope of the injunction or the issues of bad faith or improper purpose, it is clear that Cardell did in fact prevail at least in part. The Tribunal notes that Cardell alleged that the various proceedings initiated by Worldstar and SAI were "part of a bad faith campaign of harassment". (Id. ¶ 68). It goes on to describe the scope of the injunction as requested by Cardell -- enjoining Worldstar/SAI from bringing actions regarding "any matter" (id.) -- and while it is true that the Tribunal did limit the scope with the phrase "relating to", its grant of the injunction in all other respects demonstrates a recognition that an anti-suit injunction of broad scope was warranted in view of respondent's prolonged history of initiating legal proceedings.

We therefore find Worldstar's arguments unpersuasive. The

157

plain language of the Award dictates its terms and scope, and Worldstar's attempt to read ambiguity into that language is unavailing. It is clear that the words chosen by the Tribunal are of limitation, but that limitation is not one that carves out the Worldstar Action from those suits prohibited by the terms of the injunction.

### d.  Post-Award Correspondence

Lastly, Worldstar argues that the order is not clear and unambiguous because the post-award "interpretive note" issued by the Tribunal in June 2009 creates uncertainty about the scope of the Award. (Worldstar Merits Mem. at 14). That note stems from a May 11, 2009 letter from Cardell and Deltec to the Tribunal requesting that it confirm that "the Award precludes any claims by Respondents against the Deltec subsidiaries arising out of the same transaction or series of transactions (the November 30, 2001 Agreements)". (May 11, 2009 Letter to the Tribunal from Cardell & Deltec). The Tribunal, by response dated June 8, 2009, refused to issue a formal clarification, because under AAA rules an award may only be revised "to correct any clerical, typographical, or c[o]mputational errors in the award." (June 8, 2009 Letter from the Tribunal) (emphasis omitted). However, it went on to "take[] note

. . . that the preclusive effect sought by [Cardell and Deltec] clearly emerges from the findings of fact in the Award, in combination with Judge Pauley's Order dated January 3, 2006. . . as well as from Paragraph 168(5) [the anti-suit injunction] of the Award." (June 8, 2009 Letter from the Tribunal). A dissenter on the panel noted his disagreement, saying that the interpretation indicated a reading of Paragraph 168(5) that, "by asserting that provision's applicability to claims not made previously in any forum, against parties that are not before us, is overly broad and beyond the tribunal's authority." (Id.).

Worldstar characterizes the correspondence as "an exchange resolved against Cardell as a formal matter, yet itself suffused with controversy." (Worldstar Merits Mem. at 14). The simple fact that Cardell sought clarification, Worldstar argues, demonstrates that even Cardell did not think that the order clearly carried the broad meaning that movants now propose. (Id.). Furthermore, Worldstar states, Judge Marrero in his confirmation of the Award took note of the correspondence and stated that the June 8, 2009 letter was part of the Award that was subject to confirmation. (Id. at 15; see also Dec. 16, 2009 D&O at 1 n.1). Thus, according to Worldstar, "the Award as confirmed, and the injunction as therefore incorporated in the Amended Judg[ment], includes the scope [of]

159

clarification sought and obtained by Cardell, which is precisely the narrower scope Worldstar has advocated (concerning rights under the Agreements) as opposed to Cardell's current position (any proceeding that warrants mention of the 2001 Agreements)." (Worldstar Merits Mem. at 15 (emphasis omitted)).

Worldstar then makes the assertion that the Award as confirmed by the Amended Judgment "includes the Tribunal's interpretive 'note,' which states that the phrase 'relating to the . . . November 2001 Agreements' covers proceedings 'arising out of the same transaction or series of transactions [as] the November 2001 Agreements.'" (Id. at 16) (emphasis in original). Such an interpretation, it asserts, "is arguably sufficient to make it clear that the injunction does not bar the Metropolis Action" or at least "sufficient to raise a serious doubt whether the construction Cardell urges here, a construction far broader than it requested from the Tribunal in May 2009, is the only possible interpretation. (Id. (emphasis in original)).

As a final point, Worldstar notes that Judge Pauley's anti-suit injunction orders in 2006 were granted on the basis that the issues raised by the then-pending litigation in Brazil had already been decided by the first arbitral Tribunal or were pending before

160

the second panel. (Id.); see also Suchodolski Assocs., Inc. v. Cardell Fin. Corp., 2006 WL 3327625, at *2, *4; Suchodolski Assocs., Inc. v. Cardell Fin. Corp., 2006 WL 10886, at *3-*4. Worldstar notes that Judge Pauley discussed a case in which a court had denied a foreign anti-suit injunction because the claims in the foreign jurisdiction differed from those in the proceeding in the United States. (Worldstar Merits Mem. at 16 (citing Suchodolski Assocs., Inc., 2006 WL 3327625, at *2; LAIF X SPRL v. Axtel, S.A., 390 F.3d 194 (2d Cir. 2004))). The import of this point is, again, that the injunction may be interpreted as not barring actions addressing matters that were not at issue in the arbitration, and it is therefore not clear and unambiguous in its prohibition of the Worldstar Action.

Movants contend that the letters are completely irrelevant to this court's injunction. (Movants' Worldstar Reply at 7-8). They assert that the May 2009 letter request was made simply to confirm that the effect of the Award would be to preclude Worldstar/SAI from re-litigating the indemnification claims resolved against them. This request, movants explain, was prompted by the fact that in the arbitration Worldstar and SAI had argued that Judge Pauley's January 26, 2005 order dismissing their exoneration claims with prejudice did not bar later claims for indemnification. (Id. at 8).

161

The correspondence, they argue, "has nothing to do with the scope of the Injunction and has no bearing on the contempt motion." (Id. at 9).

Movants also note, correctly, the falsity of Worldstar's assertion that the Tribunal's interpretive note states that the phrase "'relating to the . . . November 2001 Agreements' covers proceedings 'arising out of the same transaction or series of transactions [as] the November 2001 Agreements'". (Worldstar Merits Mem. at 16). The "note" in the Tribunal's letter does not make such a statement. It does not mention the phrase "relating to", and the rest of the language is quoted by the Tribunal but is in fact taken from the letter sent to the Tribunal by Cardell and Deltec. (See May 11, 2009 Letter). The fact that the preclusive effect identified by Cardell in its letter "clearly emerged" from the Award does not mean that the scope of the Award is limited only to that preclusion.

Worldstar's arguments amount to an assertion that the June 8, 2009 letter interprets the injunction in a way that forecloses the broad reading urged by movants. However, the letter explicitly does not offer a detailed interpretation, but simply confirms that one preclusive effect raised by Cardell and Deltec is covered by the

scope of the injunction. That statement indicates nothing about the remaining scope of the injunction and detracts nothing from the clarity of the Award.[28]

* * *

In sum, the order clearly and unambiguously prohibited the filing of the Worldstar Action. Given the broad scope of the term "relating to", the language of the injunction is not susceptible to a reasonable interpretation that such an action would be permissible. The August 16, 2002 letter from Metropolis to Worldstar evidencing the loan clearly demonstrates that those funds -- which became part of the Subordinated Loan -- were to be paid back from Deltec to Metropolis only pursuant to the Subordination Agreement, and that any funds "referring to this credit" that Metropolis received would then be "immediately deposited" into an account designated by Worldstar. (Aug. 16, 2002 letter). Under the Subordination Agreement, actions to collect on any part of the Subordinated Loan are prohibited until the Senior Debt has been repaid. Furthermore, movants need not go so far as to show that

---

[28] We note that even if we were to adopt the "arising out of the same transaction or series of transactions [as] the November 2001 Agreements" language, we would still find that Worldstar's conduct violated the clear and unambiguous terms of the order.

there was in fact any violation of the Agreement but need only show that the Worldstar suit has a connection with the Agreement, and indeed it does.

As for Second Circuit caselaw on anti-suit injunctions, it is irrelevant for our purposes here, as we are not revisiting the validity of the injunction, and Worldstar itself argued to the Second Circuit that the order was too broad but lost before that court. In addition, the context of the Award does not detract from, but rather supports, the conclusion that the injunction was intended to prevent Worldstar from filing an array of actions -- any proceeding "relating to" the Subordination Agreement.

Lastly, the post-award correspondence serves only to confirm one preclusive effect of the injunction and does nothing to undermine its clarity in other circumstances, including that presented here. The order is clear and unambiguous with respect to Worldstar's conduct for the purposes of this contempt motion.

### 2.  The Neves Estate

Neither the Estate nor movants specifically address the issue of whether the order is clear and unambiguous with respect to

Neves/the Estate.[29] However, for the reasons that follow, we find that the order does not clearly and unambiguously prohibit the cited conduct of this respondent.

Before addressing this question, we note that the Estate suggests that in the event that the court finds personal jurisdiction over it and that Cardell asserts a claim that the Estate is liable under an alter-ego theory for the obligations of Worldstar under the Award and Amended Judgment, it will move to compel arbitration. (Estate Sur-Reply at 7). It would then be for an arbitral tribunal, it says, to decide whether such an alter-ego claim would be barred by "laches, estoppel, waiver, or comparable equitable principles by reason of the fact that Cardell did not make Mr. Neves individually a party to the prior arbitrations." (Id. at 7-8).

---

[29] We observe that the failure by the Estate to address this issue does not lead to a determination that the Estate has waived this element. The Second Circuit has emphasized that it is "the moving party . . . who bears the burden of establishing the three factors" required for a finding of contempt. Latino Officers Ass'n City of New York, Inc. v. City of New York, 558 F.3d 159. 164 (2d Cir. 2009). "Accordingly, the relevant inquiry is not whether [respondents] adequately rebutted [movants]' evidence, but rather, whether [movants]' evidence alone was adequate to establish that (1) the order was clear and unambiguous, (2) [respondents] did not . . . comply . . . and (3) [respondents] did not diligently attempt to comply with the order in a reasonable manner." Id.

There appears to be some confusion on the part of the Estate. Although movants press an alter-ego theory, they advance it only as a basis for exercising personal jurisdiction over the Estate. As we understand it, movants are not attempting here to hold the Estate liable for the obligations of Worldstar under the Amended Judgment or for its actions in allegedly violating the Amended Judgment by filing the Worldstar Action. Rather, movants are alleging that Neves himself violated the injunction and Amended Judgment by filing the Neves suit in Brazil. (See Movants' Contempt Mem. at 17-19; Movants' Estate Reply at 1). Thus, the reference to liability for Worldstar's actions is irrelevant. Rather, the issue is whether Neves violated the injunction by filing and prosecuting the Neves Action.

The standards used to determine whether an order is clear and unambiguous have been discussed above at length with reference to the conduct of Worldstar, see supra pp. 132-33, and we found that the order is clear and unambiguous in its prohibition of the Worldstar Action. The Neves Action, however, is a different type of lawsuit. While the Worldstar Action was brought as an attempt to enforce a debt, the Neves suit sought a declaratory judgment, requesting that the Brazilian court declare "the inefficacy of the Arbitration Decisions "against himself as an individual" and "the

nullification of the part of the Second Arbitration Decision"
insofar as it ordered [Neves] not to bring any suits against the
defendants in the present case." (Müller Decl. Ex. E (Neves Compl.
at 4). In essence, Neves urged that the arbitration decision should
not be recognized in Brazil with respect to him, and that the anti-
suit injunction should be partially vacated.

Worldstar stated in its submission addressing the Neves Action
that the request for partial vacatur of the Award had been
withdrawn. (See Worldstar Neves Action Mem. at 2). Furthermore, the
entire suit was dismissed in September 2011. (See Kensington Arbit.
Opp'n Decl. ¶ 11 & Ex. 3). However, we are still faced with the
issue of whether the filing and prosecution of the suit up to its
dismissal constituted a violation of the injunction.

The Neves Action was brought against Metropolis, Cardell,
Deltec, Anastácio and Cia City. (Neves Compl. at 1). Those entities
are clearly all named in the anti-suit injunction as companies that
Neves is forbidden from suing. (See Am. J. at 3-4). That still
leaves the determination of whether the Neves suit was "related to"
any of the November 2001 Agreements.

As we noted, the term "related to" has been held to be broad

167

in scope. See supra, pp. 139-40. Movants urge that the declaration that Neves requested in his lawsuit would have permitted him to "bring litigations and arbitrations, relating to the [SPA], the Guaranty and Security Agreement, and the Subordination Agreement, i.e., relating to the very subject matters that the Injunction prohibited Neves from litigating about." (Movants' Contempt Mem. at 17). Thus, movants argue, because the phrase "relating to" has a very broad meaning -- "to stand in some relation to; to have bearing or concern; to pertain; refer; to bring into association with or connection with . . ." (id.) (citing Hirsch, 160 Misc.2d at 277, 608 N.Y.S.2d at 609) -- the Neves Complaint "directly relates to, and clearly bears on, concerns, and pertains to the three agreements identified in the Injunction, since it asks the Brazilian Court to determine whether Neves may bring litigations and arbitrations concerning those agreements - despite the fact that Cardell has not been paid and is not present in Brazil." (Id.).

Movants argue that because the Amended Judgment confirmed the arbitration awards, "which interpreted the [SPA], the Guaranty and Security Agreement, and the Subordination Agreement", the Neves Action "challenges, and 'relates to' the Arbitrators' interpretation of the [SPA], the Guaranty and Security Agreement,

and the Subordination Agreement, all in violation of the
Injunction." (Id. at 18). In further support of this argument they
assert that to the extent that Neves is seeking a ruling from the
Brazil court that the awards are ineffective as to him, because he
was not a party to those proceedings, such an action "clearly
'relates to' the rights and obligations of Worldstar under the loan
documents that were the subject of the arbitration proceedings,
i.e., the three documents identified in the Injunction." (Id. at
19). Movants' contention, presumably, is that the collateral attack
by Neves relates to the Agreements because they were the subject of
the arbitrations.

We find that it is not clear from the language of the
injunction that the Neves Action was a prohibited suit. The
assertion made by movants -- that a ruling in Neves's favor would
allow him to bring litigations and arbitrations relating to the
SPA, for instance -- highlights the fact that he has not yet filed
a suit "relating to" those agreements. Although seeking to be
allowed to do so -- in effect, collaterally attacking the Final
Award -- may be arguably improper or futile for other reasons, it
does not necessarily amount to a clear violation of the anti-suit
injunction at issue. The injunction itself does not prohibit Neves
from filing suit relating to the arbitrations or to the Amended

169

Judgment. Moreover, although it is certainly reasonable to read the language of the injunction as movants do -- that is, as barring suits that call into question the applicability of the awards to respondents and that seek authorization to file suits that may relate to the Agreements -- the wording of the injunction could be more narrowly construed. Given this potential uncertainty and the rule that any ambiguities are to be construed in favor of the alleged contemnor, see, e.g., A.V. by Versace, Inc., 87 F. Supp.2d at 290-91, we cannot find that the Amended Judgment is clear and unambiguous in its prohibition of Neves's conduct for purposes of this contempt motion. Movants therefore cannot meet this initial requirement of a contempt finding, and we therefore recommend that their motion for contempt against the Neves Estate be denied.

### 3.   **Beno Suchodolski**

Movants allege that Beno Suchodolski aided and abetted both Neves and Worldstar in their respective violations of the anti-suit injunction. The order forbids "assisting" in the prosecution of any prohibited legal action, and movants assert that Beno Suchodolski assisted in the filing and prosecution of the Worldstar and Neves Actions. We have already determined that the order is clear and unambiguous in its prohibition of the Worldstar Action, but not so

170

with respect to the Neves Action. Movants have therefore likewise met the first requirement of the contempt standard with respect to Beno Suchodolski for the Worldstar Action, but not in regard to the Neves suit.

### C.   **Violation of the Amended Judgment and Attempted Compliance**

In order to prevail on a motion for contempt, movants must next show by clear and convincing evidence that each respondent violated the court's order. Furthermore, it is also their burden to show that the respondent has made no reasonable attempts to comply with the order. See Latino Officers Ass'n, 558 F.3d at 164. Having found that the order was not clear and unambiguous as to the Neves Action, we do not reach this issue with respect to the Estate. We therefore first address the conduct of Worldstar and then turn to that of Beno Suchodolski.

### 1.   **Worldstar**

We have already determined that the order is clear and unambiguous as to Worldstar's alleged conduct. Therefore, the remaining issues are whether movants have shown by clear and

171

convincing evidence that Worldstar violated the Amended Judgment by filing the Worldstar Action and did not reasonably attempt to comply with the Amended Judgment. For the reasons that follow, we find that movants have met their burden, and we therefore recommend a finding of contempt against Worldstar.

### a.   Violation of the Amended Judgment

Movants allege that by filing suit in Brazil against Metropolis, Cardell, Deltec, Anastácio and Cia City, Worldstar has violated the Amended Judgment. (See Movants' Contempt Mem. at 11-12). Specifically, they assert that Worldstar had notice of the Amended Judgment yet filed suit against those entities in an action relating to the Subordination Agreement and that the anti-suit injunction found in the Amended Judgment specifically prohibits such a suit against those entities. (Id. at 12).

As noted above, the anti-suit injunction names all of the entities sued by Worldstar in Brazil. (See Am. J. at 4). It prohibits Worldstar from "commencing or prosecuting or assisting in the prosecution of any arbitration, action or proceeding in any jurisdiction" against them, "regarding any matter relating to" the Stock Pledge Agreement, the Guaranty and Security Agreement or the

172

Subordination Agreement. (Id. at 4). Respondent does not contend that it did not file a suit in Brazil (nor could it credibly deny it) or that it is not subject to the anti-suit injunction, and we have already addressed and rejected Worldstar's arguments that the order does not clearly and unambiguously prohibit an action such as that filed by Worldstar in Brazil. See supra pp. 134-64.[30] It follows, and we find, that the evidence before us is sufficient to demonstrate clearly and convincingly that Worldstar violated the anti-suit injunction by filing and prosecuting the Worldstar Action.

First, the August 16, 2002 letter demonstrates that a loan existed between Worldstar and Metropolis and that that loan was in turn provided to Brastar as part of the Subordinated Debt and was subject to the terms of the Subordination Agreement. The letter states, in relevant part:

> In October 2001, your company [Worldstar] made a deposit of US$ 333,333.00, from the account and at the order of Metropolis Shipping and Business Inc., to Brastar Corporation, for the completion of the purchase of shares of Deltec Ho., pursuant to purchase and sale agreement of the latter company's shares.

---

[30] Apart from its assertion that the dispute should be ruled as arbitrable, this assertion that the order is not "clear and unambiguous" appears to be Worldstar's main argument.

173

> This credit is owed to Metropolis according to the terms
> of Exhibit E of the Loan Agreement [the Subordination
> Agreement] entered into between Cardell and Deltec Ho[.],
> after its merger with Brastar.
>
> We hereby state that any and all receipts of interest and
> principal on this credit belongs to Consultora Worldstar
> [sic] S/A, and that, any and all amounts received by
> Metropolis, referring to this credit, must be immediately
> deposited into an account and place determined by
> Consultora WorldStar [sic].

(Müller Decl. Ex. B). It is clear from the face of this letter that

the loan between Metropolis and Brastar was subject to the terms of

the Subordination Agreement, and thus that the delivery of any

interest or principal on that loan to Worldstar as repayment for

the original funds was also governed by the terms of that

Agreement, which prohibits enforcement actions on any part of the

Subordinated Debt until the Senior Debt is repaid. While it is

therefore likely that the Worldstar Action violated the Agreement,

as movants correctly note, a contractual violation need not

actually be established here. It is sufficient to show that the

Worldstar Action "relates to" the Subordination Agreement and hence

violates the anti-suit injunction, and this letter shows clearly

that it does.

Second, the Worldstar Action complaint on its face shows a

clear violation of the anti-suit injunction. It states that the

174

action is brought by Worldstar in the judicial district of São Paolo against Metropolis, Cardell, Deltec, Anastácio and Cia City, and that it is filed as an "ordinary action of debt collection" (Worldstar Compl. at 1) to collect the $333,333.00 that was loaned by Worldstar to Metropolis in order that Metropolis might participate in the deal for the purchase of Brastar. (See id. at 8-9). The complaint alleges that the loan was an "autonomous loan" that was made "in a side deal which was completely distinct from" the November 2001 Agreements. (Id. at 4). Worldstar quotes the August 16, 2002 letter as evidence of the loan, but conveniently omits the paragraph referring to the Subordination Agreement (id. at 8), an omission that only serves to undermine respondent's credibility here. Review of the letter in full shows that the debt and the action to collect it "relate to" -- have a connection with or association with, see Coregis Ins. Co., 241 F.3d at 128-29; Camferdam, 2004 WL 1124649, at *2 n.3 (noting that the term "relates to" means has "a connection with or reference to") -- the Subordination Agreement. The complaint therefore on its face violates the anti-suit injunction.

Worldstar's attempts to undercut movants' contempt case are unpersuasive. First, it contends that movants have failed to show by clear and convincing evidence either that there was not a loan

between Worldstar and Metropolis or that the loan has been repaid or the obligation extinguished. (See Worldstar Merits Mem. at 17). The logic of this argument is not readily apparent. Movants assume the existence of the debt -- they do not dispute that Metropolis ultimately owes $333,333.00 to Worldstar. Rather, movants' position is that the debt is subject to the terms of the Subordination Agreement, and thus the Worldstar Action "relates to" the Subordination Agreement and violates the injunction. (Movants' Worldstar Reply at 10).

Worldstar also argues that movants have not shown by clear and convincing evidence that they did not "absorb Metropolis into the Cardell group of companies . . . or that Worldstar is otherwise suing the Movants in their capacities as parties to the 2001 Agreements rather than in their capacities as legal successor to Metropolis" (Worldstar Merits Mem. at 17-18), the assertion being, we gather, that Worldstar would be permitted under the injunction to sue Cardell as a successor to Metropolis instead of as an individual entity. Worldstar emphasizes that the complaint in the Worldstar Action alleges that Metropolis was absorbed into the Cardell group, and that under Brazilian law members of such a group are treated as "a single economic unit jointly responsible for the

176

debts of each member company." (<u>Id.</u> at 18).[31]

Worldstar's allegation that Metropolis merged with Cardell is of no relevance here. We first note that the Amended Judgment makes no distinction based on whether a suit is brought against an individual entity or against that entity as a successor of another; whether or not Metropolis merged with Cardell, the fact remains that Worldstar has filed a suit against those companies regarding a matter that relates to the Subordination Agreement. Moreover, movants have submitted a declaration by Jose Pereira Wilken Bicudo, who states that he has "general power of attorney over" Metropolis. (<u>See</u> Bicudo Decl. ¶ 1). Bicudo avers that despite the foreclosure of Metropolis's Deltec shares by Cardell -- which, he notes, also took place with respect to Worldstar and SAI -- Metropolis "remains a separate corporation and it has not been merged in any respect with any of Cardell, Deltec, or the Deltec Subs." (<u>Id.</u> ¶ 8).

Lastly, we address Worldstar's contention, again, that the injunction should be read narrowly. (<u>See</u> Worldstar Merits Mem. at

---

[31] Worldstar also criticizes movants' earlier assertions to the contrary -- contained in a September 28, 2011 declaration by Costa N. Kensington, Esq. -- as conclusory, and notes that the declaration is not properly attested to as required by 28 U.S.C. § 1746, thus failing to constitute clear and convincing evidence. (<u>Id.</u> at 18-19).

17). Consistent with its narrow interpretation, Worldstar argues that movants must prove by clear and convincing evidence that the Worldstar Action "is either an 'Enforcement Action' under the Subordination Agreement or that the [Worldstar] Action otherwise involves rights and obligations under the November 2001 Agreements." (Id.). Once again, this argument is a non-starter.

The Subordination Agreement states that "[u]ntil the Senior Debt shall have been indefeasibly paid in full, the Subordinated Lender shall not . . . take any action towards collection of all or any portion of the Subordinated Debt or enforcement of any rights, powers or remedies under the Subordinated Loan Documents or other agreements entered into pursuant thereto . . . ." (Subordination Agreement at 4 ¶ 2(e)). A logical reading of this language leads to the conclusion that the Worldstar Action is indeed an enforcement action prohibited by the Subordination Agreement. In any event, the injunction prohibits actions that simply "relate to" the Subordination Agreement -- a violation of the Agreement need not be proven. (Movants' Contempt Mem. at 13; Movants' Reply to Worldstar Merits Mem. at 10). Worldstar's argument here is therefore unpersuasive.

In sum, movants have shown by clear and convincing evidence

178

that Worldstar has violated the Amended Judgment. As discussed previously, the anti-suit injunction is clear and unambiguous. It prohibits, _inter alia_, actions against movants relating to the Subordination Agreement. Worldstar's action in Brazil relates to the Subordination Agreement. Specifically, it attempts to collect on a loan that, by virtue of its ultimate use as a loan to Brastar/Deltec, is subject to the terms of that agreement. The defendants in the Worldstar Action are explicitly named in the Amended Judgment as entities against which Worldstar may not bring such an action. In addition, there has been no merger of Cardell and Metropolis such that Cardell is being sued only as successor to Metropolis. The Worldstar Action therefore clearly "relates to" the Subordination Agreement and violates the Amended Judgment.

### b.    **Attempted Compliance**

Lastly, we must determine whether or not Worldstar made reasonable attempts to comply with the court's order. Given that the injunction is prohibitive in nature, the only manner in which respondent could reasonably attempt to comply is to refrain from filing suit against the entities named in the injunction over issues relating to any of the November 2001 Agreements. While Worldstar makes a number of arguments (laid out above) attempting

179

to take its suit outside the scope of the agreement, those arguments have been rejected. The end result is that Worldstar filed and prosecuted a suit that clearly violated the court's order and that violation of the order can in no way constitute a reasonable attempt at compliance with the injunction. Cf. A.P. Moller-Maersk A/S v. Ocean Express Miami, 648 F. Supp.2d 490, 493-94, 499-500 (S.D.N.Y. 2009) (defendant that had filed actions in Panama and Guatemala was enjoined from "proceeding with litigation on the merits relating to the shipment at issue . . . in any forum other than" the Southern District of New York, but the court was "presented with no evidence that [the defendant] ha[d] made any attempt to comply with the Court's anti-suit injunction" and the defendant was found to be in contempt).

In addition, even if Worldstar did not intend to violate the injunction, contempt is still warranted. Willfulness is not a required element of contempt. See, e.g., Utica College v. Gordon, 389 Fed. App'x 71, 73 (2d Cir. 2010) (citing McComb, 336 U.S. at 191 ("The absence of wilfulness does not relieve from civil contempt.")).

In sum, we find that Worldstar has violated the Amended Judgment and we recommend that it be subject to a contempt citation

and appropriate relief.


### 2.   Beno Suchodolski


Movants initially alleged that Beno Suchodolski violated the injunction by aiding and abetting the filing of the Brazil Actions. (See Movants' Contempt Mem. at 19). However, admitting that they do not have sufficient evidence to meet the stringent clear-and-convincing standard required for a finding of contempt, movants now request that they be allowed to conduct discovery on "the factual issue whether Suchodolski can be held accountable" for any violations of the injunction. (Movants' Reply Mem. in Supp. of Contempt Mot. Against Suchodolski dated Oct. 7, 2011 at 1).


Movants argue that Suchodolski "essentially admits that the Worldstar Action violates the injunction" and that there is "ample evidence" warranting discovery before the determination of whether Suchodolski may be held in contempt. (Id.). Suchodolski opposes this request on the ground that movants have not even made out a prima facie case for contempt and are not entitled to conduct discovery. (See Sur-Reply to Mot. for Contempt Against Suchodolski ("Suchodolski Sur-Reply") at 2-4). In order to evaluate movants' request, we must first determine what standard is to be applied to

181

a movant's request to open discovery on a motion for contempt.

### a.   **Legal Standard**

The parties have not presented the court with any binding precedent on the standard to be used on a motion for contempt in determining when the moving party is to be permitted to engage in discovery in order to ascertain whether in fact there has been a violation of the court order. The cases cited by movants mention discovery on contempt motions, but do not offer useful guidance for a standard.

A number of courts have referenced the use of discovery in contempt proceedings or similar circumstances in which the issue to be determined was whether or not a violation of an order had occurred. See, e.g., Robin Wood Inc. v. Woods, 28 F.3d 396, 398 (3rd Cir. 1994) (noting that the district court held a four-day hearing after discovery on a contempt motion and found one violation of a preliminary injunction); Petter Investments, Inc. v. Hydro Eng'g, Inc., 2011 WL 2935411, *4 (W.D.Mich. July 18, 2011) (noting discovery ordered in contempt proceedings); Ford Motor Co. v. Powerflow, Inc., 2006 WL 2193802, *4 (E.D.Mich. Aug. 2, 2006) (noting that the court granted plaintiff's request to conduct

182

discovery before deciding whether to pursue a contempt motion);
J.P. v. Taft, 2008 WL 302381, *2 (S.D.Ohio Feb. 1, 2008)
(permitting limited discovery on a contempt motion "to address
whether or not defendants have violated their obligations set forth
in the Consent Decree"); Portland Feminist Women's Health Ctr. v.
Advocates for Life, Inc., 1990 WL 21406, *1-*2 (D.Ore. Mar. 2,
1990) (permitting discovery relating to contempt proceedings
despite close of discovery in the case); Ex parte Knox Kershaw,
Inc., 562 So.2d 250, 253-54 (Ala. 1990) (finding it was error for
the trial judge not to permit discovery on contempt motion). It is
clear, therefore, that discovery is not unheard of on contempt
motions.

     In addition to these examples, there is substantial caselaw
pointing to the most logical standard to be applied on a request
for discovery. Filing a motion for sanctions should not lead to
free rein for a fishing expedition. A party should first be
required to make a prima facie showing that a violation has
occurred. See, e.g., Wesley Jessen Corp. v. Bausch & Lomb, Inc.,
256 F. Supp.2d 228, 229 (D.Del. 2003). A number of courts have held
that this is the proper standard in such instances. E.g., id.;
Central Soya Co. v. Geo. A. Hormel & Co., 515 F. Supp. 798, 798
(W.D.Okla. 1980) ("[B]efore a court may permit extensive discovery

of suspected violations of its judgment, there should be at least a prima facie showing by the aggrieved party of disobedience of the judgment."); 800 Adept, Inc. v. Murex Secs. Ltd., 2007 WL 2826247, *2 (M.D.Fla. Sept. 25, 2007) (same); N.W. Controls, Inc. v. Outboard Marine Corp., 349 F. Supp. 1254, 1256 (D.Del. 1972) (requiring "prima facie case raising a likelihood that the . . . injunction is being violated" before permitting discovery); cf. LeBlanc v. Trans Union, LLC, 2007 WL 4414789, *4 (E.D.La. Dec. 13, 2007) (granting request by plaintiffs to re-open case for purposes of discovery because they were able to show a prima facie violation of an order); Sugar v. Sugar, 2003 WL 178812, *2 (Conn. Super. Jan. 7, 2003) (observing that "mere filing of a motion for contempt" should not give rise to unlimited discovery but rather there should be "a minimal threshold demonstration of a justiciable issue for postjudgment discovery to be permitted"). We agree with this approach and therefore examine movants' allegations for a prima facie showing that Suchodolski has violated the Amended Judgment.

### b.   The State of the Record

Movants assert that Suchodolski was the "ringmaster" who "orchestrated" the Brazil actions. (See, e.g., Movants' Further Submission in Supp. of Contempt Mot. Against Suchodolski dated Nov.

184

4, 2011 at 5; Kensington Reply Decl. ¶ 13). They argue that it is "inconceivable" that Suchodolski did not "assist and collaborate" with Worldstar and Neves "by providing them with legal strategy and tactics in bringing the Worldstar Action and the Neves Action." (Movants' Contempt Mem. at 19). Thus, they conclude, based on Suchodolski's "central role as strategist and protagonist in the prior decade of litigations and arbitrations, upon information and belief, Suchodolski has orchestrated the filing and prosecution of the two Brazilian complaints". (Kensington Decl. ¶ 37).

Movants proffer a bountiful list of Suchodolski's prior actions reflecting his involvement with Worldstar and Neves and state that he had the "starring role" in the 2003 and 2004 proceedings. (See Movants' Contempt Mem. at 19-20). They also note that in the Neves Action, Neves requested that the court join Suchodolski as an "interested party" (id. at 20; see also Neves Compl. at 16 (requesting that the court summon Suchodolski as "an interested third party")) and allege that this was a "ruse" confirming Suchodolski's "behind-the-scenes manipulations" and his involvement in Worldstar's and Neves's "strategy of circumventing this Court's Injunction." (Movants' Contempt Mem. at 20).

Suchodolski counters by offering a letter written by his

185

counsel to the attorney for Neves stating that he had no interest in joining a lawsuit in Brazil in violation of the injunction. (See Suchodolski Further Submission at 9 & Ex. A ("Suchodolski Decl.") ¶ 3 & App. A (May 21, 2010 letter from Michael Evan Jaffe, Esq. to Gilberto Cipullo, Esq.)). In addition, Suchodolski himself offers a declaration that he had no involvement in the Brazil suits or in financing them. (Suchodolski Decl. ¶¶ 1-2).

Further contested facts center around an accusation that Suchodolski approached Cardell with a proposal involving payments to himself and to Nelson Baeta Neves, Jr. ("Neves, Jr.") in exchange for the termination of the Brazil suits. Movants offer testimony that in June 2010 Suchodolski approached Erik Akhund, the Assistant Secretary of Cardell, saying that he could "intermediate" with Neves, Jr. (See, e.g., Akhund Decl. ¶ 10). According to Akhund, Suchodolski suggested that payments of $2 million to himself and the Neveses could lead to a resolution of the Brazil actions. (Id.). Akhund states that he then spoke with Suchodolski by telephone in August 2010, and that Suchodolski specifically said that he had spoken with Neves, Jr. Akhund then met with Suchodolski a second time in New York in September 2010, and Suchodolski again suggested that payments to himself and to the Neveses could resolve the Brazil suits. (Id. ¶¶ 13-14).

A lawyer for Anastácio and Cia City, Luiz Fernando Martin Castro, has also submitted a declaration avowing that he was in contact with Suchodolski regarding a possible agreement that would resolve the Brazil actions upon payments of sums of money to Suchodolski and Neves, Jr. (Castro Decl. ¶ 10). Castro explains that in 2008 Saõ Paolo issued a decree for the expropriation of property owned by Anastácio. (Id. ¶ 2). The expectation was for the property to be used for a convention and exposition center, possibly for such events as the 2014 FIFA World Cup and the 2020 World Trade Exposition. (Id. ¶ 3). Castro further explains that in Brazil, one way to determine the value in expropriation of property is by mutual agreement negotiated between the municipality and the property owner. The other method is by litigation, a much lengthier process. (Id. ¶¶ 4-5). However, in the context of a mutually agreed negotiation, "the existence of a pending lawsuit against the property owner can result in a portion of any proceeds from expropriation of real property being deposited into escrow until the claims are resolved." (Id. ¶ 8). Anastácio has been in discussions with the Municipality of Saõ Paolo regarding the expropriation, but in the event that the process moves forward, proceeds from such expropriation could be held in escrow "for many years, unless and until" the Brazil lawsuits are dismissed. (Id. ¶¶ 6, 9).

Castro states that he had at least four conversations with Suchodolski in 2010 and 2011 regarding the expropriation, conversations in which Suchodolski was seeking payment for himself and also represented that he would bring Neves, Jr. into the discussion, and that Neves, Jr. would accept whatever payment terms Suchodolski agreed to. (See id. ¶ 10). Castro states that "[t]he implication was that [] if these payment terms were accepted, all the lawsuits brought by the parties, either in the USA or in Brazil would be terminated." (Id.).

Suchodolski counters that it was Mr. Castro who "affirmatively sought out Mr. Suchodolski to see if he could intercede on Cardell's behalf to try to help get the Neves matter resolved" and that Suchodolski "only agreed to speak to Mr. Castro after confirming through Mr. Akhund that this contact was authorized." (Suchodolski Further Reply at 2nd pg.). Furthermore, Suchodolski asserts that his financial interests are actually aligned with Cardell's in seeing an end to the litigation in Brazil. (Id.). According to Suchodolski, he owns an interest in land adjacent to that owned by Anastácio, and Saõ Paolo has declared its intention to expropriate both parcels. Suchodolski therefore asserts that he shares Cardell's desire to maximize the value of the land and expedite payment of compensation. (Id.).

Suchodolski also alleges that Mr. Marcio Antonio Bueno, a partner in the Suchodolski Advogados Associados law firm, has been dealing with Castro regarding the expropriation, and that Castro asked Bueno if Suchodolski would speak to him, as Cardell was encountering difficulty in reaching out to the Neves family. (Id. at 3rd pg.). Thus, according to Suchodolski, it was Castro who affirmatively "sought out" Suchodoski's participation in a potential settlement of the Neves litigation. Suchodolski alleges that Akhund confirmed that the contact was appropriate before he met with Castro. (Id. at 4th pg.).

Bueno also has submitted an affidavit declaring that Castro asked him to speak to Suchodolski about the Neves action, but that Suchodolski "did not want to converse with Dr. Castro without confirmation from Mr. Erik Akhund that Dr. Castro was authorized by him to broach this topic." (Id. Ex. A). Bueno states that he was advised that Akhund had told Suchodolski that Castro was indeed authorized, and that Castro came to the offices of Suchodolski Advogados Associados to meet with Suchodolski. (Id.). Apparently Suchodolski told Bueno that Castro had asked him to intervene with the Neves family because the family was not willing to enter settlement discussions with Cardell. (Id.).

189

Movants' allegations are comprised mainly of inferences based on past dealings between the parties and on conversations in which Suchodolski purportedly offered to have the Brazil suits resolved for a large monetary sum. These conversations are factually disputed by Suchodolski, as are the conclusions to be drawn from his prior involvement with Worldstar. However, the allegations made by movants, if true, could lead to a strong case for contempt against Suchodolski. The reports by two individuals that Suchodolski sought payment in exchange for termination of the actions, coupled with Suchodolski's longtime involvement in the various litigations and arbitrations over the years, certainly leads to an inference that that involvement did not cease and that Suchodolski had at least some role in the lawsuits. Furthermore, Suchodolski and/or SAI (or their designees) have paid the legal fees of Worldstar in the various litigations and arbitrations (see Williamson Oct. 7, 2011 Decl. ¶ 22 & Ex. 2 at 3), and there is no indication that anyone else is paying those fees now. We assume that Worldstar, having no assets other than the credits owed and no income (see id. Ex. 2 at 2, 3) is not paying the fees.

We find that movants have made a prima facie case for the proposition that Suchodolski violated the Amended Judgment -- that is, that their proffer, if credited, would justify a finding of

190

contempt -- and therefore we grant movants' request to open discovery on the issue. We defer a determination of the merits of the contempt motion as to Suchodolski until the completion of such discovery. Movants are to serve written discovery requests within 10 days of this order, and discovery is to be completed within sixty days of this order.

## REMEDY

The contempt relief that movants seek is two-fold. First, they request that the court order respondents to withdraw the Brazil actions. Second, they ask that for each day that respondents fail to do so, a daily fine of $1,000 be imposed. (See Movants' Contempt Mem. at 21-23). Movants also seek attorneys' fees -- alleging that the conduct of respondents has been willful -- as well as expenses, for both the Brazil Actions and this contempt motion. (Id. at 23-24).

## I.   Withdrawal of Complaints

The Neves Action has been dismissed. While it appears that a motion has been filed -- purportedly by Neves (despite the fact that he is deceased) through "his undersigned lawyer and attorney-

in-fact" (an attorney named Marcelo Roitman) -- requesting clarification or reconsideration of the ruling (see Kensington Reply Decl. ¶ 57 & Ex. 13), our finding that the Amended Judgment is not clear and unambiguous with respect to the Neves Action precludes us from recommending an award of relief against the Estate, either of an injunctive or of a monetary nature.[32]

With respect to the Worldstar Action, the only respondent against which there currently is sufficient evidence for a contempt finding is Worldstar itself. We recommend that Worldstar be ordered to withdraw the Worldstar Action by a date certain. We defer a determination as to Suchodolski until after discovery on the issue.

## II. **Sanctions**

"'Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" Utica College, 389 Fed. App'x at 74 (quoting United States v. United Mine Workers

---

[32] Movants have not sought a finding of contempt against Worldstar with respect to the Neves Action. (See Movants' Arbit. Opp'n Mem. at 9).

of Am., 330 U.S. 258, 303 (1947)). Movants here request both coercive and compensatory sanctions. They request an imposition of a daily fine for each day that Worldstar fails to withdraw the Metropolis Action and an award of attorneys' fees and costs for both the Brazil actions and this contempt motion. (See Movants' Contempt Mem. at 22-25).

For the reasons that follow, we recommend that both coercive and compensatory sanctions be imposed against Worldstar.

## A. **Coercive Sanctions**

Coercive sanctions are appropriate "only if 'the contemnor is able to purge the contempt . . . by committing an affirmative act, and thus carries the keys of his prison in his own pocket.'" Casale v. Kelly, 710 F. Supp.2d 347, 363 (S.D.N.Y. 2010). A court has wide discretion in determining an appropriate coercive sanction, see, e.g., Rick v. Buchansky, 2001 WL 936293, *5 (S.D.N.Y. Aug. 16, 2001), but factors that a court should consider in calculating a fine include (1) "the character and magnitude of the harm threatened by continued contumacy"; (2) the "probable effectiveness of any suggested sanction in bringing about compliance"; and (3) the contemnor's ability to pay. Casale, 710 F. Supp.2d at 363

193

(quoting <u>Paramedics</u>, 369 F.3d at 657-58) (internal quotation marks omitted). "The ultimate consideration is whether the coercive sanction . . . is reasonable in relation to the facts." <u>NYS Nat'l Org. of Women v. Terry</u>, 886 F.2d 1339, 1353 (2d Cir. 1989).

Applying the above factors, we observe that the harm that would result from continued contumacy includes the same economic harm as that imposed to date -- attorneys' fees and costs of litigation. In addition, however, whatever real-estate negotiations movants may be involved in with the municipality of São Paolo may also be negatively affected. <u>See</u> <u>supra</u> pp. 186-87 (discussing expropriation of Anastácio property by São Paolo).

The effectiveness of any sanction can be difficult to evaluate. However, respondent has demonstrated itself to be persistently litigious, as shown by the apparent necessity of the anti-suit injunction. Respondent now again has brought litigation in the form of the Worldstar Action and accordingly, we believe that a fine is an appropriate method of encouraging compliance.

As for the third factor -- respondent's ability to pay -- when a fine is conditional, such as the coercive fine contemplated here, "there is no need to adjust it to [the] contemnor's financial

194

resources." <u>NYS Nat'l Org. of Women v. Terry</u>, 952 F. Supp. 1033, 1043 (S.D.N.Y. 1997); <u>cf</u>. <u>Eros Entm't, Inc. v. Melody Spot, L.L.C.</u>, 2005 WL 4655385, *6 (E.D.N.Y. Oct. 11, 2005) ("In cases where the civil contempt order is coercive, the damage award is typically computed in relation to the amount of time that passes during which the party fails to comply . . . because the party being held in contempt . . . can 'obtain his release by committing an affirmative act.'"). We observe that movants themselves have noted that Worldstar has no assets other than the credit owed to it, but we have no information as to how Worldstar's attorneys' fees are currently being paid. However, regardless of Worldstar's financial status, we may impose a conditional fine so long as Worldstar has the opportunity to purge itself of contempt by withdrawing the Brazil complaint.

In view of our analysis of the pertinent factors and the fact that Worldstar itself holds the ability to withdraw its suit and purge itself of contempt, we find that a coercive fine is appropriate in this case if respondent does not withdraw the Worldstar Action in a timely fashion. Worldstar should be granted a reasonable amount of time to comply before the imposition of a fine in order to allow it to purge the sanction by complying with the directive. We therefore recommend that a daily fine of

$1,000.00, as requested by movants (<u>see</u> Movants' Contempt Mem. at 22-23), be imposed if respondent fails to withdraw the complaint within thirty days after entry of a contempt judgment against it. We further recommend that the fine be paid to the court, as a coercive sanction -- intended to compel compliance -- is generally paid to the court, not to an opposing party. <u>See</u>, <u>e.g.</u>, <u>Terry</u>, 886 F.2d at 1353-54 (absent a showing by plaintiff of compensable injury or actual loss, directing payment to the court as opposed to plaintiff); <u>Ceglia v. Zuckerberg</u>, 2012 WL 95362, *9-*11 (W.D.N.Y. Jan. 10, 2012) (noting that "[c]oercive sanctions should be paid to the court" and imposing a $5,000 fine against defendant as a coercive sanction, payable to the court).

### B. <u>Compensatory Damages</u>

With respect to expenses incurred as a result of a violation, compensatory damages are appropriate where a plaintiff can prove that he has been harmed. <u>Vuitton et Fils S.A.</u>, 592 F.2d at 130. "'[S]ome proof of loss must be present to justify'" such an award, <u>Utica College</u>, 389 Fed. App'x at 75 (quoting <u>Terry</u>, 886 F.2d at 1352) and the fine is payable to the plaintiff. <u>See</u>, <u>e.g.</u>, <u>U2 Home Entm't, Inc. v. Wei Ping Yuan</u>, 245 Fed. App'x 28, 30 (2d Cir. 2007). Because the object is to "make reparation to the injured

party and restore the parties to the position they would have held had the injunction been obeyed", a district court "is not free to exercise its discretion and withhold an order in civil contempt awarding damages, to the extent they are established." <u>Vuitton et Fils S.A.</u>, 526 at 130.

The loss that movants have suffered includes the fees and costs of defending the Worldstar Action. We recommend that they be awarded compensatory damages in the amount of that loss. The specific amount has yet to be determined, and accordingly, movants are directed to submit to the court proof of their loss in documentary form by no later than **AUGUST 13, 2012.** Worldstar may submit a response by no later than **AUGUST 27, 2012**, and movants may submit a reply by no later than **SEPTEMBER 4, 2012.**

## C. <u>Attorneys' Fees and Costs</u>

Movants also request attorneys' fees and costs incurred as a result of bringing this contempt motion. On a motion for contempt, the general principle is that attorneys fees and costs are to be awarded only where the contemnor's conduct is willful. <u>See</u> <u>GMA</u>

Accessories, 2008 WL 2355826, at *10.[33] A finding of willfulness is appropriate where "the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 2007 WL 2982295, *4 (S.D.N.Y. Oct. 10, 2007) (quoting Bear U.S.A. Inc. v. Kim, 71 F. Supp.2d 237, 249 (S.D.N.Y. 1999)). If the court finds that a defendants' violations were willful, it should award attorneys' fees and costs "unless there are 'persuasive grounds' to deny them." Id. (quoting Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996)).

Movants argue that Worldstar's conduct was willful because it had notice of the injunction, was able to comply with it, and instead deliberately violated it. (Movants' Contempt Mem. at 24). While respondent did in fact seek to have the Amended Judgment overturned, it filed the Brazil suit before the Court of Appeals

---

[33] We note that willfulness has not definitively been mandated as a requirement in this circuit. See, e.g., Jacobs v. Citibank, N.A., 318 Fed. App'x 3, 5 n.3 (2d Cir. 2008) (noting that "a finding of willfulness or bad faith" as a requirement before a court may order attorneys' fees as a sanction for violating a court order is an issue that "appears to remain an open one in our Circuit"); Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996). We evaluate movants' request under an assumption that willfulness is required, but would reach the same result were it not a pre-requisite.

had ruled on its appeal, only days after the issuance of the Amended Judgment. In addition, even after the Second Circuit upheld the District Court's decision, Worldstar did not attempt to comply with the injunction by withdrawing its suit. It has "no basis for arguing that, once it failed to persuade the Court of its position, it made diligent efforts to avoid non-compliance." <u>GMA Accessories</u>, 2008 WL 2355826, at *9.

We find that Worldstar's violation of the Amended Judgment was willful and recommend the imposition of sanctions in the form of attorneys' fees and costs for the contempt motion. Because the amount of fees and costs to be incurred in this proceeding is still is flux, depending on possible further proceedings before the District Court, we hold the measurement of such an amount in abeyance pending any review by the court of this report and recommendation.

**CONCLUSION**

In sum, we recommend that Worldstar's cross-motion to compel arbitration or stay proceedings be denied. We recommend denial of movants' motion for contempt and sanctions as to the Estate of Neves, and a grant of that motion with respect to Worldstar. With

199

respect to Beno Suchodolski, we grant movants' request to conduct discovery on the issue of whether or not Suchodolski violated the anti-suit injunction. Document requests and interrogatories are to be served within ten days of the date of this order. Discovery is to be completed within sixty days.

We further recommend (1) that Worldstar be ordered to withdraw the Worldstar Action, and that a daily fine of $1,000 be imposed should Worldstar fail to comply within thirty days of the entry of a contempt judgment against it and (2) that Worldstar be ordered to pay compensatory damages in the amount of reasonable attorneys' fees and costs incurred by movants in defending the Worldstar Action, as well as reasonable attorneys' fees and costs for bringing the motion for contempt. As noted, we hold any determination of the amount of such fees in abeyance pending further proceedings in the District Court.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Victor Marrero, Room

1040, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
       July 17, 2012

                          RESPECTFULLY SUBMITTED,

                          _____
                          MICHAEL H. DOLINGER
                          UNITED STATES MAGISTRATE JUDGE

201

Copies of the foregoing Order and Report & Recommendation have
been mailed this date to:


Gregory Scott Hansen, Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

Helen Johnson Williamson, Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

John Martin O'Connor, Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

Eric Xinis Fishman, Esq.
Pillsbury Winthrop Shaw Pittman, LLP
1540 Broadway
New York, NY 10036

Michael Evan Jaffe, Esq.
Thelen Reid & Priest, LLP
2300 N Street, NW
Washington, DC 20037

Marc Joel Goldstein, Esq.
Marc J. Goldstein Law Offcs & Arbitration Chambers
1230 Avenue of the Americas
New York, NY 10020

Deborah B. Baum, Esq.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, NW
Washington, DC 20037